## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

**IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION**

MDL Case No. 1:22-md-03035-STA-jay

ALL CASES

Honorable S. Thomas Anderson

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Over three months after the first lawsuit was filed involving Defendant African Methodist Episcopal Church's ("AMEC") retirement plan scandal, AMEC began sending checks and accompanying letters directly to named Plaintiffs and putative class members. Those letters claim that AMEC has calculated a "new adjusted valuation" balance for each person's retirement account, and the checks purport to represent the entirety of those balances. The letters also include language that appears to forecast that AMEC will later argue that negotiating these checks constitutes a release or waiver of claims or damages at issue in this case.

These communications are concerning, and too close to the ethical line. This unrequested distribution of Plaintiffs' and putative class members' retirement funds, which is in violation of the terms of the AMEC Ministerial Retirement Annuity Plan (the "Plan"), should be enjoined because AMEC's actions: (1) deprive Plaintiffs and other putative class members of returns to which they are entitled; (2) cause Plan

participants to incur unwarranted and unnecessary tax liabilities (which further reduce their investment returns); (3) prohibit Plan participants from electing to rollover their funds into new retirement accounts; and (4) create unnecessary confusion for putative class members about the impact of negotiating these checks and what they can or should do with these funds. Further, because it is unclear how the calculations regarding these "new adjusted valuation" balances have been made, AMEC's actions risk confusion later in this litigation as the parties attempt to unwind this scandal and make Plaintiffs and putative class members whole.

By seeking this preliminary injunction, Plaintiffs simply seek to: (1) maintain the status quo, so that later there can be an orderly accounting of the current balances held by each Plan participant and they can elect how to direct their funds before wholesale distributions are made (as required by the terms of the Plan); and (2) allow parties the opportunity to exercise their rights to keep the money in their accounts or rollover their retirement funds into a new retirement account if they desire, instead of taking a lump sum that may be subject to unwanted taxes.

## FACTUAL BACKGROUND

The first in this series of lawsuits was filed on March 4, 2022. *Ewing v. Newport Group, Inc. et. al*, No. 2:22-cv-02136, ECF No. 1 (W.D. Tenn.). At that time, AMEC was conducting an investigation into tens of millions of dollars missing from the Plan. *Ewing v. Newport Group, Inc. et. al*, No. 2:22-cv-02136, ECF No. 52, Cross-Complaint & Third-Party Complaint, ¶ 23 (W.D. Tenn.) (hereinafter "AMEC's 3rd Party

Complaint").[1] Decades ago, AMEC had established a specific department within its organization, called the AMEC Department of Retirement Services, that was tasked with the administration of the Plan. AMEC's 3rd Party Complaint ¶ 17. Defendant Rev. Dr. Jerome V. Harris ran that Department from 2000 until July 2021. AMEC's 3rd Party Complaint ¶ 3.

During that time, Dr. Harris provided regular updates to the Plan participants via presentations and letters, as well as by sending semi-annual statements, that represented that the assets in the Retirement Plan were growing each year. Decl. of Rev. Matthew Ewing, attached hereto as Exhibit 1, ¶ 3 (hereinafter "Ewing Decl."). As of June 30, 2021, AMEC represented that the Plan had approximately $128,000,000 in assets. AMEC's 3rd Party Complaint, ¶ 44. However, upon the installation of a new executive director of the Department of Retirement Services in the third quarter of 2021, AMEC apparently discovered that only about $37,000,000 of the Retirement Plan's assets could be accounted for because of embezzlement, patently poor investments, and other breaches of fiduciary duty. AMEC's 3rd Party Complaint, ¶ 48.

Starting at some point in the past several weeks, AMEC began sending checks (the "Checks") along with cover letters to named Plaintiffs and at least some putative class members. Ewing Decl. ¶ 5. Those Checks were written by Defendant Symetra Life Insurance Company, contained a line above a perforation that reads "repetitive

---

[1] Parties are bound to their admissions in pleadings. *See, e.g.*, *Arvest Bank v. Byrd*, No. 10-2004, 2011 WL 902410, at *9 (W.D. Tenn. Mar. 14, 2011) (citing *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 549 (6th Cir. 2000) and *Bluegrass Hosiery, Inc. v. Speizman Indus., Inc.*, 214 F.3d 770, 772 n. 1 (6th Cir. 2000)).

payment from your retirement plan termination," and were stamped and dated as "Received by Dept of Retirement Svs African Methodist Episcopal Church." Ewing Decl. ¶ 5, Ex. A. Symetra Life Insurance Company ("Symetra ") performed administrative services for the Plan, and Plaintiffs and AMEC have alleged that Symetra is liable for at least some of the Plan's losses. *See, e.g.*, AMEC's 3rd Party Complaint, ¶¶ 37, 82-86.

The Checks were accompanied by a cover letter from AMEC's Department of Retirement Services. Ewing Decl. ¶ 5, Ex. B. The subject of the letter was "AMEC Retirement Plan Full Surrender Disbursement," followed by each recipient's Plan account number. Ewing Decl. ¶ 5, Ex. B. The full body of the form letter sent by AMEC to Plaintiffs and others reads:

> Our department has undergone an audit that is now coming to an end. We are now able to release funds, based on the new adjusted valuation. The enclosed check payable in your favor in the amount of [a specified different amount per letter] represents the amount due from the AMEC Retirement Plan account as a result of your official retirement/disassociation from the active ministry of the African Methodist Episcopal Church. Please be advised that the amount reflects a Federal Tax Withholding of 20% as required.

> By cashing this check, you acknowledge that a revaluation of your account balance is forthcoming, and that the aforementioned amount is being deducted from the adjusted balance. Please know that the General Board is working expeditiously to restore the value of participant's contributions plus interest that would have been earned had the contributions been invested with Symetra.

> God bless you and thank you for your patience. If you have any questions, please call me.

3

Sincerely, Dr. James F. Miller
Executive Director
Enclosure

Ewing Decl. ¶ 5, Ex. B.

Plaintiffs did not request these Checks. Ewing Decl. ¶ 8. Plaintiffs do not accept that the values stated in the letters are the correct values of their vested retirement assets. Ewing Decl. ¶ 8. Rather, the true balance of Plaintiffs retirement accounts should be at least three times higher. Ewing Decl. ¶ 8. And Plaintiffs do not know, and cannot acknowledge, whether a revaluation of their account balances is actually forthcoming.

Furthermore, because of AMEC's unilateral decision to send distributions that weren't requested by Plan participants, Plan participants have lost the ability to earn continued returns on these funds, and AMEC has created a taxable event that they otherwise would not have existed had the funds remained in the Plan or had Plan participants been permitted to roll those funds over into a new tax-deferred/tax-protected account. And because AMEC automatically deducted 20% for tax withholdings, Plaintiffs have been deprived of 20% of those funds, which they wouldn't have been if the funds had stayed invested in the Plan or rolled over into another retirement account. Ewing Decl. ¶ 9. By sending the Checks, AMEC has essentially involuntarily "cashed out" Plaintiffs (in an amount they contend is too low).

That's not how the Plan is supposed to work. The Plan does address distributions, and what AMEC has done is not consistent with the Plan requirements.

Plan funds, including investment gains, are not subject to income tax until they are actually distributed. Exhibit 2, *AMEC Ministerial Retirement Annuity Plan, Summary Plan Description*, p. 3.[2] The Plan expressly provides: "[i]f your vested benefit under the Plan exceeds $5,000 ($3,500 for Plan Years beginning prior to January 1, 2002), then you must consent to the distribution before it may be made." *Id.* at p. 14, Art. V. The Plan also expressly addresses restricted distributions, which are "In-service Distributions" from the Plan prior to a participant's termination of employment if certain conditions were satisfied. *Id.* at Article VII.

Under the Plan, participants were permitted to request that a direct transfer of all or a portion of a distribution be made to either a traditional Individual Retirement Account (IRA) or another qualified employer plan willing to accept the transfer. *Id.* at p. 14, Article VIII(b). Such qualified transfer would not result in income tax liabilities. Unlike the Checks with their purported "new adjusted valuation," the Plan requires that the following detailed explanation (which AMEC did not provide here) accompany any distribution:

> WHENEVER YOU RECEIVE A DISTRIBUTION, THE ADMINISTRATOR WILL DELIVER TO YOU A MORE DETAILED EXPLANATION OF THESE OPTIONS. HOWEVER, THE RULES WHICH DETERMINE WHETHER YOU QUALIFY FOR FAVORABLE TAX TREATMENT ARE VERY COMPLEX. YOU SHOULD CONSULT WITH QUALIFIED TAX COUNSEL BEFORE MAKING A CHOICE.

*Id.*

---

[2] AMEC claims in its Answer that this is a 401(a) and not a 401(k) plan, and this Plan document refers to a 401(k) plan. First, for purposes of this motion, that distinction doesn't matter. Second, if there was some mistake, it was AMEC's, and the Plan participants are entitled to rely on the rules that AMEC told them would apply. This is the Plan document that AMEC gave to the Plan participants and this is what AMEC told them to rely upon.

Even if the Plan were terminated here (which it wasn't), "FORM OF BENEFIT PAYMENT", Article V of the Plan controls that situation. And it provides:

> Upon termination, no further contributions will be made to the Plan and all amounts credited to your accounts will become 100% vested. We will direct the distribution of your accounts in a manner permitted by the Plan as soon as practicable. (See the question "How will my benefits be paid?" found in the Article of this SPD entitled "FORM OF BENEFIT PAYMENT.") You will be notified of any modification or termination of the Plan.

AMEC simply didn't do that when it sent the Checks to Plan participants.

Moreover, the vague language in the second paragraph of the letter has left Plaintiffs unable to cash these checks to reinvest them because it is unclear whether AMEC will contend that anyone cashing the checks will have released their claims in any way. Ewing Decl. ¶ 10. AMEC's refusal to clearly state that cashing the unsolicited checks does not function as a release of claims or damages is problematic given AMEC's obvious incentive to limit its legal liability and Plaintiffs' allegations that AMEC has a history of abusing its superior position over the putative class members.

Finally, it is unclear what AMEC believes is the authority or other legal/factual basis for it to calculate and provide an "adjusted valuation" for each account and then to send a check that nobody asked for in the amount of that "adjusted valuation." AMEC does not cite a Plan document or other authority that would permit these unilateral actions. Even if such authority actually existed, basic principles of equity prohibit AMEC from invoking it during pending litigation to obtain a possible release of claims or damages.

## PRELIMINARY INJUNCTION STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 396 (1981). To obtain a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the moving party must establish the following: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent injunctive relief; (3) the balance of equities tips in its favor; and (4) the injunction would be in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The issuance of preliminary injunctive relief is committed to the sound discretion of the court. *See Déjà Vu of Cincinnati, L.L.C. v. Union Tp. Bd. of Trustees*, 411 F.3d 777, 782 (6th Cir. 2005) (citation omitted). In the instant case, each of the relevant factors weighs in favor of Plaintiffs and their motion for a preliminary injunction should be granted.

## ARGUMENT

### I.    Plaintiffs are Likely to Succeed on the Merits of their Claims Against AMEC.

Plaintiffs across the six actions who are bringing this motion for a preliminary injunction assert two claims in common: breach of fiduciary duty and negligence. *Ewing v. Newport Group, Inc. et al.*, No. 2:22-cv-02136, ECF No. 1 (W.D. Tenn.); *Jackson v. Newport Group, Inc. et al.*, 2:22-cv-02174, ECF No. 1 (W.D. Tenn.); *Alexander v. Harris, et al.*, 8:22-cv-00707, ECF No. 1 (D. Md.); *Russ et. al v. Newport Group, Inc. et al.*, 1:22-cv-01129, ECF No. 5 (M.D. Fla.); *Wade et. al v. Newport Group, Inc. et al.*, 1:22-cv-01126, ECF No. 23 (E.D. Va.); and *Carmichael, Jr. et al. v. Harris*

7

*et al.*, 1:22-cv-00386, ECF No. 1 (M.D.N.C.).[3] Under Tennessee law, as detailed below, AMEC was a fiduciary to the Plan participants (which included all of the Plaintiffs and putative class members). As AMEC made clear in its Answer to Rev. Pearce Ewing's Complaint, along with its cross-complaint and third-party complaint, AMEC acted negligently and breached its fiduciary duties in various ways, including by failing to oversee Dr. Harris's actions with respect the Retirement Plan such that he was able to "lose" more than $90,000,000 through a combination of embezzlement, patently poor investments, and other breaches of fiduciary duty. AMEC's 3rd Party Complaint, ¶¶ 20-52. As a result, Plaintiffs seek this preliminary injunction to allow the Parties to work out an orderly distribution and/or reinvestment of the funds currently held by AMEC, as opposed to AMEC sending out checks that deprive plan participants of continued tax-free growth and create immediate tax burdens, with language that could be construed as seeking releases of claims or damages at issue in this litigation.

### A. Plaintiffs are likely to succeed on their claim that AMEC breached its fiduciary duties regarding the Plan.

Under Tennessee law, plaintiffs may recover damages for breaches of fiduciary duties by showing that "(1) the defendant was in a position to influence or control the plaintiff; (2) the defendant used the confidences given to him or her to obtain some

---

[3] Because the various plaintiffs have not yet filed a consolidated amended complaint, there are some differences between the claims asserted against AMEC. Because of that, and to not overburden the Court with all arguments, Plaintiffs primarily address the likelihood of success on two of the claims asserted in each of the complaints: breach of fiduciary duty and negligence. Plaintiffs are likely to succeed on the merits of their other claims, as well, but a full analysis of each and every claim isn't necessary to satisfy the first prong of the preliminary injunction standard.

benefit from, or advantage over, the plaintiff; and (3) the plaintiff, as the dominated party in the relationship, suffered some detriment at the hands of the defendant." *Givens v. Mullikin*, 75 S.W.3d 383, 410 (Tenn. 2002) (citing *Mahunda v. Thomas*, 55 Tenn App. 470, 478, 402 S.W.2d 485, 489 (1965)); *see also Grant v. Tucker*, 57 F. Supp. 3d 852, 859 (M.D. Tenn. 2014) (discussing the difference between fiduciary and confidential relationships under Tennessee law). Each of those elements are satisfied here.

First, AMEC exercised a unique position of influence and control over the Plan participants given that AMEC funded, administered, and otherwise controlled the Plan through its employees and its Department of Retirement Services. *See, e.g.*, AMEC's 3rd Party Complaint, ¶¶ 3, 16-19, 25-28, 46-47, 49-50. AMEC, as Plaintiffs' employer, provided Plaintiffs and other Plan participants the benefit of a retirement plan. The Plan was funded through contributions by AMEC (as well as through voluntary contributions by Plan participants) and was administered, managed, and otherwise controlled by AMEC through a department it created called the Department of Retirement Services, which was run by an AMEC employee, Dr. Harris. AMEC's 3rd Party Complaint, ¶ 3. Plaintiffs had no control over their own vested balances in the fund, including over how the investments should be made or what specific individuals would be responsible for making those decisions. In other words, in contrast to the Plan participants, AMEC held all of the cards.

Second, AMEC used that position of influence and control to obtain some benefit from, or advantage over, the Plaintiffs. Specifically, given its sole control over

the Plan, AMEC (through its agents) was in a position to—and in fact did—benefit from the misuse of the money in the Retirement Plan, and it had all of the Plaintiffs and putative class members at an advantage given its sole control over the Plan.

Third, there can be no dispute that the named Plaintiffs and absent Class Members suffered a detriment at AMEC's hands. Through its failure to properly monitor and audit the retirement fund, including the activities of its employee Dr. Harris, AMEC has purportedly lost over $90,000,000 from the fund. AMEC's 3rd Party Complaint, ¶ 48. This amount seemingly represents about two-thirds of each Plan participant's vested balance. Ewing Decl. ¶ 8. Indeed, AMEC's own answer to Rev. Pearce Ewing's complaint, along with its cross-complaint and third-party complaint, more or less acknowledge the key facts that will lead to a finding that AMEC breached its fiduciary duties. *Ewing v. Newport Group, Inc. et. al*, No. 2:22-cv-02136, ECF No. 52 (W.D. Tenn.) (*passim*). The cross-complaint and third-party complaint try to point fingers at others for the obvious malfeasance, but AMEC put the fox in charge of the hen house, failed to implement even the most basic cross checks and safeguards, and it is ultimately responsible to the Plan participants for what happened.

### B. Plaintiffs are likely to succeed on their claim that AMEC acted negligently regarding the Retirement Plan.

Under Tennessee law, plaintiffs may recover damages for negligence by showing: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause." *Johnson v. CoreCivic, Inc.*, No. 18-1051-STA-egb, 2018 WL 5798534, at *7 (W.D. Tenn. Nov. 5,

2018) (quoting *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 286-87 (6th Cir. 2017) (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005))). Here, these elements are satisfied.

Whether a defendant owes a duty of care is a question of law to be determined by the courts. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 365 (Tenn. 2009) (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)). Once a duty is established, the scope of duty and the standard of care are questions of fact to be decided by the trier of fact. *Friedenstab v. Short*, 174 S.W.3d 217, 225 (Tenn. Ct. App. 2004).

Here, AMEC owes a duty of care based on its affirmative actions in establishing, funding, administering, and otherwise controlling the Plan (including Plaintiff and putative class members' vested balances in the Retirement Plan). *See, e.g.*, *China Export & Credit Insurance Corporation v. Carlisle Transportation Products, Inc.*, No. 3:16–cv–00846, 2016 WL 4239970, at * 2 (M.D. Tenn. Aug. 11, 2016) ("holding that a wire transfer of funds is an affirmative act that carries with it a foreseeable risk that the funds might be sent to the wrong account" and that such an act "falls squarely within Tennessee's general duty of care"). AMEC breached its duty and thereby caused foreseeable damages by failing to monitor, oversee, audit, or take any other actions to confirm that its Retirement Services Department and its chair, Dr. Harris, were appropriately managing the Plan, leadings to losses of over $90,000,000. AMEC's 3rd Party Complaint, ¶ 48. Thus, AMEC has breached its duties to the named Plaintiffs and putative class members and injured them by depriving

them of approximately two-thirds of the vested balance of their retirement funds, and AMEC's conduct was the direct proximate cause of the injury to Plaintiffs because with proper controls and oversight of the Department of Retirement Services, the Retirement Fund's assets would not have been able to be transferred, lost, or embezzled. AMEC's 3rd Party Complaint, ¶¶ 16-48.

Again, AMEC's own answer to Rev. Pearce Ewing's complaint, along with its cross-complaint and third-party complaint, more or less acknowledge the key facts that will lead to a finding that AMEC is liable for negligence.

## II.     Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief.

"Plaintiffs seeking preliminary relief must also 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758, 771 (M.D. Tenn. 2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365 (2008) (emphasis in original)).

Here, Plaintiffs are suffering irreparable harm because of AMEC's actions. First, it's unclear what the impact is, if any, of the "acknowledgment[s]" that AMEC insists upon were any Plan participants to negotiate the checks AMEC sent them, but the Plan participants may be unknowingly releasing claims or damages in this litigation without knowing or understanding what their other options are. Second, because the funds did not stay invested and Plaintiffs were not given the chance to roll their funds into another retirement investment vehicle, Plaintiffs and putative class members are actually losing money because AMEC has created a tax liability for them by unilaterally choosing to distribute their retirement funds to them in one

12

lump sum. The actual tax impact on each individual, when combined with other income sources that they may have, may be difficult to calculate on an individual basis; plus, the losses at issue already are so great there may not be any money left to cover this latest blunder. . Third, by mailing lump sums now, AMEC has made the unilateral decision that Plaintiffs cannot continue earning returns on their retirement funds, depriving them of continued growth of these pre-tax funds.

### III.   The Balance of Equities Tips in Favor of Plaintiffs.

When balancing the equities, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758, 771 (M.D. Tenn. 2015) (quoting *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542, 107 S. Ct. 1396, 94 L.Ed.2d 542 (1987)).

Here, the Plaintiffs are incurring the harm noted in the preceding section, which includes potentially releasing claims in this litigation and incurring taxable impacts on distributions that otherwise could have been rolled into other retirement accounts. In contrast, AMEC incurs no harm if this preliminary injunction is granted. AMEC is simply left to hold, control, and invest Plaintiffs' and the putative class members' funds as it was already obligated to do so under the Plan, and as it had been doing for more than 20 years. In short, maintaining the status quo helps the Plaintiffs while causing no harm to AMEC. On balance, the equities favor the Plaintiffs.

**IV.     A Preliminary Injunction Is in the Public Interest.**

The public interest weighs in favor of granting a preliminary injunction here. AMEC's dispersal of the checks and the contents of the accompanying letter seemingly terminate the Plan participant's investments, which are his/her vested retirement benefits. Preventing this unilateral termination serves the public interest. *Cf. Carter v. Colvin*, No. CV 0:16-017-DCR, 2016 WL 5867051, at *17 (E.D. Ky. Oct. 6, 2016) ("It is in the public interest that individuals properly entitled to benefits not have them erroneously terminated.").

Furthermore, where a preliminary injunction is granted to prevent a defendant from engaging in further inequitable and unethical business behavior, it serves the public interest. *See, e.g., Peeler v. Brit. Med. Tr. Co. Ltd.*, No. 111CV01326JDBEGB, 2012 WL 12868273, at *4 (W.D. Tenn. Nov. 13, 2012) ("The public interest would be served by issuing a preliminary injunction [here]… Protecting assets and preventing these defendants from moving funds offshore serves the public interest by ensuring the perpetrators of such scams are not able to abscond, preventing any possibility of a recovery."). That is another goal of the motion for preliminary injunction here.

To the extent that the preliminary injunction sought here would affect the public interest at all, it would only serve the public interest.

**V.     The Court Has the Authority to Manage Communications Like This to Unnamed Potential Class Members and to Require a Corrective Notice.**

"It is well established that Federal Rule of Civil Procedure 23(d) authorizes a court to enjoin a named party from communicating with unnamed potential class members." *Tolmasoff v. Gen. Motors*, LLC, No. 16-11747, 2016 WL 3548219, at *10 (E.D. Mich. June 30, 2016) (citing Fed. R. Civ. P. 23(d)(1)); *In re Se. Milk Antitrust Litig.*, No. MDL 1899, 2009 WL 3747130, at *2 (E.D. Tenn. Nov. 3, 2009). "[A]n order that limits a party's ability to communicate with putative class members 'should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties.'" *In re Se. Milk Antitrust Litig.*, No. MDL 1899, 2009 WL 3747130, at *2 (E.D. Tenn. Nov. 3, 2009) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981)). "Limitations on communications should be based on "a specific record showing by the moving party of the particular abuses by which it is threatened." *In re Se. Milk Antitrust Litig.*, 2009 WL 3747130, at *2 (quoting *Gulf Oil*, 452 U.S. at 102). "Examples of abusive communications are those that are false or misleading, contain material omissions, or are coercive or intimidating." *Tolmasoff*, 2016 WL 3548219, at *11 (citing *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554, 561 (S.D. Fla. 2008)).

Courts often find a defendant's failure to mention a pending class action when it tries to secure settlements or releases misleading. *See Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758, 762 (N.D. Ohio 2010) (collecting cases). In *County of Santa Clara v. Astra USA, Inc.*, No. C 05-03740 WHA, 2010 WL 2724512, at *2 (N.D. Cal. July 8, 2010), similar to here, the defendant mailed letters and checks to potential class members where the letter stated, "this check is tendered in, and your acceptance will

constitute, full and final satisfaction of any actual or potential claim by you." Unlike here, the letter identified the pending class action lawsuit by name and docket number. *See id.* The court subsequently found that even though the case had been identified, the letter was misleading and that it should have included more substantive content, including that it "should have explained the specific claims that plaintiffs allege[.]" *Id.* at *3; *see also Cheverz v. Plains All American Pipeline, LP*, No. CV 15-4113, 2016 WL 861107, *4 (C.D. Cal. Mar. 3, 2016) ("Although the [release] notifies victims that a consolidated class action exists, it does not provide additional information, such as an explanation of the Plaintiffs' claims or the contact information for Plaintiffs' counsel. Courts routinely hold that releases are misleading where they do not permit a putative class member to fully evaluate his likelihood of recovering through the class action.").

Where communications with potential class members are misleading, courts require a curative notice sent to these potential class members. *See, e.g., James v. Detroit Prop. Exch.*, No. 18-13601, 2019 WL 9098024, at *12 (E.D. Mich. July 11, 2019). Here, the letters that AMEC sent to potential class members is misleading. It fails to mention that there is a pending class action on precisely these issues or that Plan participants could avoid tax liabilities by, for example, re-investing funds in another retirement account. The Court should require that a curative notice be sent to potential class members who received the letter, notifying them of this pending class action and the claims asserted, providing a copy of the operative complaint, and advising them of their options under the terms of the Plan.

16

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court grant the motion for preliminary injunction and order as follows:

a.  That AMEC be prohibited from sending any further funds to Plaintiffs or the putative class members without a direct, written request from the Plan participant;

b.  That AMEC be required to send a curative letter to Plan participants advising them: (i) of the pendency of this lawsuit, (ii) of their options under the Plan for distributions, including rollover, and the potential adverse  tax consequences of withdrawing funds from the Plan, and (iii) that negotiating the Checks that AMEC already sent will not result in a release of claims or damages in this MDL (but will operate as a set-off against those damages);

c.  That all Checks that have not been requested and that have not been negotiated already be voided by AMEC within three days of the entry of such an order;

d.  That AMEC be required to invest and maintain all funds reflected in the unrequested Checks in accordance with the terms of the Plan, and AMEC's fiduciary obligations to the Plaintiffs and the putative class; and

e.  Any other relief that the Court may deem appropriate.

Dated: July 14, 2022.                           Respectfully submitted,

*/s/ Matthew E. Lee*                            */s/ Gregorio A. Francis*
Matthew E. Lee                                  Gregorio A. Francis, Esq.
Mark R. Sigmon                                  Joseph A. Osborne, Esq.
Jeremy R. Williams                              **Osborne & Francis Law Firm**
Sarah J. Spangenburg                            **PLLC**
**MILBERG COLEMAN BRYSON**                      433 Plaza Real, Suite 271
**PHILLIPS GROSSMAN, PLLC**                     Boca Raton, FL 33432
                                                Tel: (561) 293-2600;
900 W. Morgan Street                            Fax: (561) 923-8100
Raleigh, NC 27603
Tel: 919-600-5000                               gfrancis@realtoughlawyers.com
                                                josborne@realtoughlawyers.com
Fax: 919-600-5035
mlee@milberg.com
msigmon@milberg.com                             J. Gerard Stranch, IV,(BPR 23045)
jwilliams@milberg.com                           Benjamin A. Gastel, (BPR 28699)
sspangenburg@milberg.com                        **BRANSTETTER, STRANCH**
                                                **& JENNINGS, PLLC**
                                                223 Rosa L. Parks Avenue, Suite 200
Rachel Dapeer                                   Nashville, Tennessee 37203
**DAPEER LAW, P.A.**                            Phone: (615) 254-8801
300 S. Biscayne Blvd. Suite 2704                Fax: (615) 255-5419
Miami, FL 33131                                 gerards@bsjfirm.com
rachel@dapeer.com                               beng@bsjfirm.com

David H. Wise                                   Richard W. Schulte
Joseph M. Langone                               Stephen D. Behnke
**WISE LAW FIRM, PLC**                          **WRIGHT & SCHULTE, LLC**
10640 Page Ave. Suite 320                       865 South Dixie Drive
Fairfax, VA 22030                               Vandalia, Ohio 45377
dwise@wiselaw.pro                               rschulte@legaldayton.com
jlangone@wiselaw.pro                            sbehnke@legaldayton.com

Dhamian A. Blue                                 Elizabeth Hopkins
**BLUE, LLP**                                   Scott M. Lempert
205 Fayetteville Street                         Susan L. Meter
Raleigh, NC 27601                               **KANTOR & KANTOR, LLP**
dab@bluellp.com                                 19839 Nordhoff Street
                                                Northridge, CA 91324

18

Mark P. Chalos
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
*mchalos@lchb.com*
*kbyrd@lchb.com*

ehopkins@kantorlaw.net
slempert@kantorlaw.net
smeter@kantorlaw.net

Dean C. Graybill
Dara Smith
**AARP Foundation Litigation**
601 E Street, N.W.
Washington, D.C. 20049
dgraybill@aarp.com
dsmith@aarp.com

*Counsel for Plaintiffs*