**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION** | MDL Docket No. 1:22-md-03035-STA-jay ALL CASES<br><br>Honorable S. Thomas Anderson |

TABLE OF CONTENTS

CONSOLIDATED AMENDED COMPLAINT – CLASS ACTION ............................................ 1

INTRODUCTION ................................................................................................................. 1

PARTIES ............................................................................................................................... 3

JURISDICTION AND VENUE ............................................................................................. 15

FACTUAL ALLEGATIONS ................................................................................................. 15

   I.   History of the AMEC ..................................................................................................... 15

   II.  History of the AMEC Fund ............................................................................................ 17

   III.  The Operative Fund ....................................................................................................... 18

   IV.  Defendants' Misappropriation and Mismanagement of the Plan ................................... 22

     A.  Defendants' Failed Oversight of the Plan ................................................................ 22

     B.  Defendant Harris' Fraudulent Scheme ..................................................................... 23

     C.  Defendant Harris' False Representations to Class Members About the Plan ............ 29

     D.  AMEC's Alleged Discovery of Defendant Harris' Scheme ..................................... 33

PLAINTIFFS' SPECIFIC ALLEGATIONS ......................................................................... 37

CLASS ACTION ALLEGATIONS ...................................................................................... 39

   I.   Class Definition ............................................................................................................ 39

   II.  Rule 23(a) and Rule 23(b)(3) Requirements ................................................................ 40

     A.  Numerosity .............................................................................................................. 40

     B.  Commonality ........................................................................................................... 40

     C.  Typicality ................................................................................................................ 42

     D.  Adequacy of Representation .................................................................................... 42

     E.  Rule 23(b)(1) Requirements .................................................................................... 43

     F.  Rule 23(b)(2) Requirements .................................................................................... 43

     G.  Rule 23(b)(3) Requirements .................................................................................... 43

CLAIMS FOR RELIEF ........................................................................................................ 44

COUNT I, BREACH OF FIDUCIARY DUTY (On behalf of Plaintiffs and Members of the
Class) (Against AMEC, AMEC Department of Retirement Services, AMEC General Board,
AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, Robert Eaton, Newport,
Symetra, and Rodney Brown) ........................................................................................................ 44

COUNT II, Claim for Violation of Tennessee Uniform Trust Code For Breach of Trust and
Misappropriation of Trust Funds (On Behalf of Plaintiffs and Members of the Class) (Against
AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of

Bishops, Bishop Green, Bishop Davis, Dr. Harris, Robert Eaton, Newport, Symetra, and Rodney Brown) ............................................................................................................................... 51

COUNT III, NEGLIGENCE (On behalf of Plaintiffs and Members of the Class) (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, Bishop Green, Bishop Davis, Robert Eaton, Newport, Symetra, and Rodney Brown) ............................................................................................................................... 56

COUNT IV, CONVERSION (On Behalf of Plaintiffs and Members of the Class) (Against Dr. Harris, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill Entities)..................... 59

COUNT V, FRAUDULENT CONCEALMENT (On Behalf of Plaintiffs and Members of the Class) (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, Newport, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, the Motorskill Entities, and Rodney Brown) ............................... 60

COUNT VI, FRAUDULENT MISREPRESENTATION (On Behalf of Plaintiffs and Members of the Class) (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, Newport, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, the Motorskill Entities, and Rodney Brown)......................................................................... 62

COUNT VII, BREACH OF CONTRACT (On Behalf of Plaintiffs and Members of the Class) (Against AMEC)............................................................................................................................ 63

COUNT VIII, Claim for Promissory or Equitable Estoppel (On Behalf of Plaintiffs and Members of the Class) (Against AMEC)........................................................................................ 66

COUNT IX, TORT OF OUTRAGE (On Behalf of Plaintiffs and Members of the Class) (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, and Robert Eaton) ...................................................................... 68

COUNT X, CIVIL CONSPIRACY (On Behalf of Plaintiffs and Members of the Class) (Against Dr. Harris, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill Entities)...... 69

ALTERNATIVE CLAIMS FOR RELIEF IN THE EVENT THAT THIS COURT DETERMINES THAT THE PLAN IS DIRECTLY GOVERNED BY ERISA.......................... 70

COUNT XI, Claim for Plan Benefits Under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) In the Alternative to Counts I-XI (On Behalf of Plaintiffs and Members of the Class) (Against AMEC and the Plan) ......................................................................................... 70

COUNT XII, Breach of Fiduciary Duties for Failing to Prudently and Loyally Select, Retain and Monitor Plan Investments in Violation of ERISA Section 404, 29 U.S.C. § 1104 (On Behalf of Plaintiffs and Members of the Class) (Against AMEC Department of Retirement Services,

Bishop Green, Bishop Davis, and Dr. Harris) ............................................................... 71

COUNT XIII, ENGAGING IN PROHIBITED TRANSACTIONS IN VIOLATION OF ERISA
SECTION 406(b), 29 U.S.C. § 1106(b) (On Behalf of Plaintiffs and Members of the Class)
(Against Dr. Harris and Robert Eaton) ......................................................................... 73

COUNT XIV, BREACHES OF FIDUCIARY DUTY FOR FAILURE TO MONITOR
APPOINTED FIDUCIARIES (On Behalf of Plaintiffs and Members of the Class) (Against
AMEC, AMEC Council of Bishops, AMEC General Board, AMEC Department of Retirement
Services, Bishop Green and Bishop Davis) .................................................................. 74

COUNT XV, BREACH OF FIDUCIARY DUTIES BY FAILURE TO FOLLOW THE TERMS
OF THE PLAN IN VIOLATION OF ERISA SECTION 404, 29 U.S.C. § 1104 (On Behalf of
Plaintiffs and Members of the Class) (Against AMEC, the Plan, AMEC Council of Bishops,
AMEC General Board, AMEC Department of Retirement Services, Bishop Green, Bishop Davis
and Dr. Harris) ............................................................................................................. 76

COUNT XVI, VIOLATION OF ERISA REPORTING AND DISCLOSURE PROVISIONS (On
Behalf of Plaintiffs and Members of the Class) (Against AMEC, or in the alternative, the AMEC
Department of Retirement Services or Newport) ........................................................... 78

    A.   Pension Benefit Statements ................................................................................... 78

    B.   Summary Plan Descriptions ................................................................................. 78

    C.   Annual Reports ................................................................................................... 79

    D.   Summary Annual Reports ..................................................................................... 80

COUNT XVII, CLAIM FOR CO-FIDUCIARY BREACHES IN VIOLATION OF ERISA
SECTION 405(a), 29 U.S.C. § 1105(a) AND FOR KNOWING PARTICIPATION IN
FIDUCIARY BREACHES (On Behalf of Plaintiffs and Members of the Class) (Against All
Defendants) .................................................................................................................. 80

PRAYER FOR RELIEF ................................................................................................ 81

<u>**CONSOLIDATED AMENDED COMPLAINT – CLASS ACTION**</u>

Plaintiffs Reverend Pearce Ewing, Reverend Charles R. Jackson, Presiding Elder Cedric V. Alexander, Reverend Derrell Wade, Reverend Reuben J. Boyd, Presiding Elder Phillip Russ, IV, Reverend Marcius King, by and through Lynette Glenn, Power of Attorney, Reverend Matthew Ewing, Reverend A. Offord Carmichael, Jr., and Reverend Diane Conley, (collectively "Plaintiffs") bring this consolidated Class Action Complaint against Defendants African Methodist Episcopal Church Ministerial Retirement Annuity Plan, Newport Group, Inc., Symetra Life Insurance Company, Rev. Dr. Jerome V. Harris, African Methodist Episcopal Church, Inc. ("AMEC"), AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Samuel L. Green, Sr., Bishop James Davis, Robert Eaton, Financial Freedom Funds, LLC, , Financial Freedom Group, Inc., Financial Technologies, LLC, Motorskill Venture Group, Motorskill Ventures 1, L.P., Motorskill Asia Venture Group, Asia Ventures 1, L.P., Jarrod Erwin, Randall Erwin, Rodney Brown and Company, Doe Corporations 1-10, and John Does 1-10 (collectively "Defendants"), and allege the following:

<u>**INTRODUCTION**</u>

1.     For nearly two decades, Defendants breached their fiduciary duties and engaged in negligent conduct—permitting a single individual to exercise unsupervised control in managing the African Methodist Episcopal Church Ministerial Retirement Annuity Plan ("the Plan") and the fund of retirement assets associated with the Plan ("the Fund"). This individual, Defendant Harris, made a series of self-dealing, illegal, and/or risky investments without any oversight from the African Methodist Episcopal Church ("the Church") and its ministers.

2.     The Church's negligence in failing to supervise and correct mismanagement and misdeeds by Harris and others resulted in the loss of more than $90 million of Class Members'

retirement funds, representing roughly 75% of the assets in the Fund. At every step of the way, Defendant Harris was unchecked by Defendants. The Church conducted no oversight of his investments. The entities and individuals he invested the funds with knew that the investments were risky, imprudent, and the result of self-dealing. And finally, numerous accounting entities and service providers, who had fiduciary duties to protect the money and provide correct retirement figures to Class Members, failed to check Defendant Harris' actions.

3.      Plaintiffs bring this class action on behalf of AMEC ministers and other employees who, as a result of Defendants' catastrophic failures to protect their retirement accounts in the Plan, collectively lost tens of millions of dollars in career retirement savings.

4.      Plaintiffs and the members of the class are ministers, bishops, officers, elders, and other employees (and their respective beneficiaries) of AMEC or AMEC-related educational institutions or programs who have: (i) lost money that was (or should have been) invested in the Fund, (ii) had diminished investment returns because of mismanagement of the Fund, or (iii) found that they were never actually made participants in the Fund as they were promised and should have been.

5.      Defendants oversaw and controlled the investments in the Fund and did not adequately monitor or oversee the Fund. They are each responsible for the Fund's massive losses.

6.      The loss of assets and other mismanagement of the Fund is a direct and proximate result of Defendants' failure to fulfill their duties to Plaintiffs and the putative class.

7.      Subsequent to Plaintiffs' filing of these cases, AMEC filed cross-claims and third party claims blaming Defendant Harris and others and alleging that Defendant Harris and other third-party defendants engaged in fraud against the church and the Pension Fund members.

8.      For purposes of this Consolidated Complaint, Plaintiffs do not assert the Plan is

directly governed by ERISA. As a church plan, the Plan is exempted from ERISA unless it affirmatively elected to be governed by ERISA. Any references to ERISA herein are not intended to assert that the Plan is an ERISA Plan. However, Plaintiffs do assert and allege that Defendants have repeatedly agreed in written Plan documents provided to the Plaintiffs and other Class members to govern the Plan in accordance with the requirements of ERISA, and thus Defendants should be held to ERISA standards with respect to their management of the Plan and its assets. Plaintiffs are entitled to the remedies enumerated in ERISA, in addition to any remedies under state law, for any failure on the part of Defendants to live up to those standards. Moreover, should Defendants provide proof that the Plan is an ERISA Plan because it so elected, or should the Court determine that the Plan is an ERISA plan, Plaintiffs have pled claims under ERISA in the alternative to the state-law claims.

## PARTIES

9.     Plaintiff Reverend Pearce Ewing is a resident of Jacksonville, Florida. Rev. Pearce Ewing served as an AMEC minister for many years and retired in September 2021. Shortly after his retirement, he sought to access monies due him from the Fund. At all times relevant herein, Rev. Pearce Ewing has been a Fund contributor and a participant in the Plan.

10.     Plaintiff Reverend Charles R. Jackson is a resident of Orlando, Florida. Rev. Jackson served currently serves as the Pastor for Mt. Tabor AME Church in Altamonte Springs, Florida. At all times relevant herein, Rev. Jackson has been a participant in the Plan and had vested retirement benefits in the Plan.

11.     Plaintiff Presiding Elder Cedric V. Alexander is a resident of Bowie, Maryland. Presiding Elder Alexander served as an AMEC minister and Presiding Elder for approximately 26 years. Presiding Elder Alexander retired in September 2020. Shortly after his retirement, he sought to access monies due him from the Fund. At all times relevant herein, Presiding Elder Alexander

has been a participant in the Plan and had vested retirement benefits in the Plan.

12.     Plaintiff Reverend Derrell Wade is a resident of Suffolk, Virginia. Rev. Wade currently serves as the Pastor for Macedonia AME Church in Suffolk, Virginia. He has served in AMEC since 1994. At all times relevant herein, Rev. Wade has been a participant in the Plan and had vested retirement benefits in the Plan.

13.     Plaintiff Reverend Reuben J. Boyd is a resident of North Chesterfield, Virginia. Rev. Boyd serves as the Pastor of the Third Street Bethel AME Church located in Richmond, Virginia. He has served in AMEC since 1988. At all times relevant herein, Rev. Boyd has been a participant in the Plan and had vested retirement benefits in the Plan.

14.     Plaintiff Presiding Elder Phillip Russ, IV, is a resident of Santa Rosa, Florida. Presiding Elder Russ served as an AMEC minister for over 40 years. Presiding Elder Russ retired in September 2021. Shortly after his retirement, he sought to access monies due him from the Fund. At all times relevant herein, Presiding Elder Russ has been a participant in the Plan and had vested retirement benefits in the Plan.

15.     Plaintiff Reverend Marcius King, is a resident of Jacksonville, Florida. Rev. King served as an AMEC minister from the age of 16 until he retired in 2017 at the age of 73. Rev. King has been unable to withdraw his funds from the AMEC retirement fund and his efforts to rollover the funds to an IRA were similarly unsuccessful. At all times relevant herein, Rev. King has been a participant in the Plan with vested retirement benefits in the Plan.

16.     Plaintiff Reverend Matthew Ewing is a resident of Cantonment, Florida. Rev. Matthew Ewing served as an AMEC minister for over 43 years. Rev. Matthew Ewing retired in September 2021. Shortly after his retirement, he sought to access monies due him from the Fund. At all times relevant herein, Rev. Matthew Ewing has been a participant in the Plan with vested

retirement benefits in the Plan.

17.     Plaintiff Reverend A. Offord Carmichael, Jr., is a resident of Graham, North Carolina. Rev. Carmichael served as an AMEC minister for 48 years. Rev. Carmichael currently serves as an itinerant elder, the highest ministerial order in the AMEC. Rev. Carmichael plans to retire within the next two years, after 50 years of service to the church. At all times relevant herein, Rev. Carmichael has been a participant in the Plan with vested retirement benefits in the Plan.

18.     Plaintiff Reverend Diane Conley is a resident of Morganton, North Carolina. Rev. Conley began her pastoral service in the church as a supply pastor in 1992. She was ordained as a deacon in 1994. Rev. Conley has been an itinerant elder, the highest ministerial order in the church, since 1996. At all times relevant herein, Rev. Conley has been a participant in the Plan with vested retirement benefits in the Plan.

19.     Defendant African Methodist Episcopal Church Ministerial Retirement Annuity Plan ("AMEC Plan" or "the Plan") is the operative plan establishing a trust and a trust fund for the benefit of certain AMEC ministers and employees. For purposes of the alternative claims only, AMEC Plan is an "employee pension benefit plan" within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).

20.     Defendant Newport Group, Inc. is a corporation organized under the laws of Florida with its principal place of business in Walnut Creek, California.

21.     Newport Group was a fiduciary by virtue, among other things, of its status and authority as a third-party administrator to the Fund.

22.     Defendant Symetra Life Insurance Company is a corporation organized under the laws of Iowa with its principal place of business in Bellevue, Washington.

23.     Symetra was a fiduciary by virtue, among other things, of its exercise of control

over management and disposition of Fund assets.

24.     Defendant Rev. Dr. Jerome V. Harris is a citizen and resident of Memphis, Tennessee. He served as the Executive Director of the AMEC Department of Retirement Services from 2000 until June 2021.

25.     Defendant Harris was a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. § 35-15-103(13).

26.     Defendant Harris was a fiduciary of the Fund by reason of being a Trustee within the meaning of the Uniform Prudent Investor Act, Tenn. Code Ann. § 35-14-102(3).

27.     Defendant Harris was also a fiduciary of the Fund within the meaning of Section 1.20 of the Plan, which defined fiduciary using the definition in ERISA to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan."

28.     Accordingly, Defendant Harris was a Fund fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that he had and exercised discretionary authority and control over Fund management and had and exercised authority and control over the disposition of the Fund's assets.

29.     As stated in the operative Plan Document at Section 9.11, Dr. Harris is identified as a named fiduciary of the Plan and was a Trustee within the meaning of ERISA Section 402(a)(2), 29 U.S.C. § 100.

30.     Defendant African Methodist Episcopal Church, Inc. ("AMEC") is a corporation incorporated in Pennsylvania having its principal place of business located at 500 Eight Avenue South, Nashville, Tennessee 37203. AMEC's Department of Retirement Services oversaw the

Pension Fund and church employees' retirement benefits.

31.     AMEC is a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

32.     AMEC is a fiduciary of the Fund by reason of being a Trustee within the meaning of the Uniform Prudent Investor Act, Tenn. Code Ann. § 35-14-102(3).

33.     AMEC is also a fiduciary of the Fund within the meaning of Section 1.20 of the Plan, which defined fiduciary using the definition in ERISA to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan."

34.     Accordingly, AMEC is a Fund fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that it exercises discretionary authority and control over Fund management and exercises authority and control over the disposition of the Fund's assets.

35.     As stated in the 2006 Plan Document at Section 9.11, AMEC is identified as a named fiduciary of the Plan and as an Administrator within the meaning of ERISA Section 402(a)(2), 29 U.S.C. § 100.

36.     Defendant AMEC Department of Retirement Services ("Department") is a separate legal entity from AMEC with the responsibility for administering the Plan. The Department is headquartered in Memphis, Tennessee.

37.     Department is a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

38.     Department is a fiduciary of the Fund by reason of being a Trustee within the

meaning of the Uniform Prudent Investor Act, Tenn. Code Ann. § 35-14-102(3).

39.     Department is a fiduciary of the Fund within the meaning of Section 1.20 of the Plan, which defined fiduciary to mean, *inter alia*, any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan."

40.     Accordingly, the Department is a Fund fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that it exercises discretionary authority and control over Fund management and exercises authority and control over the disposition of the Fund's assets.

41.     Defendant AMEC General Board ("General Board") is the administrative body of AMEC with elected members from the church.

42.     Defendant AMEC acts through Defendant General Board to carry out its authority to approve the Plan and amendments thereto, appoint, monitor, and remove trustees.

43.     Through its grant and exercise of power to appoint, monitor and remove other fiduciaries, General Board is a fiduciary of the Fund within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

44.     Through its grant and exercise of power to appoint, monitor and remove other fiduciaries, General Board is a fiduciary of the Fund within the meaning of the Uniform Prudent Investor Act, Tenn. Code Ann. § 35-14-102(3).

45.     Through its grant and exercise of power to appoint, monitor and remove other fiduciaries, General Board is a fiduciary of the Fund within the meaning of Section 1.20 of the Plan, and is a fiduciary of the Fund within the meaning of 29 U.S.C. § 1002(21)(A), ERISA Section

3(21).

46.     Defendant Council of Bishops is the executive body of AMEC, consisting of all the Bishops of the Church.

47.     The Council has and exercises the general oversight authority of the Church.

48.     The Council of Bishops is responsible for enforcing the Church's Doctrine and Discipline, which, among other things, includes direction and promises with respect to the Plan.

49.     The Doctrine and Discipline provides detail about the Plan, including clergy and other employees who must be enrolled by the Church and required Church contributions to the Plan on behalf of Plan participants.

50.     Through its enforcement power over the Plan's terms, the Council of Bishops is a fiduciary of the Fund within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

51.     Through its enforcement power over the Plan's terms, the Council of Bishops is a fiduciary of the Fund within the meaning of the Uniform Prudent Investor Act, Tenn. Code Ann. § 35-14-102(3).

52.     Through its enforcement power over the Plan's terms, the Council of Bishops is a fiduciary of the Fund within the meaning of Section 1.20 of the Plan and 29 U.S.C. § 1002(21)(A), ERISA Section 3(21).

53.     Defendant Bishop Samuel L. Green, Sr. served as the Chair of the AMEC Department of Retirement Services from 2016 until July 2021. He is a citizen and resident of Columbia, South Carolina.

54.     Bishop Green was a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-

103(20).

55.     Bishop Green was a fiduciary of the Fund by reason of being a Trustee within the meaning of the Uniform Prudent Investor Act, Tenn. Code Ann. § 35-14-102(3).

56.     Bishop Green was a fiduciary of the Fund within the meaning of Section 1.20 of the Fund, which defined fiduciary using the definition in ERISA to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan."

57.     Accordingly, Bishop Green was a Fund fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that he had and exercised discretionary authority and control over Fund management and had and exercised authority and control over the disposition of the Fund's assets.

58.     Defendant Bishop James Davis served as the Chair of the AMEC Department of Retirement Services from 2012 until July 2016.

59.     Bishop Davis was a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

60.     Bishop Davis was a fiduciary of the Fund by reason of being a Trustee within the meaning of the Uniform Prudent Investor Act, Tenn. Code Ann. § 35-14-102(3).

61.     Bishop Davis was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan, which defined fiduciary using the definition in ERISA to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any

discretionary authority or discretionary responsibility in the administration of the Plan."

62.     Accordingly, Bishop Davis was a Fund fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that he had and exercised discretionary authority and control over Fund management and had and exercised authority and control over the disposition of the Fund's assets.

63.     Defendant Robert Eaton served as a *de facto* investment advisor and/or formally designated Financial Advisor for Defendant Harris during Defendant Harris's tenure as Executive Director of the AMEC Department of Retirement Services. Upon information and belief, Eaton is a resident of Illinois.

64.     Defendant Eaton was a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13).

65.     Defendant Eaton was a fiduciary of the Fund by reason of being a trustee within the meaning of the Uniform Prudent Investor Act, Tenn. Code Ann. § 35-14-102(3).

66.     Eaton was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan, which defined fiduciary using the definition in ERISA to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so."

67.     Accordingly, Eaton was a Fund fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that he had and exercised discretionary authority and control over the disposition of the Fund's assets.

68.     Defendant Eaton was also a fiduciary because of the position of trust he had assumed with respect to the Fund.

69.     Defendant Financial Freedom Funds, LLC, was an entity formed by Defendant

Harris in 2006. It was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan, which defined fiduciary using the definition in ERISA to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so."

70.    Accordingly, Financial Freedom Funds was a Fund fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that it had and exercised discretionary authority and control over the disposition of the Fund's assets.

71.    Defendant Financial Freedom Group, Inc., was an entity formed by Defendants Harris and Eaton in 2007. It was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan, which defined fiduciary using the definition in ERISA to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so."

72.    Accordingly, Financial Freedom Group was a Fund fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that it had and exercised discretionary authority and control over the disposition of the Fund's assets.

73.    Defendant Financial Technologies, LLC is an entity that is owned, operated, and/or controlled by Defendant Robert Eaton. It was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan, which defined fiduciary using the definition in ERISA to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so."

74.    Accordingly, Financial Technologies, LLC was a Fund fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that it had and exercised discretionary authority and control over the disposition of the Fund's assets.

75.     Defendants Motorskill Venture Group, Motorskill Ventures 1, L.P., Motorskill Asia Venture Group, and Motorskill Asia Ventures 1, L.P. (collectively, the "Motorskill Entities") are private equity funds.

76.     Upon information and belief, the Motorskill Entities have a business address at 2150 Town Square Place, Suite 200, Sugar Land, TX 77479. It was a fiduciary of the Fund and the Plan within the meaning of Section 1.20 of the Plan, which defined fiduciary using the definition in ERISA to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so." Accordingly, Motorskill Entities was a Plan fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that it had and exercised discretionary authority and control over the disposition of the Plan's assets.

77.     Motorskill Ventures 1, L.P. is registered in Delaware as a limited partnership; its registered agent is The Company Corporation, 251 Little Falls Drive, Wilmington, DE 19808. It was a fiduciary of the Fund and the Plan within the meaning of Section 1.20 of the Plan, which defined fiduciary using the definition in ERISA to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so." Accordingly, Motorskill Ventures 1 was a Plan fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that it had and exercised discretionary authority and control over the disposition of the Plan's assets.

78.     Motorskill Asia Ventures 1, L.P. is registered in Delaware as a limited partnership; its registered agent is The Company Corporation, 251 Little Falls Drive, Wilmington, DE 19808. It was a fiduciary of the Fund and the Plan within the meaning of Section 1.20 of the Plan, which

defined fiduciary using the definition in ERISA to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so." Accordingly, Motorskill Venture 1 was a Plan fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that it had and exercised discretionary authority and control over the disposition of the Plan's assets.

79.     Defendant Jarrod Erwin was a principal of Motorskill Ventures, Inc. Upon information and belief, Jarrod Erwin is a resident of Texas.

80.     Defendant Randall Erwin was a principal of Motorskill Ventures, Inc. Upon information and belief, Randall Erwin is a resident of Texas.

81.     Defendant Rodney Brown and Company ("Rodney Brown") is a certified public accounting firm.

82.     Upon information and belief, Rodney Brown has a business address at 495 Burnham Avenue, Calumet City, Illinois 60409.

83.     Defendant Rodney Brown was a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. § 35-15-103(13) and Tenn. Code Ann. § 35-15-807.

84.     Defendant Rodney Brown was a fiduciary of the Fund by reason of being a trustee within the meaning of the Uniform Prudent Investor Act, Tenn. Code Ann. § 35-14-102(3).

85.     Defendants Doe Corporations 1-10 are affiliates or subsidiaries of Defendants here that may be responsible for the conduct alleged herein. Such parties are named in a "Doe Corporations" capacity pending discovery in this case.

86.     Defendants John Does 1-10 are affiliates or subsidiaries of Defendants here that

may be responsible for the conduct alleged herein or exercised fiduciary authority with respect to the Plan during the class period that are currently unknown to Plaintiffs. Such parties are named in a "John Doe" capacity pending discovery in this case.

## JURISDICTION AND VENUE

87.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C § 1332(d). The amount in controversy exceeds $5,000,000, and there are members of the proposed Class who are citizens of a State different from the State of citizenship of at least one of the Defendants.

88.     To the extent that this matter is governed by ERISA, this Court also has federal question jurisdiction under 28 U.S.C. § 1331 and jurisdiction pursuant to 29 U.S.C. § 1132(e)(2).

89.     This Court may exercise personal jurisdiction over Defendants because Defendants conduct substantial business in this State, including conducting Fund business within this State, and have engaged in the unlawful practices described herein in this District.

90.     Venue is proper in this District under 28 U.S.C. § 1391(b) because: (1) Defendants reside and are subject to the Court's personal jurisdiction in this District and (2) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

I.     **History of the AMEC**

91.     The African Methodist Episcopal Church ("AMEC") was the first formally organized African American Christian denomination in the United States.

92.     The first member church of AMEC, Mother Bethel A.M.E. Church, was dedicated in Philadelphia, Pennsylvania in 1794. Richard Allen, a former slave from Delaware, was the church's first leader.

93.     Allen successfully sued in the Pennsylvania courts in 1807 and 1815 for the right

of his congregation to exist as an independent institution separate and apart from the existing Methodist Episcopal Church.

94.     In 1816, Allen convened a meeting in Philadelphia with representatives of four other African American congregations from the Mid-Atlantic region. These congregations came together to form AMEC and elected Allen as AMEC's first bishop.

95.     Prior to the Civil War, AMEC was concentrated in the Northeast and Midwest. Major congregations were located in Philadelphia, New York, Boston, Pittsburgh, Baltimore, Cincinnati, Chicago, Detroit, and Washington, DC.

96.     During the Civil War and Reconstruction, AME clergy moved into the states of the collapsing Confederacy to spread the gospel and educate the newly-freed Black population. By 1880, membership reached 400,000 as AMEC rapidly spread in the South. During this period, AMEC also operated over 2,000 schools and served more than 150,000 students.

97.     Throughout its history, AMEC has relied on the talent and dedication of its ministers and employees. Many of its ministers and employees have made important contributions to American culture and history.

98.     Jarena Lee became the first female AMEC preacher in 1819 and later became the first African-American woman to have her autobiography published in the United States.

99.     AMEC Minister Hiram Revels served as a chaplain in the Union Army during the Vicksburg campaign. In 1870, Revels became the first African-American Senator in United States history.

100.     AMEC Bishop Daniel Payne became the first African-American president of an American college in 1863. Payne served as an AMEC bishop for more than four decades and wrote the first major history of AMEC in 1891.

101.     AMEC Minister Theophilus G. Steward helped inspire AMEC's missionary efforts among the freed slaves of the former Confederacy with his sermon, "I Seek My Brethren." Steward also served as a U.S. Army chaplain and a founding member of the American Negro Academy, the first organization in the United States to support and promote African-American academic scholarship.

102.     Today, AMEC has more the 2,500,000 members and 7,000 congregations. AMEC is organized into 20 Episcopal Districts, which span 39 countries on 5 continents. The work of the Church is administered by 21 active bishops and nine General Officers who manage departments of the Church.

## II.    History of the AMEC Fund

103.     Beginning in the mid-1960s, AMEC provided a retirement plan for its eligible employees.

104.     By the mid-1990s, the Plan was renamed the "African Methodist Episcopal Church Retirement Plan".

105.     The Plan was principally funded by two methods of contribution: 1) AMEC employer entities (or AMEC itself) would contribute a portion of eligible employees' compensation to the Fund on each individual employee's behalf; and 2) eligible employees were permitted to contribute additional portions of their compensation to the Fund for their future retirement benefit.

106.     Each employee had an account in the Fund, and the money in each employee's account was the employee's property.

107.     The monies deposited into the Fund were managed by a trustee, whose responsibility was to ensure that the Fund's assets were properly managed and protected for the

benefit of the eligible employees whose earnings had funded the Plan.

108.    Under Plan documents, AMEC retained the ability to "appoint and remove the Trustee from time to time" when "necessary for the proper administration of the Plan to assure that the Plan [was] operated for the exclusive benefit of the [eligible employees] and their Beneficiaries."

109.    After the initial creation of the Plan, AMEC organized a second, separate retirement fund only for ministers and church elders.

110.    This second plan was funded entirely by AMEC.

111.    Additionally, on or about January 1, 2003, AMEC created a third plan, a 401(k) (defined contribution) plan for eligible employees who wished to contribute to their retirement in this form of investment savings.   To contribute, eligible employees reduced their earned compensation and directed their earnings to the 401(k) plan.

## III.    The Operative Fund

112.    At some point in or around 2005, upon information and belief, AMEC consolidated the various governing documents of these plans into one organized retirement investment plan document consisting of three "Levels".

113.    The Plan is now called the Ministerial Annuity Plan of the African Methodist Episcopal Church (the "Plan") and is sponsored by AMEC.   This combined retirement plan is the operative Plan at issue in this case.

114.    Level I consists of the 401(k) defined contribution aspect of the Plan.  Level II consists of AMEC funded retirement benefits.  The Plan requires AMEC to fund this Level by contributing 12% of each plan participant's annual salary.  Level III provides annual contributions from the Church's General Treasury to all active Pastors and Presiding Elders.

115. Upon information and belief, a summary plan description ("SPD") currently found on the Church's website for Church employees is the only SPD issued by AMEC. The document describes the defined contribution plan, requiring plan participants who wish to participate to elect to reduce compensation to make contributions to the plan.

116. Upon information and belief, there is no summary plan description describing Level II and Level III components of the Plan.

117. On its first page, the Plan's SPD declares that "The Plan is subject to federal laws, such as ERISA (the Employee Retirement Income Security Act)."

118. Pursuant to the terms of the Plaintiffs' employment, AMEC was required to contribute a percentage of the Plaintiffs' income into the Fund.

119. Upon information and belief, in many instances AMEC did not contribute the required percentage.

120. Upon information and belief, AMEC did make contributions into the Fund for Plaintiffs which were invested on their behalf.

121. Additionally, many Plaintiffs chose to invest an additional specified portion of their income into the Fund.

122. The Fund functioned as the vehicle through which the assets of Plan were held, managed, administered and invested, purportedly on behalf of the Plaintiffs and members of the class.

123. While the Plan document in Plaintiffs' possession, effective January 1, 2006, conflicts on whether the Plan is directly governed by ERISA, the Plan's operative Plan Document expressly states that the Plan is to be construed and enforced according to ERISA.

124. In addition, the Summary Plan Description, as well as other written

communications to the Church's clergy and other employees, including the Church's Doctrine and Discipline (published every four years to provide clergy and Church members updated information on Church beliefs, teachings and practices), all expressly state that the Plan is an ERISA plan, and is to be operated in full compliance with ERISA.

125.    Accordingly, all state, trust and common law claims asserted herein must be read to mandate that the Plan and Fund be operated in compliance with ERISA.

126.    For purposes of this Consolidated Complaint, Plaintiffs do not assert the Plan is an actual ERISA Plan.  Any references to ERISA herein are not intended to assert that the Plan is an ERISA Plan.

127.    However, Plaintiffs do assert and allege that Defendants have agreed to govern the Plan as if it is an ERISA Plan and thus certain remedies may be available as a result of Defendants' conduct.

128.    Moreover, should Defendants provide lawful proof that the Plan is an ERISA Plan or should the Court determine that the Plan is an ERISA plan, Plaintiffs have pleaded claims under ERISA below only in the alternative.

129.    As detailed below, whether the Plan is an ERISA plan or an exempt church plan that is governed by state law, Defendants directly owed fiduciary duties to Plaintiffs and the putative Class members.

130.     These fiduciary duties obligated Defendants to conduct due diligence, monitor investments, and oversee and audit the Fund and its trustee(s) or managers, in order to assure that that the Fund was prudently and loyally managed and the assets of the Fund were prudently and loyally invested so that plan participants and their beneficiaries would have the retirement funds to which they are entitled.

131.    At all times relevant, the Defendants had the power to monitor, review, dismiss, appoint, and control the operations of various trustee(s) and fiduciaries whose responsibility it was to act in the best interests of the plan participants.

132.    The Doctrine and Discipline provides clergy and Church members updated information on Church beliefs, teachings and practices.   It also includes a section on the Department of Retirement Services and the Plan.

133.    Starting from at least the 2000 version to the most current 2016 version, the Doctrine and Discipline states that the Plan "***shall be*** consistent with and comply with all requirements of the Employee Retirement Income Security Act (ERISA)" (emphasis added).

134.    In addition, every such Doctrine and Discipline describes the funding of the Plan by the Church for Level II, and the required enrollment of "[a]ll Bishops, General Officers, College Presidents, Dean of Theological Seminaries and Itinerant Elders and all other ordained persons receiving an appointment to a pastoral charge," as described above.

135.    These Doctrine and Discipline documents also state that the Plan is "all-inclusive so that no salaried servant of the AME Church will be excluded, regardless of age."

136.    In the Department of Retirement Services' 2017 Annual Report (a section of the annual General Board Report following the Church's July 2016 Quadrennial Session of the General Conference), Defendants Green and Harris wrote that Level III of the Plan provides annual contributions from the Church's General Treasury to all active Pastors and Presiding Elders.

137.    The Plan requires AMEC to enroll all "eligible employees," which is defined by the Plan as "any person who is employed by the employer".

138.    The Plan also requires the Plan to be funded by AMEC at 12% of each plan participant's annual salary.

139.   All eligible and enrolled participants in the Plan are entitled to distributions pursuant to a Vesting Schedule. Upon official retirement or separation from active service, eligible and officially enrolled participants are eligible to receive the total amount of funds vested in their name, plus accrued interest. Eligible and officially enrolled participants are also permitted to seek disbursements related to hardship.

## IV.   Defendants' Misappropriation and Mismanagement of the Plan

### A.   Defendants' Failed Oversight of the Plan

140.   From 2000 until June 2021, Dr. Harris acted as Trustee of the Plan, making investment decisions and taking action with the blessing and authority of the directors of AMEC and the Plan.

141.   As Executive Director, Defendant Harris provided annual reports to the AMEC Commission on Retirement Services of the General Board.

142.   AMEC assigned Defendant Davis (and later, Defendant Green) the role of chairing the AMEC Department of Retirement Services and overseeing Defendant Harris.

143.   On or about December 19, 2001, on Defendant Harris's recommendation, Defendant AMEC General Board resolved to allow Defendant Harris to move its annuity funds to Safeco Insurance.

144.   On or about December 31, 2001, AMEC opened its investment account with Safeco Insurance and invested approximately $49,500,000.00.

145.   Safeco Insurance rebranded as Defendant Symetra Life Insurance Company in approximately 2005.

146.   AMEC engaged American Express Tax & Business Services ("AMEX TBS") to operate as an independent third-party administrator of the Plan.

147.   AMEX TBS's role as third-party administrator required it to manage the Plan on a

day-to-day basis. AMEX TBS's responsibilities included, but were not limited to, tracking balances of Plan participants, and preparing and sending statements to Plan participants.

148.    In mid-2005, H&R Block acquired AMEX TBS, and rebranded it under the name RSM McGladrey.

149.    RSM McGladrey was then sold by H&R Block to an entity called Pension Specialist, Inc., which was later rebranded to Verisite, and then merged with Defendant Newport in 2014.

150.    Through all these corporate changes to the Plan's operative third-party administrator, all relevant liabilities related to the third-party administration of the Plan ultimately ended up with Defendant Newport.

151.    Both AMEC (by and through its representatives such as Defendant Green) and the third-party administrators failed to engage in proper oversight over Defendant Harris and his investment decisions.

152.    Further, as alleged below, AMEC never performed a proper audit and the Plan's third-party administrators did not seek to verify investments.

**B. Defendant Harris' Fraudulent Scheme**

153.    In 2001, Defendant Harris began his long-running conspiracy to, *inter alia*, embezzle funds and defraud Plaintiffs.

154.    Defendant Harris created AMEC Financial Services, LLC in 2002 to serve as a primary vehicle for his investment schemes and business ventures with third parties.

155.    The activities of AMEC Financial Services, LLC included, *inter alia*, entering into a marketing alliance with Financial Technologies, LLC to provide unknown and possibly illusory "services" in exchange for compensation to Financial Technologies and Defendant Robert Eaton.

156.    AMEC Financial Services, LLC was administratively dissolved in 2010.

157.    Financial Technologies, LLC is an entity that is owned, operated, and/or controlled by Defendant Robert Eaton.

158.    Defendant Harris engaged Financial Technologies, LLC to serve as AMEC's exclusive broker of record for the Plan.

159.    Upon information and belief, Financial Technologies, LLC and Defendant Robert Eaton received compensation through this broker arrangement.

160.    In 2004, the AMEC Department of Retirement Services, in conjunction with AMEC Financial Services, LLC, loaned Financial Technologies, LLC more than $500,000. Defendant Eaton signed on Financial Technologies, LLC's behalf and used the commission checks he and Financial Technologies LLC received from Symetra related to the Fund as collateral to secure the loan.

161.    The loan was originally due to be repaid in three years, but roughly a year after the loan was made, Financial Technologies, LLC obtained a favorable settlement agreement with AMEC and AMEC Financial Services LLC.

162.    Under the terms of the settlement agreement, AMEC and AMEC Financial Services LLC discharged the debt owed by Financial Technologies in exchange for certain tangible and non-tangible assets that are believed to be worth far less than $500,000.

163.    Subsequently, Defendant Financial Freedom Funds, LLC ("Freedom Funds") was formed by Defendant Harris in 2006.

164.    Upon information and belief, AMEC Ministerial Retirement Annuity Plan was listed as the Manager of Freedom Funds in the documents establishing Freedom Funds.

165.    Upon information and belief, Defendant Harris was listed as the Plan's Trustee in

the documents establishing Freedom Funds.

166.    For roughly fifteen years, Defendant Harris used Freedom Funds as a vehicle to divert millions of dollars from the Department, the Plan, and the Fund.

167.    Freedom Funds made numerous high-risk, speculative, and/or fraudulent investments.

168.    Defendant Financial Freedom Group, Inc. ("Freedom Group") was formed by Defendants Harris and Robert Eaton in 2007.

169.    Both Defendant Harris and Defendant Eaton owned a 50% share in Freedom Group.

170.    Defendant Robert Eaton served as the president of Freedom Group.

171.    For roughly fourteen years, Defendant Harris, in conjunction with Defendant Robert Eaton, used Freedom Group as a vehicle to divert money from the Department, the Plan, and the Fund.

172.    Defendants Harris and Robert Eaton were listed as signatories for agreements involving Freedom Group.

173.    Freedom Group's business transactions included, *inter alia*, a loan of more than $500,000 from AMEC Financial Services.

174.    Trinity Financial Consultants, LLC ("Trinity") was formed by Defendant Harris in 2008.

175.    Defendant Harris was listed as the managing member of Trinity.

176.    For roughly thirteen years, Defendant Harris used Trinity as a vehicle to divert money from the Department and the Plan.

177.    Trinity's business transactions included, *inter alia*, a Management and Administrative Services Agreement between Trinity and Freedom Funds.

178.    Defendant Harris used Freedom Funds and other financial entities within his control to make high-risk investments in various Motorskill Entities.

179.    Defendant Randall Erwin initially served as the representative of Motorskill Entities in its dealings with Defendant Harris and entered into various agreements with Dr. Harris.

180.    Defendant Jarrod Erwin later took over Defendant Randall Erwin's role as the representative of Motorskill Entities in its dealings and agreements with Defendant Harris.

181.    Jarrod Erwin is the son of Randall Erwin.

182.    Through Motorskill Ventures Group, the Plan made investments in "Motorskill Ventures" and "Motorskill Asia Ventures."

183.    The Plan also made separate investment in Freedom Funds, which in turn invested in additional Motorskill Ventures Group investments called "Motorskill Ventures 1" and "Motorskill Asia Ventures 1."

184.    From roughly 2005 to 2016, the Plan invested a total of between $30 million and $40 million in Motorskill Entities. These transactions occurred by wiring funds from the Department's bank account to Motorskill Entities.

185.    Defendant Harris also requested that Symetra electronically wire funds to Motorskill Entities, which Symetra did without confirming whether Dr. Harris had such authority.

186.    The Motorskill Entities stopped providing quarterly financial statements in 2019.

187.    As a result, Defendant Harris no longer provided any information regarding these investments to Newport.

188.    Despite not receiving Motorskill Entity quarterly financial statements, Newport continued to provide Plan participants with quarter statements reflecting account balances that included investments in the Motorskill Entities.

189.    On June 11, 2021, Dr. Harris received written notification that his investments in the Motorskill Entities were virtually worthless.

190.    The Motorskill Entities have not provided financial records or other documentation to explain how the millions of dollars invested, directly and indirectly, by the Plan evaporated.

191.    On information and belief, the moneys invested by the Plan in the Motorskill entities were not merely recklessly invested but in whole or in part converted outright by Defendants Randall Erwin and Jarrod Erwin, individual Doe Defendants, Corporate Doe Defendants, and unknown others.

192.    Defendants Harris and Eaton also, on information and belief, took a share of the converted funds, directly or indirectly.

193.    The funds in which the Plan invested were terminated by Motorskill.

194.    The only known asset of value remaining in the Motorskill Entities is an 11% membership interest in Day and Night Solar, LLC.

195.    This asset's value is unknown but almost certainly not anywhere close to the tens of millions of dollars that were originally invested in the Motorskill Entities.

196.    Defendant AMEC alleges that Defendant Harris, without authority, used Pension funds to issue loans to various entities, some of which have not been repaid.

197.    Defendant Harris used funds from the Department and/or Plan to loan over a half a million dollars to Day and Night Solar, LLC.

198.    Day and Night Solar, LLC was created by Defendant Robert Eaton.

199.    Defendant Robert Eaton is the president of Day and Night Solar, LLC.

200.    Upon information and belief, at some point Defendant Harris owned a stake in Day and Night Solar.

201.    At some point, Defendant Harris resigned his membership interest upon advice of counsel due to the conflict of interest that arose from making these loans.

202.    Upon information and belief, the "counsel" that advised him to do this was working on behalf of AMEC at the time.

203.    Therefore, AMEC was on notice that Defendant Harris was using Plan assets improperly.

204.    Even a cursory review of Plan assets by AMEC's general counsel, the General Board or anyone else with an interest in protection the Plan would have revealed that the Plan was being unlawfully looted by Defendant Harris, Defendant Eaton and other defendants to whom they gave access to Plan funds.

205.    Defendant Harris also invested $2.5 million of the Plan's assets in undeveloped land in Key Marco, Florida.

206.    Upon information and belief, the AMEC Council of Bishops and/or the AMEC General Board was contemporaneously aware of the Key Marco investment.

207.    Key Marco Holdings, LLC was listed on the note, mortgage, and loan documents associated with that undeveloped land.

208.    The sole member of Key Marco Holdings, LLC, is Defendant Financial Freedom Funds, LLC.

209.    A recent valuation of these properties indicates that they are worth less than half of the $2.5 million original loan amount.

210.    Upon information and belief, Defendant Robert Eaton recommended the investments in one or more Motorskill investment ventures, Day & Night Solar, LLC, and Key Marco Holdings, LLC.

211.    Defendant Eaton recommended these investments to Defendant Harris.

212.    Defendant Eaton maintained his own investment stake in Day & Night Solar, LLC, and Key Marco Holdings, LLC.

213.    Defendant Eaton was compensated by Defendant Harris for his investment recommendations with funds that were withdrawn from the Pension Fund and/or returns from investments made by the Plan.

214.    The actions of Defendants failed to reasonably or reliably protect the interest of the Plaintiffs in their investments.

215.    At some point during the Defendant Harris's tenure as Executive Director, the Department retained the services of Rodney Brown and Company to audit the Department's financial statements.

216.    Rodney Brown and Company subsequently certified that the total account balances of annuities held and invested on behalf of the Plan were in excess of $128,000,000 in 2020 and 2021.

217.    Rodney Brown and Company's audit report stated that it was required to obtain reasonable assurances that the Department's financial statements were free from material misstatement.

218.    Upon information and belief, the reports presented by Rodney Brown and Company were so ill-supported and facially inadequate that no fiduciary of a Pension Fund with the size, leadership structure, and importance of the Plan could accept the reports at face value without violating the fiduciary's duty of care.

## C. Defendant Harris' False Representations to Class Members About the Plan.

219.    Throughout the early 2000s and until the Relevant Time Period, Defendant Harris

would routinely publish written materials and present those materials at annual conferences and meetings on the condition of the Fund and its investments.

220.   However, from 2001 to 2021, Defendant Harris created various entities and/or used pre-existing entities, purportedly to perform services for the Department and/or Plan, but in fact to divert Department and/or Plan funds to engage in self-dealing and other illegal acts.

221.   A common cover story for these diversions was that these various entities were performing services for the Department and/or Plan.

222.   The AME Church established a "General Board" in 1956 to guide the AME Church.

223.   The General Board Orientation Handbook, issued for each four-year period between the Church's Quadrennial Sessions, requires the General Board to hire an auditor to conduct an annual audit of the Department, including with respect to the contributions and investments in the Plan.

224.   The Handbook further states that the General Board is to require the Plan's Executive Director to provide each General Board member a report on the Plan and its assets one month before the annual General Board Meeting.

225.   In July 2016, at the 50th Quadrennial Session General Conference of the AME Church, Dr. Harris reported on the status of the Plan.

226.   In his report, Defendant Harris thanked Plan participants "for their continued confidence in [the] efforts to provide for their retirement future."

227.   Dr. Harris went on to praise the "personal commitment and the sacrificial support of the churches that [the Plan participants] serve" as the reason that "the AMEC Retirement Plan has continued to experience unparalleled growth and financial success for more than fifty-two years."

228.    In his July 2016 presentation, Defendant Harris reported that at the beginning of fiscal year 2015, the Plan had a total value of $113,388,374.50 and as of the fiscal year end had grown to $117,521,777.23.

229.    In 2017, Defendant Harris again reported on the financial condition of the Plan. In this presentation he showed a bar graph indicating significant growth in Plan assets between 2012 and 2017 as follows:



230.    In his overview, Defendant Harris stated that the last twelve months had been a

time of turmoil and uncertainty, which had an impact on the financial markets both in the United States and globally. He further stated that it was because of this uncertainty and market instability that the Department "has continued to adhere to a conservative investment strategy which has been in place since 2001. It is a strategy that has resulted in the continuous and consistent growth of the AMEC Ministerial Retirement Annuity Plan portfolio as reflected in the following pages of this report."

231.    Dr. Harris's 2017 report represented that as of fiscal year end 2017 the Plan portfolio total value was $119,800,961.03.

232.    The report of the Department of Retirement Services for 2016/2017 represented that "Symetra Financial and Retirement Services Company" is the investment company through which Plan annuity investments are purchased.

233.    The 2016/2017 Department of Retirement Services report represented that "[a]s of March 31, 2017 and 2016, the total account balances of annuities held and invested on behalf of the clergy servants and full-time employees of the African Methodist Episcopal Church was $119,801,000 and $117,522,000."

234.    At the General Conference held in Orlando, Florida in July 2021, AMEC told Conference attendees that the balance of the Plan's assets was nearly $130,000,000.

235.    While Defendant Harris's representations often attempted to reassure Plaintiffs that their funds were being invested in a conservative, protected manner, later audits and investigations revealed that AMEC (through Defendants Davis, Green and others, including without limitation Defendants Individual Does 1-10 and Corporate Does 1-10) and the third-party administrators it had hired to help oversee and administer the Fund had failed to properly oversee or manage the funds invested by Plaintiffs and the putative class into the Plan.

**D. AMEC's Alleged Discovery of Defendant Harris' Scheme**

236.    AMEC has publicly stated that it only learned of Defendant Harris' scheme in June 2021, upon his retirement and as part of the transition to new department leadership.

237.    Each Plaintiff had funds contributed to the Plan on their behalf by AMEC. Those funds were vested benefits for all Plaintiffs due to the length of their respective service.

238.    The Fund was making disbursements until summer 2021.

239.    Rev. Pearce Ewing and other Plaintiffs and putative class members received a letter from the Plan dated September 14, 2021, notifying them that disbursements would be temporarily paused while the Plan was audited due to a change in leadership.

240.    The letter indicated that this audit would take 4-6 weeks.

241.    In approximately the first week of November 2021, AMEC sent a second letter to Plaintiffs and proposed class members indicating that the audit was not finished and therefore disbursements could not be made.

242.    Later audits and subsequent communications revealed that of the approximately $120,000,000 in assets invested into the Plan (and/or which were purportedly held in conservative investment funds and portfolios), some $80,000,000 to $90,000,000 was unaccounted for by 2020 or 2021.

243.    Details of imprudent, illogical, speculative, and highly risky investments of Plan assets followed, indicating that AMEC and the Plan management failed to adequately protect the interests of the Plaintiffs and their retirement savings.

244.    For example, on January 31, 2022, a meeting of the General Board confirmed that the Plan had, in fact, lost more than $90 million, with the exact amount unknown. The meeting was recorded and made available to the public via video on the internet.

245.    At that meeting, it was reported that as recently as June 30, 2021, the Fund had been

represented to have a value of $126,800,000.

246.    More than $90 million of this $126.8 million was now known to be missing, and the Church stated that no one connected with the Church, except Defendant Harris, knew where the money and other Plan-related records went.

247.    Those attending the January 31, 2022, meeting were told that despite repeated representations to Plan participants over the last two decades, the Plan's assets were not all invested in annuities provided by Symetra.

248.    Meeting attendees were also informed that the Council of Bishops, General Board, Department of Retirement Services, the chair of the Department, Bishop Green, and the Trustees allowed a single individual, Defendant Harris, to exercise full decision-making authority over the use of all Plan assets.

249.    Rev. James F. Miller, Dr. Harris's replacement as Executive Director of the Department of Retirement Services, promised that "never again will we allow one person to count the money."

250.    This statement in and of itself concedes that Defendants completely abdicated their fiduciary duties owed to the Plan and the Plan's participants, including Plaintiffs and class members.

251.    At the meeting on January 31, 2022, Rev. Dr. Miller informed the attendees of the meeting that the office of the Executive Director of the Department of Retirement Services had been emptied, with nothing in the office cabinets but "empty files and paperclips." Even the most current version of the Plan document could not be located.

252.    Upon investigation into the missing assets, AMEC stated that it learned that tens of millions of dollars had been supposedly diverted into high-risk, speculative, imprudent, and/or

fraudulent investments and loans to financial entities that were created, controlled, and/or owned by Defendants Harris and Eaton.

253.    The AMEC investigative committee reported that they had only been able to verify about $38,000,000 in existing Plan assets: $36,900,000 of the Plan assets invested with Symetra, along with about $1,000,000 of value in an investment in a speculative, high-risk investment in undeveloped real estate located in Key Marco Island, Florida.

254.    Defendants AMEC, Bishop Green, Bishop Davis, AMEC Department of Retirement Services, AMEC General Board, and AMEC Council of Bishops violated their fiduciary duties by accepting the reports of Rodney Brown and Company at face value.

255.    AMEC, Bishop Green, Bishop Davis, AMEC Department of Retirement Services, AMEC General Board, and AMEC Council of Bishops violated their fiduciary duties by failing to ensure that a sufficiently well-qualified and respected auditor was engaged for the task of auditing and performing due diligence on the Plan.

256.    Upon information and belief, Rodney Brown and Company lacked the size, experience, resources, and industry qualifications to audit an entity with the size and importance of the Department.

257.    Rodney Brown and Company violated its fiduciary duty to Plaintiffs and the other Class Members and/or committed professional malpractice by failing to obtain reasonable assurances that the Department's financial statements were free from material misstatement.

258.    The mismanagement and manipulation of the Plan by Defendant Harris and his co-conspirators was so extensive and so prolonged that a properly qualified auditing firm could not have failed to notice, while conducting a good faith audit of the Plan's financial health, that the Plan was being illegally and fraudulently looted by Defendants Harris, Eaton and other Defendants

to whom they entrusted Plan funds.

259.    As alleged above, tens of millions of dollars of the Plaintiffs' retirement funds have been move into speculative and unsafe investments with disastrous results.

260.    Even the funds that were invested in legitimate and safer investment vehicles generated returns that were woefully below that required by the Department of Labor to provide sufficient retirement security.

261.    These breaches of fiduciary duty harmed the Plaintiffs and the putative class.

262.    Defendant Harris retired in 2021.

263.    The current Executive Director of the Department of Retirement Services is Rev. Dr. James F. Miller.

264.    Upon information and belief, approximately $8-9 million of Defendant Harris's personal funds have been frozen by the federal government as part of its investigation. These funds were presumably accumulated at the expense of the Plan's participants.

265.    AMEC now denies all responsibility for the calamity that has befallen Plaintiffs.

266.     AMEC instead places all blame on Defendants Harris, Symetra, and Harris's associates.

267.    AMEC asserts that Defendant Harris repeatedly represented to AMEC "a deceptive, false, and grossly inflated value for the Annuity Plan." *See* https://religionnews.com/2022/05/26/ame-church-files-lawsuit-against-dr-harris-and-others-for-embezzlement-and-fraud/.

268.    The fraudulent scheme orchestrated by Defendant Harris relied on the systematic shirking of fiduciary duties by Defendants AMEC, AMEC General Board, AMEC Council of Bishops Department of Retirement Services, Bishop Davis. and Bishop Green.

269.    These Defendants failed to prudently select, retain and monitor the appointed fiduciaries of the Fund and the investments made by the Fund.

270.    Defendants also failed to enroll numerous qualified employees in the Plan that, according to the terms of the Plan, Defendant AMEC was required to enroll.

271.    Accordingly, Defendants breached their fiduciary duties to follow the terms of the Plan.

272.    Defendants also failed to contribute the full 12% of salary for each Plan participants, and therefore likewise breached their fiduciary duties to follow the terms of the Plan.

**PLAINTIFFS' SPECIFIC ALLEGATIONS**

273.    Each Plaintiff has been told that the balance of his or her respective retirement benefits are approximately 1/3 of what they were represented to be in July 2021.

274.    Each Plaintiff has been denied access to the full amount of their account balances.

275.    After Rev. Pearce Ewing retired in September 2021, he attempted to access his retirement funds from the Plan. At that time, he was denied access to his money.

276.    Rev. Pearce Ewing has since learned that he may be left with a mere fraction of the funds that he reasonably expected to receive.

277.    Because he is unable to rely on his retirement benefits, Rev. Pearce Ewing has been forced to make ends meet by driving large commercial trucks at night.

278.    Similar to Rev. Pearce Ewing, Rev. Wade has also been told that a significant portion of the Pension Fund is missing and that he cannot access or rollover his funds into an IRA.

279.    Presiding Elder Russ, Rev. King, and Rev. Matthew Ewing also attempted to access their monies in the Pension Fund around September 14, 2021, when they received the letter from AMEC regarding stopped disbursements and the audit. These three also received the follow-up letter in November 2021 from AMEC, just like Rev. Pearce Ewing and others.

280.    Rev. Jackson similarly received the form letter from AMEC dated September 14, 2021, notifying him that disbursements would be temporarily paused while the Pension Fund was audited.

281.    Rev. Jackson is over 70 years old and planned to rely on the usage of these funds in his retirement.

282.    On September 29, 2021, shortly after his retirement, Rev. Jackson mailed a written request to release his funds held by the Pension Fund, which was denied.

283.    On September 13, 2021, Presiding Elder Alexander completed and signed an Authorization for Distribution form requesting a direct rollover of his Pension Fund plan assets to an Individual Retirement Account.

284.    On October 8, 2021, Presiding Elder Alexander sent an email to Rev. Dr. James F. Miller, the newly elected Executive Director of the Department of Retirement Services, following up on this request.

285.    At that time, Presiding Elder Alexander was informed that the rollover was held up due to a pending audit and that the Pension Fund's funds had been frozen.

286.    This year, Defendant AMEC rolled over to his IRA approximately 1/3 of the amount indicated in his last account statement pursuant to his Authorization for Distribution form completed in September of 2021.

287.    Rev. Carmichael and Rev. Conley both received AMEC's September 14, 2021, and November 9, 2021, letters regarding the audit and pausing of disbursements.

288.    Both Rev. Carmichael and Rev. Conley have been unable to access their funds and have been told that the recent balance owed to them is significantly less than what they earned and were entitled to.

289.     For example, Rev. Carmichael's most recent account statement for the period of April 1, 2021, through June 31, 2021, showed an account balance of $107,989.04. In stark contrast, as of May 19, 2022, the online portal (maintained by Newport) showed a balance of $32,442.24.

290.     AMEC ministers and other employees, like Plaintiffs, have wrongly been denied access to their retirement funds. Further, they are now being told by AMEC that their retirement funds may be as much as 80% lower than was represented in June 2021. Even the June 2021 statements likely concealed years of disastrous returns that were far below even conservative rates that should have been obtained by the Fund had Defendants been properly adhering to their fiduciary duties they owed Plaintiffs and the putative class members.

## CLASS ACTION ALLEGATIONS

291.     Plaintiffs bring this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), (b)(2), and/or 23(b)(3) seeking injunctive and monetary relief for Defendants' misconduct, as alleged herein.

**I.     Class Definition**

292.     Plaintiffs bring this action on behalf of the following class:

### Class:

All persons residing in the United States who are participants in the African Methodist Episcopal Church Ministerial Retirement Annuity Plan, all persons residing in the United States who are beneficiaries entitled to benefits as of January 1, 2021 under the African Methodist Episcopal Church Ministerial Retirement Annuity Plan, and all persons residing in the United States who are qualified employees of the AMEC who were not, but should have been, made participants or beneficiaries in the African Methodist Episcopal Church Ministerial Retirement Annuity Plan. Any Defendant employees who have responsibility or involvement in the administration of the Plan, or who are subsequently determined to be fiduciaries of the Plan, and their beneficiaries are excluded from the Class

293.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses under Rule

23(c)(5), or modified in any other way.

294.    Plaintiffs are members of the Class they seek to represent.

295.    The misconduct challenged herein has been and is continuing in nature.

## II.    Rule 23(a) and Rule 23(b)(3) Requirements

### A.    Numerosity

296.    Upon information and belief, there are thousands of members of the proposed Class, who are geographically located throughout the United States.

297.    Upon information and belief, there are over 5,000 ministers and other AMEC employees impacted by the factual allegations contained in this Complaint.[1]

298.    The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through AMEC's corporate records.

299.    The number of class members are so numerous that joinder of all members is impracticable.

300.    The identification of Class members is ascertainable through Defendants' maintained records.

### B.    Commonality

301.    The prosecution of the claims herein will require the adjudication of numerous questions of law and fact common to the Class. The common questions of law and fact predominate over any questions affecting only individual Class members. The common questions include:

    a.    Whether Defendant Harris is an ERISA fiduciary or a fiduciary under state law and had discretionary authority or control respecting management and disposition of the Plan's assets and operation and management of the Plan.

---

[1] *See* https://www.bet.com/article/mp3ze7/ame-church-suspended-payments-retirees.

b. Whether Defendant Bishop Davis is an ERISA fiduciary or a fiduciary under state law and had discretionary authority or control respecting management and disposition of the Plan's assets and operation and management of the Plan.

c. Whether Defendant Bishop Green is an ERISA fiduciary or a fiduciary under state law and had discretionary authority or control respecting management and disposition of the Plan's assets and operation and management of the Plan.

d. Whether Defendant General Board is an ERISA fiduciary or a fiduciary under state law and had discretionary authority or control respecting management and disposition of the Plan's assets and operation and management of the Plan.

e. Whether the Defendants breached their fiduciary duties to the ministers and other AMEC employees that participated in the AMEC's retirement plan;

f. Whether Defendants fraudulently concealed their respective breaches of fiduciary duties;

g. Whether the Defendants fraudulently concealed the actions of Dr. Harris and other Defendants regarding the mismanagement of and missing funds from the Pension Fund;

h. Whether the Defendants were negligent in failing to perform adequate due diligence and management in relation to the Fund;

i. Whether Dr. Harris converted Plaintiffs' funds in the Pension Fund;

j. Whether Defendants must be held to the duties set forth in the Plan documents;

k. Whether Defendants breached their duty of loyalty owed to Plaintiffs and violated Tennessee Uniform Trust Code;

l. Whether Defendants have failed to administer, fund and otherwise operate the Plan

in accordance with ERISA;

m.  Whether the Plan is deemed to be an ERISA-covered Plan;

n.  Whether and to what extent Plaintiffs were damaged by the Defendants' misconduct challenged herein;

o.  The appropriate measure of damages to which the Plaintiffs are entitled; and,

p.  Whether the Plaintiffs are entitled to accounting of the Fund.

### C.  Typicality

302.    All Class members were subject to the same misconduct as alleged herein, all are similarly affected by Defendants' wrongful conduct, and their injuries arise out of the same wrongdoing.

303.    Plaintiffs' claims are also typical of the claims of the other members of the Class because, to the extent Plaintiffs seek equitable relief, it will affect all Class members equally.

304.    All Class members were injured and continue to be injured in the same manner by the alleged breaches of fiduciary duty.

305.    Plaintiff has no interests that are antagonistic to the claims of the Class.

306.    Plaintiffs understand that this matter cannot be settled without the Court's approval.

307.    AMEC does not have any defenses unique to Plaintiffs' claims that would make Plaintiffs' claims atypical of the remainder of the Class.

### D.  Adequacy of Representation

308.    Plaintiffs are adequate representatives of the Class.

309.    Plaintiffs' interests are coextensive with those of the members of the proposed Class. Plaintiffs are willing and able to represent the proposed Class fairly and vigorously.

310.    Plaintiffs have no interests antagonistic to, or in conflict with, the other Class

members, and will fairly and adequately protect the interests of the Class.

311.    Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

312.    Plaintiffs have retained counsel highly skilled in complex class litigation, and in benefits-related class actions in particular, who are qualified, experienced, and able to conduct this litigation.

### E.  Rule 23(b)(1) Requirements

313.    The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

314.    The requirements of Rule 23(b)(1)(B) are satisfied because adjudications of these claims by individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede the ability of other members of the Class to protect their interests.

### F.  Rule 23(b)(2) Requirements

315.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### G.  Rule 23(b)(3) Requirements

316.    If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members.

317.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

318.     Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter.

## CLAIMS FOR RELIEF

## COUNT I

## BREACH OF FIDUCIARY DUTY

### (On behalf of Plaintiffs and Members of the Class)

### (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, Robert Eaton, Newport, Symetra, and Rodney Brown)

319.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

320.     Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, Harris, and the AMEC Council of Bishops owed Plaintiffs and other Class members fiduciary duties because they all had substantial discretion and control over the Plaintiffs' and other Class members' retirement funds and communications with Plaintiffs and other Class members.

321.     Defendants AMEC, the AMEC General Board, and the AMEC Council of Bishops owed Plaintiffs and other Class members fiduciary duties because they were charged with, *inter alia*:

a)   Appointing and removing the Trustee and the general administrator of the Plan as necessary for the proper administration of the Fund;

b)   Managing the assets of the Fund for the sole and exclusive benefit of the Fund's

participants and beneficiaries, and acting with the care, skill, diligence, and prudence required of fiduciaries pursuant to common law and state law;

c)   Monitoring the selection of the Fund's investments, and the investments themselves, and the performance of all Fund fiduciaries and other persons to whom duties had been delegated under the provisions of the Fund or procedures established to administer the Fund;

d)   Enrolling all eligible employees in the Plan as Plan participants; and

e)   Funding each eligible Participant's account by the Plan's required 12% of salary.

322.   AMEC, the AMEC General Board, and the AMEC Council of Bishops breached their fiduciaries duties by, *inter alia*:

a)   Failing to remove Defendant Harris and/or the leadership of the AMEC Department of Retirement Services (including Bishop Green and Bishop Davis) for their failures to properly administer the Fund;

b)   Failing to conduct the necessary monitoring and due diligence to ensure that the Fund was being operated for the exclusive benefit of the Plan participants and their beneficiaries;

c)   Failing to monitor the selection of the Fund's investments and the investments themselves;

d)   Failing to adequately and thoroughly review the performance of all other fiduciaries of the Fund in a timely manner;

e)   Permitting Defendant Harris and his co-conspirators (as a result of the failures enumerated above) to engage in a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Fund;

f)   Failing to ensure that all qualified and eligible AMEC employees were made participants or beneficiaries in the Plan; and

g)   Failing to fund each eligible Participant's account by the Plan's required 12% of salary.

323.   As the general administrators of the Fund, AMEC Department of Retirement Services, Bishop Green, and Bishop Davis owed Plaintiffs and other Class members fiduciary duties because they were charged with, *inter alia*:

a)   Determining all questions relating to the eligibility of AMEC employees to participate or remain a participant in the Plan and to receive benefits under the Plan, and to enroll all eligible employees in the Plan as Plan participants;

b)   Ensuring that all eligible participants' Plan accounts are funded by Defendant AMEC the required 12% of each participant's salary;

c)   Computing, and certifying the amount and kind of benefits to which any Fund beneficiary would be entitled, and directing the Trustee with respect to the same;

d)   Authorizing and directing the Trustee with respect to all discretionary or otherwise directed disbursements from the Fund;

e)   Maintaining all necessary records for the administration of the Fund;

f)   Making and publishing rules for regulation of the Fund;

g)   Determining the size and type of any contract to be purchased from any insurer, bank, issuer or other financial institution and designating the financial institution from which to purchase any such contract;

h)   Computing and certifying to AMEC and Defendant Harris the sums of money necessary or desirable to be contributed to the plan; and

  i) Keeping a record of all actions taken and all other books of account, records, policies, and assorted data that may be necessary for proper administration of the Fund.

324. As the general administrators of the Fund, AMEC Department of Retirement Services, Bishop Green, and Bishop Davis breached their fiduciary duties by, *inter alia*:

  a) Failing to exercise an appropriate duty of care in determining questions of eligibility and ensuring that all qualified AMEC employees were participants or beneficiaries of the Plan;

  b) Failing to ensure that all eligible participants' Plan accounts are funded by Defendant AMEC the required amount of 12% of each participant's salary;

  c) Failing to exercise an appropriate duty of care in monitoring the Trustee's withdrawals and disbursements from the Fund;

  d) Failing to maintain all necessary records to administer the Fund in a manner that would reasonably protect the Fund from mismanagement, self-dealing, embezzlement, or other misconduct by Fund fiduciaries;

  e) Failing to make and publish rules for regulation of the Fund in a manner reasonably calculated to protect the Fund from mismanagement, self-dealing, embezzlement, or other misconduct by Fund fiduciaries;

  f) Failing to exercise sufficient oversight over the selection of Symetra as annuity provider and the terms of the contract with Symetra;

  g) Failing to conduct the due diligence and monitoring necessary to accurately compute and certify the sums of money necessary or desirable to be contributed to the Fund;

  h) Failure to keep a record of all actions taken, books of account, policies, and assorted data in a manner reasonably calculated to protect the Fund from mismanagement,

self-dealing, embezzlement, or other misconduct by Fund fiduciaries; and

i)   Permitting Defendant Harris and his co-conspirators (as a result of the failures enumerated above) to engage in a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Fund.

325.   As the third-party administrator of the Fund, Newport owed Plaintiffs and Class Members fiduciary duties because it had substantial discretion and control over the management and oversight of the Fund's assets and each participant's balance.

326.   Newport breached its fiduciary duties by, *inter alia*:

a)   Failing to require all regular financial statements from all Plan investments;

b)   Continuing to report Fund investments as maintaining their full value even after Fund investments stopped providing regular financial statements;

c)   Failing to ensure that all investments made by the Fund were made by a Plan representative acting within the scope of his authorization; and

d)   Permitting Defendant Harris and his co-conspirators (as a result of the failures enumerated above) to engage in a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Fund.

327.   Symetra owed Plaintiffs and other Class members fiduciary duties because it had "authority or control respecting management or control of [Fund] assets."

328.   Symetra breached its fiduciary duties by, *inter alia*,

a)   Failing to establish and/or maintain controls, processes, and procedures in a manner consistent with trust law standards and reasonably calculated to protect the Fund from mismanagement, self-dealing, embezzlement, or other misconduct by Fund fiduciaries

b)    Failing to adequately ensure that all withdrawals and disbursements from the Fund were made by a Plan representative acting within the scope of his authorization; and

c)    Permitting Defendant Harris and his co-conspirators (as a result of the failures enumerated above) to engage in a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Fund.

329.    Defendant Eaton owed Plaintiffs and other Class members fiduciary duties because he acted as a paid investment adviser for the Fund and exercised discretionary control or authority over plan assets.

330.    Defendant Eaton breached his fiduciary duties by, *inter alia*,

a)    Engaging in self-dealing by recommending investments in which he had a personal interest; and

b)    Recommending investments that were extraordinarily speculative and imprudent for the Fund and exposed the Participants of the Plan to an intolerable amount of investment risk.

331.    Defendant Rodney Brown and Company owed Plaintiffs and other Class members fiduciary duties because it received a delegation of fiduciary responsibility from the Department for the tasks of certifying the sums invested in the Fund and monitoring the Trustee's withdrawals and disbursements from the Fund.

332.    Defendant Rodney Brown and Company breached its fiduciary duties by failing to conduct a good-faith audit with the care and competence that would be expected of an auditor tasked with performing due diligence on a pension fund with the size and importance of the Fund.

333.    The Defendants' conduct, including poor oversight, control, and management, was fraudulently concealed from Plaintiffs and other Class members until January 2022 when it was

first revealed that 70% to 80% of the Fund's assets were missing.

334. Neither Plaintiffs nor the other Class members could have uncovered the Defendants' misconduct even through the exercise of reasonable diligence.

335. The Defendants occupied a superior position over Plaintiffs and other Class members with respect to their management and control over the retirement funds of Plaintiffs and other Class members.

336. This discretion and control gave rise to fiduciary duties of loyalty and care on the part of each Defendant to Plaintiffs and other Class members.

337. The Defendants' superior position necessitated that Plaintiffs and other Class members repose trust and confidence in the Defendants to fulfill their duties, and Plaintiffs and other Class members reposed such trust by investing in the Fund.

338. As managers and professional advisors of the Fund, Defendants owed fiduciary duties to the Plaintiffs and other Class members.

339. The Defendants breached their fiduciary duties to Plaintiffs and other Class members by failing to adequately manage the Fund.

340. The Defendants breached their fiduciary duties to Plaintiffs and other Class members by failing to protect the assets of the Fund so as to ensure the retirement security of Plaintiffs and other Class members.

341. Plaintiffs and other Class members have been damaged as a proximate result of Defendants' breaches of fiduciary duty and are entitled to damages, and appropriate equitable relief, including accounting.

## COUNT II

### Claim for Violation of Tennessee Uniform Trust Code For Breach of Trust and Misappropriation of Trust Funds

### (On Behalf of Plaintiffs and Members of the Class)

### (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, Robert Eaton, Newport, Symetra, and Rodney Brown)

342.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 – 318 as if fully set forth herein.

343.    The Plan's assets (the Fund) are held in trust for the benefit of Plaintiffs and the Class members.

344.    AMEC agreed and represented in writing in the Plan document and Summary Plan Description that "The Plan and Trust will be governed by the laws of the State of Tennessee."

345.    Plaintiffs and the other Class members are beneficiaries of the Plan's trust.

346.    AMEC, in its role as the Employer with respect to the Plan, is a fiduciary pursuant to the Plan's documents.

347.    AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishops Davis and Green, Dr. Harris and the Doe Defendants are trustees within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20), as well as the Uniform Prudent Investor Act, Tenn. Code Ann. § 35-14-102(3).

348.    Under the Tennessee Uniform Trust Code, "A trustee shall take reasonable steps to take control and protect the trust property." Tenn. Code Ann. § 35-15-809.

349.    Under the Tennessee Uniform Trust Code, "A trustee shall administer the trust solely in the interests of the beneficiaries." Tenn. Code Ann. § 35-15-802.

350.    By investing, or permitting the investment of, more than two-thirds of the Fund's

assets into highly risky, speculative, possibly fraudulent, and demonstratively imprudent investments real estate, Defendants violated the Tennessee Uniform Prudent Investor Act.

351.    Trustees also owe a duty of loyalty to trust beneficiaries.   *See* Tenn. Code Ann. §§ 35-15-802 ("(a) A trustee shall administer the trust solely in the interests of the beneficiaries. (b) …a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected the transaction").

352.    Defendants AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green and Bishop Davis breached their duty of loyalty owed to Plaintiffs and the Class under Tennessee state law through their complete abandonment of their fiduciary duties, failing to do anything as it relates to administration of the Fund, including the selection and monitoring of Plan investments and seemingly permitting a single fiduciary, Defendant Harris, to make all investment decisions for the Fund.

353.    This misconduct resulted in Defendant Harris's and Defendant Eaton's extraordinarily high-risk and/or fraudulent investments in the Motorskill Entities, Day and Night Solar and undeveloped real estate in Key Marco Island, Florida.

354.    In doing so, these Defendants failed to make Fund investment decisions based solely on the merits and what was in the interest of Plan participants.  These Defendants therefore failed to discharge their duties solely in the interest of the participants and beneficiaries of the Fund, and for the exclusive purpose of providing benefits to participants and their beneficiaries, in violation of their duty of loyalty under Tenn. Code Ann.  § 35-15-802.

355.    Dr. Harris's investments of Fund assets in high-risk venture firms and undeveloped

real estate were made in order to benefit Defendants Harris and Eaton.

356.    Accordingly, misappropriation of Fund assets constitutes misconduct of the highest order.

357.    Defendant Harris's and Eaton's self-dealing violated TN Code §§ 35-15-802(b).

358.    As fiduciaries/trustees of the Fund, all Defendants have violated Tennessee Uniform Trust Code.

359.    Tenn. Code Ann. § 35-15-105(b)(2) states that the terms of a trust may not restrict, eliminate, or otherwise modify the duty of a trustee to act in accordance with the terms and purposes of the trust and interests of the beneficiaries.

360.    To the extent that Defendants are determined by this Court to be trustees under the Tennessee Uniform Trust Code, Tenn. Code Ann. § 35-15-105(b)(2) forecloses any contractual defense that purports to restrict, eliminate, or otherwise modify Defendants' duty to act in accordance with the terms and purposes of the trust and interests of the beneficiaries.

361.    Tenn. Code Ann. § 35-15-105(b)(8) and Tenn. Code Ann. § 35-15-1008(a)(1) prevent the enforcement of any provision that would relieve a trustee of liability from a breach of trust that the trustee committed in bad faith or with reckless indifference.

362.    Defendant Harris's breach of trust occurred over many years, involved multiple instances of self-dealing, involved sustained efforts to deceive Plaintiffs, and resulted in the loss of tens of millions of dollars.

363.    Defendant Harris's breaches of trust were committed in bad faith or with reckless indifference.

364.    The breaches of trust committed by AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, and Bishop Davis

involved a failure to make any significant effort to perform the basic and fundamental task of monitoring and supervising Defendant Harris's actions.

365.    The breaches of trust committed by AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, and Bishop Davis involved a failure to engage a well-qualified auditor and a decision to rely on facially inadequate auditing reports from an unqualified auditor for a number of years.

366.    The breaches of trust committed by AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, and Bishop Davis were committed with reckless indifference to the purposes of the Fund and the interests of the Fund's beneficiaries.

367.    The breach of trust committed by Robert Eaton involved self-dealing and investment recommendations that violated the duty of care and loyalty for a fiduciary of the Fund by exposing the Fund to an imprudent degree of risk.

368.    Eaton's breach of trust was committed in bad faith or with reckless indifference to the purposes of the Fund and the interests of the Fund's beneficiaries.

369.    Newport's breach of trust involved the failure to require all regular financial statements from all Fund investments, the issuance of financial reports with investment valuations that lacked adequate documentation, and the failure to ensure that all investments made by the Fund were made by a Plan representative acting within the scope of his authorization.

370.    Defendant Harris's actions as Plan representative were so irregular and the lack of adequate Plan procedures to prevent embezzlement, self-dealing, and mismanagement were so obvious that Newport could not have failed to foresee an unreasonable risk of harm to the beneficiaries of the Fund.

371. Newport's breach of trust was committed in bad faith or with reckless indifference to the purposes of the Fund and the interests of the Fund's beneficiaries.

372. Symetra's breach of trust involved the failure to ensure that all withdrawals and disbursements from the Fund were made by a plan representative acting within the scope of his authorization.

373. Symetra's breach of trust also involved the failure to establish and/or maintain controls, processes, and procedures in a manner consistent with trust law standards and reasonably calculated to protect the Fund from mismanagement, self-dealing, embezzlement, or other misconduct by Fund fiduciaries.

374. Defendant Harris's actions as Plan representative were so irregular and the lack of adequate Symetra controls, processes, and procedures to prevent embezzlement, self-dealing, and mismanagement were so obvious that Symetra could not have failed to foresee an unreasonable risk of harm to the beneficiaries of the Fund.

375. Rodney Brown's breach of trust involved the repeated failure to make a serious inquiry into the financial health of the Fund and the accuracy of the Fund's financial summaries.

376. Rodney Brown's breach of trust also involved the repeated decision to accept an auditing responsibility for which Rodney Brown was fundamentally unqualified and incapable of fulfilling in accordance with industry standards of competence and care.

377. Rodney Brown's breach of trust was committed in bad faith or with reckless indifference to the purposes of the Fund and the interests of the Fund's beneficiaries.

378. Tenn. Code Ann. § 35-15-105(b)(11) states that the terms of a trust may not restrict, eliminate, or otherwise modify the power of a court to take such action and exercise such jurisdiction as may be necessary in the interests of justice.

379.    Therefore, to the extent that this Court determines that the terms of the Plan and its associated contracts do not provide an adequate remedy against Defendants for the losses suffered by the Plaintiffs and the Class, this court is empowered to order whatever remedies are necessary in the interests of justice.

380.    Plaintiffs and the Class are entitled to damages sufficient to restore the value of the Fund and its distributions to what they would have been had the breach of trust not occurred. See Tenn. Code Ann. § 35-15-1002.

381.    The amount of damages should be, at a minimum, sufficient to restore the value of the Fund to its June 30, 2021 valuation of $126,800,000.

382.    Plaintiffs and the Class are entitled to present proof that the value of the Pension Fund would have been even greater than $126,800,000 if the Defendants had not committed a breach of trust.

383.    Plaintiffs and the Class are also entitled to all remedies enumerated in Tenn. Code Ann. § 35-15-1001, including a right to an accounting, a right to void certain actions by the trustees, a right to impose a lien or a constructive trust on trust property, and a right to trace trust property for the purpose of recover wrongfully disposed property and/or its proceeds.

## COUNT III

## NEGLIGENCE

### (On behalf of Plaintiffs and Members of the Class)

### (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, Bishop Green, Bishop Davis, Robert Eaton, Newport, Symetra, and Rodney Brown)

384.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

385.     The Defendants had a special relationship with Plaintiffs and other Class members that gave rise to a duty to exercise due care in the management and oversight of their assets invested in the Fund.

386.     The Defendants knew or should have known that Plaintiffs and other Class Members were relying on the Defendants to manage and oversee the investments entrusted to the Fund with reasonable care, and Plaintiffs and other Class members did reasonably and foreseeably rely on the Defendants to exercise such care by entrusting assets to the Fund.

387.     The Defendants failed to exercise due care and thereby injured Plaintiffs and other Class members.

388.     Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, Bishop Green, Bishop Davis, Robert Eaton, Newport, and Symetra negligently failed to exercise the degree of prudence, caution, and good business practice required of persons who obtain and manage retirement funds.

389.     Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, Bishop Green, Bishop Davis, Robert Eaton, Newport, Symetra, and Rodney Brown and Company also negligently failed to perform adequate due diligence and monitoring with respect to the Fund and its investments.

390.     AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, and Bishop Davis failed to exercise the degree of caution required and to perform adequate due diligence when they failed to engage a well-qualified auditor to conduct regular audits of the Plan.

391.     AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, and Bishop Davis failed to exercise the degree of caution

required and to perform adequate due diligence when they relied on facially inadequate auditing reports from a single unqualified auditor for a number of years.

392.    Rodney Brown negligently failed make a serious inquiry into the financial health of the Plan and the accuracy of the Plan's financial summaries as part of its repeated audits.

393.    Rodney Brown negligently accepted an auditing responsibility for which Rodney Brown was fundamentally unqualified and incapable of fulfilling in accordance with industry standards of competence and care.

394.    If the Defendants had not been negligent, they would have discovered that Plaintiffs and other Class members had lost a substantial portion of their retirement funds.

395.    As a proximate and foreseeable result of Defendants' negligence, Plaintiffs and other Class members have been damaged.

396.    By reason of the foregoing, the Defendants are jointly and severally liable to Plaintiffs and other Class members.

## COUNT IV

## CONVERSION

## (On Behalf of Plaintiffs and Members of the Class)

## (Against Dr. Harris, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill Entities)

397.    Plaintiffs realleges and incorporates by reference the allegations contained in paragraphs 1 – 318 as if fully set forth herein. Plaintiffs bring this claim against Dr. Harris, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., and the Motorskill Entities.

398.    Plaintiffs and other Class members had an ownership and other possessory rights to their respective portions of the Plan based on the amounts they contributed to the Plan and rates of return that the Plan should have reasonably achieved.

399.    Dr. Harris, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill Entities converted a portion of the Plan's assets that Plaintiffs and Class members had possessory rights to.

400.    Defendant Harris converted a portion of the Plan's assets that Plaintiffs and Class members had possessory rights to by, *inter alia*, depositing funds from the Plan into his personal checking account, using funds from the Plan for investment transactions that involved self-dealing, otherwise misappropriating funds, and using funds from the Plan to enrich himself and his co-conspirators.

401.    Robert Eaton, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., and Financial Technologies, LLC converted a portion of the Plan's assets that Plaintiffs and Class members had possessory rights to by, *inter alia*, using funds from the Plan for investment

transactions that involved self-dealing and using funds from the Plan to enrich themselves and their co-conspirators.

402.     Randall Erwin, Jarrod Erwin, and the Motorskill Entities converted a portion of the Plan's assets that Plaintiffs and other Class members had possessory rights to by, *inter alia*, using funds from the Plan to enrich themselves and their co-conspirators.

403.     Plaintiffs and the other Class members have been damaged as a proximate and direct result of Defendants' conversion of Plaintiffs and other Class members' respective contributions to the Fund. Plaintiffs and the other Class members have been deprived of the reasonable rates of return that they would have otherwise enjoyed.

## COUNT V

## FRAUDULENT CONCEALMENT

### (On Behalf of Plaintiffs and Members of the Class)

### (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, Newport, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, the Motorskill Entities, and Rodney Brown)

404.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

405.     Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, and Rodney Brown concealed or suppressed material facts regarding the management of the Fund and lack of oversight of Dr. Harris, his investments, and the balance of the Fund.

406.     Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, and Rodney Brown concealed or suppressed material facts from Plaintiffs and Class members by failing to disclose

the mismanagement and missing funds from the Plan prior to January 2022.

407.   Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, and Rodney Brown owed a duty to not conceal material facts and to disclose material facts to Plaintiffs and other Class members.

408.   Plaintiffs and other Class members could not have discovered the material facts that were concealed or suppressed by Defendants.

409.   Plaintiffs and other Class members reasonably relied on the resulting misrepresentation created by the concealment or suppression of material facts relating to the mismanagement of the Plan's assets, the lack of oversight for the Fund, and the true balance of the Fund.

410.   As a result of Defendants' actions, Plaintiffs and other Class Members have been damaged.

411.   Defendants Dr. Harris, Newport, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill Entities concealed or suppressed material facts concerning the nature and results of investments made with funds from the Plan.

412.   This concealed fact was material because it provided an extraordinarily strong reason to discount or otherwise question the reported value of the Plan's investments.

413.   Plaintiffs and other Class members could not have discovered this material fact, which was concealed and not disclosed by Defendants.

414.   As a result of Defendants' actions, Plaintiffs and other Class members have been damaged.

<u>**COUNT VI**</u>

**FRAUDULENT MISREPRESENTATION**

**(On Behalf of Plaintiffs and Members of the Class)**

**(Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, Newport, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, the Motorskill Entities, and Rodney Brown)**

415.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

416.    Defendants affirmatively misrepresented the true balance and rate of return of the Fund through the use of inaccurate and misleading reported balances in the annual Fund balance update.

417.    These reported balances and rates of return were false at the time they were communicated to Plaintiffs and other Class members.

418.    The balance and rate of return of the Fund were material facts relating to the performance and management of the Plan.

419.    The false representations about the balance and rate of return of the Fund were made either knowingly, without belief in their truth, or recklessly.

420.    To the extent that any Defendant did not know that the representations were false or believed that the representations were true, that Defendant acted recklessly and in dereliction of its duty to perform due diligence and monitoring with respect to the Fund and its investments.

421.    Plaintiffs and other Class members reasonably relied on the misrepresentations about the balance and rate of return of the Fund.

422.    Plaintiffs and other Class members suffered damage as a result of the misrepresentations about the balance and rate of return of the Fund.

**COUNT VII**

**BREACH OF CONTRACT**

**(On Behalf of Plaintiffs and Members of the Class)**

**(Against AMEC)**

423.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

424.    At all relevant times, AMEC was the "sponsor" and "employer" with respect to the Plan.

425.    AMEC has repeatedly represented in writing that the Plan's fiduciaries were committed to "adhere to a conservative investment strategy," and had done so since 2001, resulting "in the continuous and consistent growth of the AMEC Ministerial Retirement Annuity plan portfolio."

426.    Consistent with AMEC's promises that the Plan's participant's retirement savings were invested in a safe, conservative investment strategy, Symetra was the only investment listed as a Plan investment on plan participants' benefits statements.

427.    AMEC has also repeated these promises in the Plan document, Summary Plan Description, Doctrine and Discipline, plan participants' quarterly benefits' statements and other documents.

428.    AMEC has repeatedly promised that Level II benefits are funded by the Church for all eligible employees at 12% of salary, and that the Church funds Level III benefits for all Pastors and Presiding Elders with retirement benefits funded annually by the Church's General Treasury.

429.    AMEC also represented in the Plan document, summary plan description, and Doctrine and Disciplines from 2000 to the most current publication that the Plan would be operated

in compliance with ERISA and provide all the protections that ERISA entails.

430.    In exchange for employment, Plaintiff and the other Class members were offered renumeration which included retirement savings benefits through a Plan governed by ERISA.

431.    The written promises made by AMEC were clearly communicated to Plaintiffs and Class members, including through the summary plan description found on the Church's website, the quadrennial General Conference, the quadrennial Doctrine and Discipline text that follows each General Conference, the Church's annual conference reports, and plan participants' quarterly benefits statements.

432.    Plaintiffs and the other Class members' continued work for AMEC constituted consideration for the promises contained in the Plan's documents.

433.    Accordingly, AMEC's Plan documents constitute enforceable contracts.

434.    By continuing to work for the Church, Plaintiffs and Class members performed their obligations under the contracts and satisfied the conditions required to trigger AMEC's duty to provide retirement benefits pursuant to the terms of an ERISA-compliant Plan, whether or not the Plan is an ERISA-exempt church plan.

435.    These terms include, *inter alia*, funding all participant accounts pursuant to the Plan's terms and restoring all accounts to the amounts listed on Plan participants' last benefits statements and paying benefits to retirees upon request.

436.    Defendant AMEC breached its obligations under the contracts by failing to make contributions pursuant to Plan terms, making risky, self-dealing investments with Plan assets, and failing to pay Plaintiffs and other Class Members retirement benefits to which they are entitled when requested to do so.

437.    AMEC willfully failed to perform, evaded the spirit of the bargain, and failed to act

in a manner consistent with the reasonable expectations of the Plaintiffs and the Class to the extent that it failed to adhere to even minimum levels of fiduciary responsibilities under the terms of the Plan by (a) failing to enroll all eligible participants; (b) failing to fund Plan participants' account pursuant to the Plan's terms; and (c) allowing a single fiduciary, Dr. Harris, to make all investment decisions for the Plan, with no oversight by any other fiduciary or its advisors or agents,

438.    Defendant AMEC further breached the implied covenant of good faith and fair dealing, as AMEC failed to exercise good faith in the performance of its obligations to comply with ERISA.

439.    These failures resulted in losses of tens of millions of dollars in retirement savings for the Church's clergy and other eligible participants.

440.    Plaintiffs and the Class are entitled to specific performance of the obligations contained in the Plan documents, including: (a) AMEC's obligation to operate the Plan in accordance with ERISA; (b) AMEC's obligation to enroll all eligible employees in the Plan; (c) AMEC's obligation to make contributions pursuant to the Plan's terms; (d) AMEC's obligation to promptly pay retirement benefits to retirees upon request; and (e) AMEC's implied obligation to act in good faith in the performance of its contractual obligations.

**COUNT VIII**

**Claim for Promissory or Equitable Estoppel**

**(On Behalf of Plaintiffs and Members of the Class)**

**(Against AMEC)**

441.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

442.     Plaintiffs assert a state law claim for promissory or equitable estoppel against Defendant AMEC to the extent that the Plan did not create an enforceable contractual relationship between AMEC and Plaintiffs and the other Class members.

443.     As shown above, AMEC repeatedly promised and represented (a) to operate the Plan in accordance with ERISA; (b) to enroll all eligible employees in the Plan; (c) to make contributions pursuant to the Plan's terms, including contributing 12% of each employee's salary; (d) to fund Level III benefits for all Pastors and Presiding Elders from the Church's General Treasury; and (e) and to invest the Plan's assets utilizing a conservative investment strategy.

444.     These promises and representations were clearly communicated to Plaintiffs and the other Class members through AMEC's Plan documents and communications, including the summary plan description, quarterly benefit statements, the quadrennial General Conference, the quadrennial Doctrine and Discipline text that follows each General Conference, the Church's annual conference reports, and/or other generally distributed documents and oral assurances.

445.     AMEC expected or reasonably should have expected that Plaintiff and the other Class members would continue to work for AMEC in reliance, in whole or in part, on AMEC's promise and representation to follow the strictures of ERISA, including by paying and funding

pension benefits, and prudently and loyally investing their retirement savings, in exchange for their completion of years of service.  A principal purpose of a pension is to encourage employees to continue working at their job instead of leaving and causing turnover.

446.   Plaintiffs and the other Class members continued working at their jobs and earned their years of service for their pension benefits in reliance on the promises and representations made to them by AMEC.

447.   AMEC has repudiated these promises and representations by failing to operate an ERISA-compliant Plan, failing to enroll all eligible employees, failing to fund all Plan participants at the level promised and failing to invest Plan assets in a prudent and loyal manner.

448.   Because Plaintiffs and the other Class members continued to work for the Church in reliance on AMEC promises, they forewent opportunities to seek other employment that would have paid them benefits, including retirement benefits.  Plaintiffs and the Class can never undo those years spent working for AMEC and cannot reverse time to work for an employer that will actually honor its promises and representations to pay pension benefits.  Accordingly, if AMEC does not honor its promises and representations to operate the Plan in compliance with ERISA and adequately fund and invest the promised pension benefits, Plaintiffs and the other Class members have relied on these promises and representations to a substantial detriment, as they will retire with far less income than they expected and will have been deprived of the opportunity to make up for that lost income.

449.   AMEC's promises and representations must be enforced to avoid this injustice to Plaintiffs and the other members of the Class.

## COUNT IX

## TORT OF OUTRAGE

## (On Behalf of Plaintiffs and Members of the Class)

## (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, and Robert Eaton)

450.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

451.    As set forth herein, Defendants herein intentionally misled and lied to the Plaintiffs and Class members concerning their intended use of contributions to the Fund and the value of Plaintiffs and Class members' respective accounts and of the Fund as a whole.

452.    Defendants misled and lied to the Plaintiffs and other Class members with the intent that they would contribute to the Fund pursuant to the Plan's terms in the amount of 12% of each participant's salary.

453.    Defendants made these lies and misrepresentations for the sole purpose of their own financial benefit.

454.     Defendants knew the investments made by the Plan created an imprudent, extraordinarily high risk that the Plaintiffs and others would lose their investments and be deprived of a vital source of financial support in their golden years.

455.    The Defendants knew their lies misrepresented the true value and risk profile of the the Fund.

456.    Defendants knew that their false advice would cause Plaintiffs and other Class members to continue contributing to the Fund even while the true value of the Fund lagged behind Defendants' rosy reports and continued to decline.

457.    Plaintiffs and other Class members have suffered severe emotional distress as a

consequence of discovering that their reasonably-expected rewards for years of service to AMEC are not forthcoming.

458.    Plaintiffs and other Class members have suffered severe emotional distress as a consequence of learning that any financial plans that they developed for sustaining themselves and their families in their golden years have been utterly destroyed.

459.    Plaintiffs and other Class members have suffered severe emotional distress as a consequence of learning that they have been victimized by the very religious leaders and organizations to which Plaintiffs and other Class members have served in their devotion to the ministry and God.

460.    The conduct of these Defendants was either intentional or reckless; they intended their behavior when they knew or should have known that severe emotional distress would likely result to the Plaintiffs and other Class members from the behavior set forth hereinabove.

461.    The conduct of these Defendants was outrageous; it went beyond all bounds of decency so as to be regarded as odious and utterly intolerable in a civilized community.

462.    As a direct and proximate cause of the intentional conduct or reckless disregard of the Defendants and each of them, the Plaintiffs and other Class members have suffered needless severe emotional distress.

## COUNT X

## CIVIL CONSPIRACY

### (On Behalf of Plaintiffs and Members of the Class)

### (Against Dr. Harris, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill Entities)

463.    Plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1-318 as if fully set forth herein.

464. Dr. Harris, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill Entities conspired together in a scheme that was intended to accomplish an unlawful purpose. by concerted action.

465. Dr. Harris and his co-conspirators shared a common plan or design.

466. Dr. Harris and each of his co-conspirators was aware of the common plan or design and the intent of the other co-conspirators to participate in that common plan or design.

467. Dr. Harris and each of his co-conspirators committed overt acts in furtherance of the conspiracy.

468. Dr. Harris and each of his co-conspirators provided substantial assistance to the conspiracy.

469. Plaintiffs and other Class Members have suffered damages as a result of the conspiracy.

## ALTERNATIVE CLAIMS FOR RELIEF IN THE EVENT THAT THIS COURT DETERMINES THAT THE PLAN IS DIRECTLY GOVERNED BY ERISA

### COUNT XI

### Claim for Plan Benefits Under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

### In the Alternative to Counts I-XI

### (On Behalf of Plaintiffs and Members of the Class)

### (Against AMEC and the Plan)

470. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-318 as if fully set forth herein.

471. ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), empowers plan

participants to bring suit to recover benefits due them under the terms of the plan, to enforce their rights under the terms of the plan, or to clarify their rights to future benefits under the plan.

472.    If the Plan is an ERISA plan, Plaintiffs are participants in the Plan.

473.    In September 2021, Plaintiffs were informed that they were unable to access or rollover their retirement benefits in the Plan.

474.    Plaintiffs were informed that this distribution was being held up because of an audit.

475.    This audit was necessitated by the loss of over $90 million in stated Plan assets.

476.    Even though some distributions have now resumed, no Plaintiffs or Class members has been paid anywhere near the full value of their pensions.

477.    AMEC and the Plan have not provided a procedure for Plaintiffs to appeal the decision to freeze the Plan's benefit payments and to refuse to pay the retirement benefits owed to them and other retirees in the amounts listed in their 2021 account statements for an indefinite period.[2] Plaintiffs have therefore either exhausted the Plan's administrative process or any such procedures would be futile.

## COUNT XII

## Breach of Fiduciary Duties for Failing to Prudently and Loyally Select, Retain and Monitor Plan

## Investments in Violation of ERISA Section 404, 29 U.S.C. § 1104

## (On Behalf of Plaintiffs and Members of the Class)

## (Against AMEC Department of Retirement Services, Bishop Green, Bishop Davis, and Dr. Harris)

478.    Plaintiffs realleges and incorporates by reference the allegations contained in

---

[2] Plaintiffs have also not been afforded a procedure for disputing their account balances indicated on any checks disbursed by AMEC in June 2022 and purported by AMEC to be their current account balance.

paragraphs 1 - 318 as if fully set forth herein.

479.    29 U.S.C. Section 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection, retention, and monitoring of the Plan's investments.

480.    The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis, and eliminating imprudent ones. This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Intern.*, 575 U.S. 523, 530 (2015).

481.    As described throughout this Complaint, Defendants abandoned their fiduciary duties with respect to administration of the Plan, including the selection and monitoring of Plan investments and instead permitted a single fiduciary, Defendant Harris, to make all investment decisions for the Plan.

482.    This misconduct—Defendants' indifference to Plan assets and retirement Plan participants' retirement savings—resulted in Defendant Harris's and Eaton's extraordinarily high-risk, speculative investments in the Motorskill Venture Group (a possibly fraudulent venture capital business), Day and Night Solar and undeveloped real estate in Key Marco Island, Florida and to the loss or disappearance of most or all of the Plan assets placed in these investments, more than $90 million in total.

483.    Through these failures to manage and administer the Plan and its assets, these Defendants failed to discharge their duties with respect to the Plan solely in the interest of the

participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries, in violation of their fiduciary duty of loyalty under 29 U.S.C.§ 1104(a)(1)(A).

484.    Through their actions and inactions, these Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

485.    As a direct and proximate result of the above breaches of fiduciary duties, the Plan and their participants have suffered a minimum of tens of millions of dollars of losses in retirement assets.

486.    Pursuant to ERISA, these Defendants are liable to restore all losses suffered by the Plan and its participants and beneficiaries caused by the breaches of fiduciary duty. 29 U.S.C. §§ 1109(a), 1132(a)(2) and 1132(a)(3).

## COUNT XIII

## ENGAGING IN PROHIBITED TRANSACTIONS IN VIOLATION OF ERISA SECTION 406(b), 29 U.S.C. § 1106(b)

### (On Behalf of Plaintiffs and Members of the Class)

### (Against Dr. Harris and Robert Eaton)

487.    Plaintiffs realleges and incorporates by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

488.    As described throughout this Complaint, Defendants Harris and Eaton are fiduciaries of the Plan.

489.    ERISA Section 406(b)(1), 29 U.S.C. § 1106(b) establishes a flat prohibition on

fiduciary self-dealing, providing that a fiduciary shall not "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b).

490.    Upon information and belief, Defendants Harris and Eaton invested Plan assets in Motorskill Ventures Group, Financial Freedom Fund, LLC and in undeveloped real estate in Florida in order to benefit themselves, financially or otherwise, and to serve their own self-interest in violation of ERISA Section 406(b)(1).

491.    As a direct and proximate result of the above violations of ERISA Section 406(b)(1), the Plan and its participants suffered tens of millions of dollars of losses in retirement assets.

492.    Pursuant to ERISA, 29 U.S.C. §1109(a), §1132(a)(2) and (a)(3), Defendants Harris and Eaton are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned from these unlawful investments of Plan assets.

## COUNT XIV

## BREACHES OF FIDUCIARY DUTY FOR FAILURE TO MONITOR APPOINTED FIDUCIARIES

### (On Behalf of Plaintiffs and Members of the Class)

### (Against AMEC, AMEC Council of Bishops, AMEC General Board, AMEC Department of Retirement Services, Bishop Green and Bishop Davis)

493.    Plaintiffs realleges and incorporates by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

494.    As described throughout this Complaint, Defendants AMEC, Council of Bishops, General Board, Department of Retirement Services, Bishop Green and Bishop Davis were named fiduciaries pursuant to ERISA Section 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries

within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. As such, they were bound by the duties of loyalty, exclusive purpose, and prudence.

495.   The scope of the fiduciary responsibilities of these Defendants included the responsibility to appoint, remove, and monitor the performance of other fiduciaries, including Defendant Dr. Harris.

496.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries perform their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

497.   The monitoring duty further requires that appointing fiduciaries have procedures in place so that they may review and evaluate, on an ongoing basis, whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

498.   Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with the complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

499.   An appointing and monitoring fiduciary also has the express power and inherent

obligation to remove fiduciaries who are failing to abide by the requirements of ERISA in the performance of their duties.

500.    These Defendants breached their fiduciary monitoring duties by, among other things, (1) failing to inquire or ask questions of the sole fiduciary making all investment decisions for the Plan, Defendant Harris, (2) failing to obtain reports concerning management of the Plan and (3) failing to remove Harris for his own fiduciary breaches.

## COUNT XV

## BREACH OF FIDUCIARY DUTIES BY FAILURE TO FOLLOW THE TERMS OF THE PLAN IN VIOLATION OF ERISA SECTION 404, 29 U.S.C. § 1104

### (On Behalf of Plaintiffs and Members of the Class)

### (Against AMEC, the Plan, AMEC Council of Bishops, AMEC General Board, AMEC Department of Retirement Services, Bishop Green, Bishop Davis and Dr. Harris)

501.    Plaintiffs realleges and incorporates by reference the allegations contained in paragraphs 1 – 318 as if fully set forth herein.

502.    Despite the 2006 Plan document's ambiguity concerning whether the Plan is an ERISA-governed church plan, the Plan document does state that the Plan must comply with ERISA.

503.    AMEC's most recent 2016 Doctrine and Discipline provides the "Duties and Responsibilities" for the Department, Executive Director and Trustee, which details many of the provisions of the Plan.  The Doctrine and Discipline states that the Plan "shall be consistent with and comply with all requirements of the Employee Retirement Income Security Act (ERISA)."

504.    On its first page, the Plan's Summary Plan Description similarly declares that "The Plan is subject to federal laws, such as ERISA (the Employee Retirement Income Security Act)".

505.    The Plan document requires AMEC to enroll all "eligible employees," which is defined by the Plan as "any person who is employed by the employer".

506.     The Doctrine and Discipline states that all bishops, general officers, college presidents/deans of theological seminaries, itinerant elders and all other ordained persons receiving an appointment to a pastoral charge must be enrolled and become participants in the Plan.

507.     This Doctrine and Discipline also states that the Plan is "all-inclusive so that no salaried servant of the AME Church will be excluded, regardless of age."

508.     In the Department of Retirement Services 2017 Annual Report (a section of the annual General Board Report following the Church's July 2016 Quadrennial Session of the General Conference), Defendants Green and Harris wrote that Level III of the Plan provides annual contributions from the Church's General Treasury to all active Pastors and Presiding Elders.

509.     On information and belief, Defendants failed to enroll all active Pastors and Presiding Elders in the Plan in contravention to the Plan's terms, and accordingly, failed to make the required Level III contributions for all clergy-participants, in violation of their fiduciary duties under 29 U.S.C. § 1104(a)(1)(D).

510.     On information and belief, Defendants failed to enroll all other "eligible employees" in the Plan in contravention to the Plan's terms, and accordingly, failed to make the required Level II AMEC-funded contributions for all these employees, whether clergy or other "eligible employee."

511.     Further, the Plan requires Church-funded contributions of twelve percent (12%) of each participant's salary, with a minimum contribution of $312 to be paid twice annually, first at the Church's Annual Conference and second at the Church's Mid-Year Convocation.

512.     Upon information and belief, Defendants failed to follow or ensure that the local churched followed the Plan's terms as they relate to these required contributions for many Class members, in violation of their fiduciary duties under 29 U.S.C. § 1104(a)(1)(D).

513.     As a direct and proximate result of the above breaches of fiduciary duties, the Plan and their participants have suffered millions of dollars of losses in retirement assets. Pursuant to ERISA, 29 U.S.C. §§ 1109(a), 1132(a)(2) and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan caused by the breaches of fiduciary duty.

## COUNT XVI

## VIOLATION OF ERISA REPORTING AND DISCLOSURE PROVISIONS

### (On Behalf of Plaintiffs and Members of the Class)

### (Against AMEC, or in the alternative, AMEC Department of Retirement Services or Newport)

514.     Plaintiffs realleges and incorporates by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

A. **Pension Benefit Statements**

515.     ERISA Section 105(a) requires the administrator of an individual account plan to furnish plan participants with a pension benefit statement either quarterly or annually, depending on the design of the plan. 29 U.S.C. § 1025(a). This statement must indicate, among other detailed requirements, the "value of each investment to which assets of the individual account have been allocated." *Id*. at § 1025(a)(2)(B)(i).

516.     Since at least the time the Plan started placing Plan assets in investments outside of Symetra, AMEC, or in the alternative, the Department of Retirement Services, has failed to provide Plaintiffs or any member of the Class with a pension benefit statement that meets the requirements of 29 U.S.C. § 1025(a)(2)(B)(i).

B. **Summary Plan Descriptions**

517.     ERISA Section 102, 29 U.S.C. § 1022, requires the SPD to apprise plan participants

of their rights and obligations under the plan.

518.    ERISA Section 104, 29 U.S.C. § 1024 requires that SPDs be distributed within 90 days to new participants, and that an updated SPD to be distributed to all plan participants and beneficiaries every fifth year if a Plan is amended and every 10 years if a Plan has not been amended during that time period.

519.    Since at least 2002, AMEC, or in the alternative, the Department of Retirement Services, has failed to provide Plaintiffs or any member of the Class with a current Summary Plan Description.

520.    The SPD on the Church's website is as many as 16 years old and is limited to Level I benefits (indicating that the Plan is limited to benefits under provisions of IRS Code 401(k), ignoring Level II and III of the Plan.

521.    Because AMEC, or in the alternative, the Department of Retirement Services, has been the Plan Administrator of the Plan at all relevant times, it violated ERISA Sections 102, 104, 29 U.S.C. §§ 1022, 1024, by failing to provide Plaintiffs and members of the Class with accurate and updated SPDs.

**C.  Annual Reports**

522.    AMEC, or in the alternative, the Department of Retirement Services, or in the further alternative, Newport, has failed to file any annual reports with respect to the Plan with the Secretary of Labor in compliance with ERISA Sections 103, 29 U.S.C § 1023.

523.    AMEC, or in the alternative, the Department of Retirement Services, or in the further alternative, Newport, has failed to file a Form 5500 and associated schedules and attachments, which the Secretary has approved as an alternative method of compliance with ERISA Sections 103, 29 U.S.C. § 1023.

524.     Because AMEC, or in the alternative, the Department of Retirement Services, or in the further alternative, Newport, has been the Plan Administrator of the Plan at all relevant times, these failures violated ERISA Section 104(a), 29 U.S.C. § 1024(a).

D. **Summary Annual Reports**

525.     AMEC, or in the alternative, the Department of Retirement Services, has failed to furnish Plaintiffs or any member of the Class with a Summary Annual Report with respect to the Plan in compliance with ERISA Section 104(b)(3) and regulations promulgated thereunder. ERISA Section 104(b)(3), 29 U.S.C. § 1024(b)(3).

526.     Because AMEC, or in the alternative, the Department of Retirement Services, has been the Plan Administrator of the Plan at all relevant times, it violated ERISA Section 104(b)(3), 29 U.S.C. § 1024(b)(3), by failing to furnish Plaintiffs or any member of the Class with a Summary Annual Report with respect to the Plan in compliance with ERISA section 104(b)(3) and regulations promulgated thereunder. ERISA Section 104(b)(3), 29 U.S.C. § 1024(b)(3).

## <u>COUNT XVII</u>

### <u>CLAIM FOR CO-FIDUCIARY BREACHES IN VIOLATION OF ERISA SECTION 405(a), 29 U.S.C. § 1105(a) AND FOR KNOWING PARTICIPATION IN FIDUCIARY BREACHES</u>

### <u>(On Behalf of Plaintiffs and Members of the Class)</u>

### <u>(Against All Defendants)</u>

527.     Plaintiffs realleges and incorporates by reference the allegations contained in paragraphs 1 - 318 as if fully set forth herein.

528.     In addition to liability under any other provision of ERISA, Section 405(a) imposes liability on a fiduciary for breach of a fiduciary responsibility of another fiduciary of the same plan if a fiduciary: (1) knowingly participates in or knowingly conceals another fiduciary's breaches; (2) through a failure to comply with his or her own fiduciary responsibilities, has enabled the other

fiduciary's breaches; or (3) if he or she has knowledge of another fiduciary's breaches and makes no reasonable efforts under the circumstances to remedy those breaches. 29 U.S.C. § 1105(a).

529.    As fiduciaries with respect to the Plan, Defendants have separately and jointly violated their duties as co-fiduciaries through, among other things:

>    a.    Their complete abdication of their own fiduciary duties with respect to Plan management, which enabled Defendant Harris to make wildly imprudent Plan investments and to lose the majority of Plan assets.

>    b.    Their failure to take any action to remedy obvious fiduciary breaches, despite their obvious knowledge of breaches by their co-fiduciary's breaches, such as the failure by Defendant Harris and other fiduciaries to follow Plan documents, to review and report on Plan investments and to abide by ERISA's reporting and disclosure requirements.

530.    Even to the extent any of the Defendants was not a fiduciary or acting as such with respect to the transactions in question, each of the Defendant knowingly participated in the breaches of other Defendants in violation of ERISA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray the Court for the following relief:

>    1.    That the Court certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

>    2.    That the Court name Plaintiffs as Class Representatives and their counsel as Class Counsel;

>    3.    That the Court enter an order finding that Defendants' conduct was a breach of their respective fiduciary duties under state law, ERISA, or both;

4.    Declare that Defendants Harris and Eaton engaged in self-dealing with respect to the Plan and its assets;

5.    That the Court enter an order finding that Defendants fraudulently concealed their actions from Plaintiffs and the Class;

6.    That the Court enter an order finding that that Defendants' conduct was negligent as alleged herein;

7.    That the Court enter an order finding that Defendants are liable on the other grounds alleged herein.

8.    That the Court enter an order that Defendants promptly pay Plaintiffs and retired participants (and those who have retired and should have been enrolled as participants) any and all benefits due;

9.    That the court reform the Plan to bring the Plan into compliance with ERISA;

10.    That the Court enter an order that Defendants operate the Plan in compliance with ERISA, including by:

   a.    Requiring Defendants to invest the assets of the Plan in a prudent and loyal manner;

   b.    Requiring AMEC to enroll all employees pursuant to Plan terms, as described herein; and

   c.    Requiring AMEC to make contributions pursuant to Plan terms, as described herein;

11.    That the Court award Plaintiffs and Class members damages and injunctive relief as appropriate, including but not limited to an equitable accounting

(at Defendants' expense), punitive damages, and emotional harm damages;

12. That the Court award Plaintiffs and Class members punitive damages in amounts reflecting the intentional, malicious, reckless and grossly negligent behavior of the various Defendants.

13. That the Court enter an order that Defendant AMEC be estopped from denying payment of the amount Plan account balances as represented on Plan participants' second quarter 2021 benefit statements;

14. That the Court enter an order that Defendants be removed from their roles as fiduciaries for the Plan, and appoint an independent fiduciary to bring the Plan into compliance with ERISA or applicable state law and to manage the Plan and its assets in compliance with applicable law;

15. That the Court award Plaintiffs and Class members pre-judgment and post-judgment interest;

16. That the Court award Plaintiffs and the other Class members reasonable attorneys' fees, costs, and expenses;

17. That all costs of this action be taxed against Defendants; and

18. That the Court award Plaintiffs and the Class such other and further relief as this Court may deem just and proper.

19. Plaintiffs demand a trial by jury.

20. Plaintiffs reserve the right to amend the Complaint.

Dated: August 19, 2022.                    Respectfully Submitted,


*/s/ J. Gerard Stranch, IV*                   Dean Graybill
J. Gerard Stranch, IV                      AARP Foundation
BRANSTETTER, STRANCH                       601 E Street, NW
& JENNINGS, PLLC                           Washington, DC 20049
223 Rosa L. Parks Avenue, Suite 200        (202) 434-6280
Nashville, Tennessee 37203                 Fax: (202) 434-6424
(615) 254-8801                             dgraybill@aarp.org
Fax: (615) 255-5419
gerards@bsjfirm.com
                                           Kenneth S. Byrd
**Liaison Counsel**                        LIEFF CABRASHER
                                           HEIMANN & BERNSTEIN, LLP
Gregorio A. Francis                        222 2nd Ave S
OSBORNE & FRANCIS LAW FIRM,                Nashville, TN 37210
PLLC                                       615-313-9000
433 Plaza Real, Suite 271                  Fax: 615-313-9965
Boca Raton, FL 33432                       kbyrd@lchb.com
(561) 293-2600;
Fax: (561) 923-8100
gfrancis@realtoughlawyers.com              Elizabeth Hopkins
                                           KANTOR & KANTOR LLP
Matthew E. Lee                             19839 Nordhoff Street
MILBERG COLEMAN BRYSON                     Northridge, CA 91324
PHILLIPS GROSSMAN, PLLC                    818-886-2525
900 W. Morgan Street                       Fax: 818-350-6274
Raleigh, NC 27603                          ehopkins@kantorlaw.net
919-600-5000
Fax: 919-600-5035
mlee@milberg.com                           **Plaintiffs' Steering Committee**

**Interim Co-Lead Counsel**

Dhamian Blue
Blue LLP
P.O. Box 1730
Raleigh, NC 27602
919-833-1931
Fax: 919-833-8009
dab@bluellp.com

Richard Schulte
Wright & Schulte LLC
865 S. Dixie Dr.
Vandalia, OH 45377
937-435-9999
Fax: 937-435-7511
rschulte@yourlegalhelp.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2022, I electronically filed the above with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV