# EXHIBIT 2

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF TENNESSEE

3                    EASTERN DIVISION

4

5    IN RE:  AME CHURCH EMPLOYEE        )  MDL Docket No.

     RETIREMENT FUND LITIGATION,        )1:22-md-03035-STA-jay

6                                       )

                                        )  ALL CASES

7                                       )

                                        )  Honorable S. Thomas

8                                       )  Anderson

9

   _____

10

11      VIDEO DEPOSITION OF: JULIAN LESTER ALEXANDER, III

12 _____

13

14            S T I P U L A T I O N

15

16        IT IS STIPULATED AND AGREED by and between the

17   parties through their respective counsel that the

18   deposition of JULIAN LESTER ALEXANDER, III, may be

19   taken on July 7, 2025, before Anne E. Miller,

20   Commissioner and Notary Public, at Baker, Donelson,

21   1901 6th Avenue North, Suite 2600, Birmingham, Alabama.

22        IT IS FURTHER STIPULATED AND AGREED that it

23   shall not be necessary for any objections to be made by

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 2

1  counsel to any questions except as to form or leading
2  questions, and that counsel for the parties may make
3  objections and assign grounds at the time of trial or
4  at the time said deposition is offered in evidence or
5  prior thereto.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1         I N D E X
2  Examination by Mr. Abeles ................... 6
3
4  EXHIBITS:
5  Exhibit 777 ................................ 10
     (Report -- attached)
6  Exhibit 778 ................................ 38
     (Financials -- attached)
7  Exhibit 779 ................................ 71
     (Smick paper -- attached)
8  Exhibit 780 ................................ 95
     (Chalmers paper -- attached)
9  Exhibit 781 ................................ 136
     (IBIS -- attached)
10 Exhibit 782 ................................ 151
     (Supplemental Rule 26 -- attached)
11 Exhibit 783 ................................ 156
     (Fred -- attached)
12 Exhibit 784 ................................ 158
     (Announcement -- attached)
13
14
15
16
17
18
19
20
21
22
23

Page 3

1      A P P E A R A N C E S
2
3  Appearing For The Plaintiff:
4    BAKER, DONELSON
     Mr. Bruce A. McMullen
5    Ms. Mary Wu Tullis
     First Horizon Building
6    165 Madison Avenue
     Suite 2000
7    Memphis, Tennessee 38103
8
   Appearing For The Defendant:
9
     CARLTON, FIELDS, PA
10   Mr. Scott M. Abeles
     1025 Thomas Jefferson Street NW #400W
11   Washington, DC 20007
12
13 Court Reporter:  Anne E. Miller
   Videographer:  John Badgley
14 Appearing via Zoom:  Cedric Alexander
          Larry Blocho
15        Dhamian Blue
          Scott McCullough
16        Kenny Byrd
          Derrell Wade
17
18
19
20
21
22
23

Page 5

1      I, Anne E. Miller, a Court Reporter of the State
2  of Alabama, acting as Commissioner, certify that on
3  this date there came before me at Baker, Donelson, 1901
4  6th Avenue North, Suite 2600 at Birmingham, Alabama, on
5  July 7, 2025, beginning at or about 10:02 a.m., JULIAN
6  LESTER ALEXANDER, III, witness in the above cause, for
7  oral examination, whereupon the following proceedings
8  were had:
9
10
11      THE VIDEOGRAPHER:  Good morning.  We are on
12 the record at 10:02 on Monday, July 7th, 2025.  This
13 begins media unit one in the video-recorded deposition
14 of Julian Lester Alexander the III, in the matter of
15 AME Church Employee Retirement Fund litigation.  Will
16 counsel identify yourselves and state whom you
17 represent?
18      MR. ABELES:  Scott Abeles, Carlton, Fields,
19 for Symetra.
20      MR. McMULLEN:  Bruce McMullen, Baker,
21 Donelson.  And I represent the church and the church
22 entities.
23      MS. TULLIS:  Mary Wu Tullis, Baker,

2 (Pages 2 - 5)

Julian Lester Alexander , III                              July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 6

1  Donelson, on behalf of AME church.
2       MR. BLOCHO:  Larry Blocho, Groom Law Group
3  Charter, on behalf of Newport Group, Incorporated.
4       THE VIDEOGRAPHER:  Will the court reporter
5  please swear in the witness?
6
7          J. LESTER ALEXANDER,
8  having been first duly sworn, was examined and
9  testified as follows:
10
11      THE REPORTER:  Usual stipulations?
12      THE WITNESS:  Read and sign.
13
14  EXAMINATION BY MR. ABELES:
15  Q.  Good morning, Mr. Alexander.  You and I met
16  briefly a few minutes ago.  Thank you for coming
17  in today.  This is not your first rodeo, right, in
18  terms of being deposed?  Is that right?
19  A.  I have been deposed before, yes.
20  Q.  So we often go through sort of the rules of the
21  road and so forth at the beginning.  I think we can
22  mostly address those, if anything comes up.  The one I
23  like to remind witnesses of is that our court reporter,

Page 7

1  Anne, can only record one speaker at a time and gets
2  grumpy when people talk over one another.  So I will do
3  my best to avoid speaking over you and ask you to do
4  the same.  Is that okay with you?
5  A.  I will do my best.
6  Q.  Okay.  We can take breaks about every hour or so
7  or, you know, if you need one in between, just let me
8  know.  What I would ask is, if I can -- if I'm in the
9  middle of a series of questions that has a natural
10  break, I generally just want to get to that point and
11  then take a break.  Okay?
12  A.  Understood.
13  Q.  Lawyers are nosy people, and they like to ask
14  expert witnesses about their discussions with counsel
15  and stuff.  And I am not going to ask you about your
16  discussions with these counsel here, the counsel for
17  the church, Bruce and Mary and others.  But did you
18  have any communications with other counsel in the case
19  such as plaintiff's counsel?
20  A.  No.
21  Q.  Okay.  And I use plaintiff's counsel as a for
22  example.  Any other counsel besides the church's
23  counsel?

Page 8

1  A.  Not that I'm aware of, no.
2  Q.  So what were you retained to do here in this
3  case?
4  A.  Principally retained to review documents and
5  deposition testimony and then perform a damages
6  analysis related to the reputation loss under an
7  assumption of a finding of liability.
8  Q.  And you said principally to do -- and I'm
9  summarizing -- a damages analysis.  Did you reach
10  conclusions that relate to liability in this case?
11  A.  No.
12  Q.  Okay.  And did you disclose all of your opinions
13  in the report -- let me step back.  You served both an
14  expert report and a supplemental report, correct?
15  A.  Correct.
16  Q.  Did you disclose all of the opinions that you
17  intend to give in this case in those reports?
18  A.  I believe so.  That doesn't mean that there
19  might not be some amplification that I respond to in a
20  question, and but I believe my reports are a complete
21  statement of my opinions and the basis thereof.
22  Q.  Okay.  That was my next question.  You disclosed
23  all the bases of the opinions you have given in your

Page 9

1  reports?
2  A.  Yes.
3  Q.  Okay.  And did you disclose all of the materials
4  you considered in reaching your conclusions?
5  A.  I believe I have disclosed more than what I have
6  considered.  So, yes.
7  Q.  And so you did have a very long list of
8  documents at the end of your report.  Did you
9  personally actually lay your eyes on all of those
10  documents?  I think it was like 900, 871 pages.
11  A.  You know, I'm a CPA, and CPA's normally work in
12  teams.  And so, no.  I did not personally lay my eyes.
13  I had a team that worked with me, and they -- between
14  myself and my team, every document has been looked at.
15  Q.  Okay.  From time to time during this deposition,
16  I may ask you have you seen this document before.  And
17  when I say you, I mean you, Mr. Alexander, not your
18  team when I ask that question.  Do you understand that?
19  A.  I will do my best, yeah.
20  Q.  Okay.  Are there any corrections or
21  clarifications to the reports that you submitted that
22  you would like to state now?
23  A.  No.

3 (Pages 6 - 9)

Julian Lester Alexander , III                                July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 10

1    (Exhibit 777 was marked for identification.)
2    Q. (BY MR. ABELES)  Okay.  So I have marked your
3    expert report, your January 31st, 2025, expert report,
4    which has a cover sheet which we received from your
5    counsel here as Exhibit 777.  Does that appear to be
6    your report?
7    A. I didn't recognize it because of the cover
8    sheet.
9    Q. Yeah.
10   A. It's front and back.  Yes.
11   Q. Good.  I want to direct your attention to
12   paragraph six, which is on page four of Exhibit 777.
13   A. Okay.
14   Q. I'm just going to start with the first sentence.
15   It says --
16   A. Wait a minute, wait a minute.
17   Q. Sure.
18   A. Okay.
19   Q. Okay.  And the first sentence of paragraph six
20   states, "The assets of the qualified AMEC plans, e.g.,
21   annuity contracts, were liquidated and vested in ways
22   that violated the AMEC doctrine and discipline to the
23   detriment of the qualified AMEC plans and the qualified

Page 11

1    AMEC plans beneficiaries."  Did I read that correctly?
2    A. Yes.
3    Q. So when you say that the assets were liquidated
4    and invested in ways that violated the AMEC doctrine
5    and discipline, is that a conclusion you reached or an
6    assumption you are making or something else?
7    A. I think that's probably -- it is a statement
8    that I'm making, but I also believe that that's
9    something that the trier of fact will have to decide.
10   Q. It's a statement you are making, but is it an
11   opinion that you are offering to a reasonable degree of
12   certainty?
13   A. I don't think -- I think I have been retained as
14   a damages expert, not as a liability expert.  So in
15   that context, I do not believe it's an opinion.
16   Q. Okay.  And I heard you say that earlier, and I
17   appreciate it.  Paragraph six and seven to me relate to
18   liability as opposed to damages.  Do you agree with
19   that, that categorization?  That's why I'm asking you
20   about it.
21   A. Let me look.
22   Q. Sure.
23   A. Let me look.  You know, whether that's an

Page 12

1    opinion or whether that's the basis for my opinion,
2    it's kind of hard to say.  It is consistent with my
3    experience, but I will stand by what I said earlier.
4    I'm not here to offer liability opinions.  But based on
5    my experience, those statements are accurate.
6    Q. Okay.  So I'm going to take them in pieces just
7    so there is clarity as to what your opinions are and
8    what your sort of statements or something that sounds
9    like it's less than an opinion are.  We have read the
10   first sentence of six, and I'm going to go to the
11   second sentence.  It says, "The plan asset custodian
12   and plan administrator advocated their duties by
13   allowing assets of the qualified AMEC plans to be
14   diverted and invested in more risky investment vehicles
15   that required a trust which was never established."  Is
16   that an opinion you are offering to a reasonable degree
17   of certainty, or is it not an opinion?
18   A. I think the advocation of duties probably falls
19   within the area of an opinion.  But the rest of it, I
20   think, is a factual statement.  I mean, it's just true
21   that money was taken from a safe place and put in an
22   incredibly risky place in footnote four and footnote
23   five and footnote six.

Page 13

1    Q. Okay.  And we will get to those footnotes in
2    just a minute, but I just want some clarity for the
3    record.  Is it the case that you are offering an
4    opinion that the plan in this case, that the plan asset
5    custodian and plan administrator advocated their duties
6    by allowing assets of the qualified AMEC plans to be
7    diverted and invested in more risky investment
8    vehicles?
9    A. I don't think I am going to be asked to give
10   that opinion at trial.
11   Q. Okay.  If you are -- did you disclose all of the
12   bases that supports that -- I will just call it a
13   statement in your reports, or would you have to do more
14   work in order to offer that opinion at trial.
15   A. I'm not sure I'm following your question.
16   Q. Okay.  You say you don't think you are going to
17   be offering that opinion.
18   A. Let me clarify that.  I don't plan to offer that
19   opinion at trial.
20   Q. Okay.  And is that because you have not done
21   enough work in order to stand behind this statement,
22   raise your hand under oath and put your reputation to
23   it.

4 (Pages 10 - 13)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 14

1    A. I think it's because it falls outside of the
2  scope of what I was asked to do.
3    Q. Okay. Let's go to the next sentence. It says,
4  "The plan asset custodian and plan administrator
5  advocated their duties by allowing improper fees to be
6  paid using assets of the qualified AMEC plans." Same
7  question, is that an opinion you intend to offer at
8  trial?
9    A. I don't believe so. Again, I think that falls
10  outside what I was asked to do in this matter, and it
11  really is me, based on my experience, describing how I
12  see the facts.
13    Q. Okay. And it's how you see the facts, not as an
14  expert witness restained in this case but based on
15  something else, your other experience just from doing
16  this for a long time; is that right?
17    A. I think I understand your question, and I'm not
18  -- I don't plan to offer that as an expert opinion.
19  And yes, it is based on my experience.
20    Q. Okay. The last sentence of paragraph six says,
21  "Moreover, the wrongful acts of the plan asset
22  custodian and plan administrator and the harmful impact
23  of such on the qualified AMEC plans beneficiaries,

Page 15

1  harmed the ability of the AMEC to carry out its
2  mission, which has diminished the fair value of the
3  AMEC." I think that is an opinion of yours; is that
4  right?
5    A. Yes.
6    Q. Okay.
7    A. Assuming a finding of liability.
8    Q. Okay. Paragraph seven generally has to do with
9  internal controls or the lack thereof. Is that a fair
10  characterization?
11    A. Let me look at it.
12    Q. Sure.
13    A. Yeah. It's based on my experience and
14  description of how enterprise risk management and the
15  constituents involved in a plan relate to one another.
16    Q. Okay. Do you plan if called to trial to offer
17  an opinion about the quality of appropriateness of the
18  controls that were in place by Symetra?
19    A. No, because I don't have enough information to
20  do that.
21    Q. Okay. In looking at your biography,
22  Mr. Alexander, it looked like part of what you do in
23  business and in litigation is what's called forensic

Page 16

1  accounting. Is that right?
2    A. Yeah. I have been called a forensic accountant.
3    Q. And what is the difference between a forensic
4  accountant and a more generic accountant?
5    A. I mean, I don't really use that term because it
6  doesn't really have a professional definition. But I
7  have a lay understanding of what lawyers mean when they
8  use it, which it means you are acting as a CPA in the
9  normal course of what you normally do, except you are
10  doing it either in the presence of litigation or in the
11  presence of suspected malfeasance or wrongdoing.
12    Q. Okay. When you do engage in forensic accounting
13  as lawyers might call it, the thing that forensic
14  accountants do is trace the flow of funds; is that
15  correct?
16    A. That's one thing a forensic accountant might do.
17    Q. Did you study the flow of funds in this case
18  with regard to transactions involving the plan?
19    A. No. That was outside the scope of what I was
20  asked to do.
21    Q. Okay. So you are not aware of at what point in
22  time, if any, Symetra becomes aware of plan
23  transactions?

Page 17

1    A. That's not something that I focused on because
2  it doesn't really have direct bearing on my opinions,
3  but it's possible that information is somewhere in the
4  documents I have.
5    Q. But you are not offering an opinion on -- you
6  don't know enough to offer an opinion that relates to
7  the flow of funds in this case; is that right?
8    A. I have not -- I have not engaged in any type of
9  tracing exercise that would be necessary to have that
10  opinion.
11    Q. Okay. In the report, you refer to Symetra as
12  the plan asset custodian, correct?
13    A. I do.
14    Q. What does that mean? You didn't have a
15  definition. What is the definition as you are using
16  the term of a plan asset custodian?
17    A. They control the assets.
18    Q. Okay. And so in your view, Symetra -- and so
19  why are you using that term to describe Symetra?
20    A. It's a term of art CPA's use. It's defined in
21  the relevant accounting and auditing literature
22  applicable to CPA's.
23    Q. I wanted to use the right word there. When you

5 (Pages 14 - 17)

Julian Lester Alexander , III                                July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 18

1  say control the assets, is it your understanding that
2  Symetra controls the assets of the plan or just has
3  some control with regard to the annuities that it sold
4  to the plan?
5      A.  Well, when I'm -- I'm looking at this from the
6  point of view of a plan that was originally set up to
7  hold annuities, and then the control is when assets
8  were moved out of the annuity investments to other
9  investments that required Symetra to make that move.
10 So they were responsible for moving funds out of the
11 annuities.
12     Q.  Okay.  I just want some clarification.  Once
13 funds are moved out of the annuities, you would agree
14 that Symetra no longer controls the assets that were
15 moved out of the annuities.  Is that fair?
16     A.  I don't know that I have -- I haven't looked at
17 that issue so I don't know that I have enough
18 information to answer that question.
19     Q.  And is it your understanding that Symetra is --
20 was -- let me say was.  Was holding plan assets?
21     A.  I don't know what you mean by that.
22     Q.  Okay.  Well, you said that the plan asset
23 custodian controls the plan assets.  How does it

Page 19

1  control them, I guess is my question?
2      A.  Well, one element of control is the ability to
3  take them from one investment and send them to another
4  investment.
5      Q.  Okay.  And your understanding -- is it your
6  understanding based on your expertise that when a plan
7  purchases an annuity contract, that the money that the
8  plan pays to the annuity provider are still plan assets
9  once that money goes to the annuity provider?
10     A.  I don't understand that question.
11     Q.  Sure.  So let me just be transparent.  You
12 understand that Symetra's role here was it sold annuity
13 contracts to the plan as a general matter.  Is that
14 right?
15     A.  That's my understanding.
16     Q.  Okay.  And when it sold those annuity contracts
17 to the plan, Symetra received compensation in exchange
18 for those annuity contracts, right?
19     A.  You are now -- I'm going to fail a memory test
20 at this level of detail.  I'm not going to be able to
21 answer those questions other than based on my
22 experience in general, but not specifically based on my
23 knowledge gained in this case.  So I would -- and I'm

Page 20

1  taught not to presume and assume, and you would require
2  me to presume and assume to answer that question.
3      Q.  I'm with you.  You are under oath, and you do
4  want to be careful with what you are saying.
5  Hopefully, you will see by the end of the day, I'm not
6  trying to trick any answers out of you.  I like my
7  case.  So I'm trying to be a straight shooter here.
8  Setting this case aside, okay?  When an annuity
9  provider -- if you know, when an annuity provider sells
10 an annuity contract to a purchaser and the purchaser
11 provides the sale price back to the annuity provider,
12 is the money that the annuity provider receives still
13 in some way the purchaser's money or is it just the
14 annuity provider's money that it just goes in its
15 general treasury and that's its money from there on?
16     A.  I have no idea what you are asking me.
17     Q.  Okay.  What did you understand the duties of a
18 plan asset custodian to be?
19     A.  Are we asking specific to this case?
20     Q.  Yes.  Thank you for that.  Yes.  What did you
21 understand Symetra's duties to be in this case?
22     A.  Well, generally speaking, what I see as a plan,
23 it was initially set up to invest in annuities.  Well,

Page 21

1  first of all, let me just say this:  What the duties
2  are or are not is outside the scope of what I was asked
3  to do.  But generally speaking, the plan is an annuity
4  plan.  My experience with annuity plans are they
5  represent a risk, an investment risk tolerance, that is
6  very, very low because annuities are considered to be
7  an incredibly safe investment.
8      Q.  If I could go back to paragraph six, the second
9  sentence that we talked about a few minutes ago.  There
10 was one other part of it that I wanted to ask you
11 about.  The full sentence, again, is "The plan asset
12 custodian and plan administrator abdicated their duties
13 by allowing assets of the qualified AMEC plans to be
14 diverted and invested in more risky investment vehicles
15 that required a trust which was never established.  I
16 want to ask you about the last piece."  You are not an
17 expert on trust formation in Tennessee, I take it?
18     A.  I am not.
19     Q.  Okay.  You didn't study the requirements for
20 establishing a trust in Tennessee; is that fair, for
21 purposes of this case?
22     A.  I wouldn't do that.
23     Q.  Okay.  And you don't otherwise know the

6 (Pages 18 - 21)

Julian Lester Alexander , III                                      July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 22

1 requirements for establishing a trust under Tennessee
2 law; is that fair?
3    A. That question doesn't make sense to me from the
4 context of what I was saying, but you are correct. I
5 don't practice law, and I certainly don't know what the
6 requirements are in Tennessee to establish a trust.
7    Q. Okay. The reason I'm asking you is that you
8 said these -- that the plan required a trust, which was
9 never established. And so that's what I'm probing.
10 When you say required -- a trust was required, it was
11 required by what?
12    A. It's been my experience that a trust is required
13 for certain types of investments.
14    Q. Okay. Did you study that question in particular
15 in this case as to whether a trust was required?
16    A. I'm not intending on offering an opinion
17 regarding whether there was or wasn't a trust, much
18 less whether one was or wasn't required.
19    Q. Okay. And is it the same answer as to whether a
20 trust was in fact established? You're not intending
21 on offering an opinion one way or the other on that?
22    A. That is correct.
23    Q. "Has built a Plan Asset Custodian" -- a

Page 23

1 custodian and a Plan Administrator who should
2 establish -- when you say Plan Administrator, you are
3 referring to Newport; is that correct?
4    A. Correct.
5    Q. Okay. Neither paragraph -- or neither paragraph
6 six nor paragraph seven references any other defendant
7 in this case. Is that your understanding?
8    A. I haven't really contemplated that question so I
9 will need to read them again.
10    Q. Sure.
11    A. I believe six and seven both are focused on the
12 role of the custodian and the administrator.
13    Q. And you are aware in this -- so let me step
14 back. Have you read the complaint, at least the second
15 amended complaint that was filed by the plaintiffs in
16 this case?
17    A. I will fail a memory test, but a long time ago,
18 I read the complaint, yes.
19    Q. And did you read the -- I guess it would be
20 called the cross claims that -- the allegations that
21 were made by the church against other defendants?
22    A. A long time ago, yes.
23    Q. Fair enough. I'm not going to ask you for any

Page 24

1 details, but you understand that Dr. Harris was accused
2 of a lot of wrongdoing in both of those filings? He is
3 the -- he acted as the trustee. I cut you off. Did
4 you answer?
5    A. I said yes.
6         MR. BYRD: Object to the form.
7         MR. BYRD: Hold on. I need to object,
8 objection on behalf of the plaintiffs, Kenny Byrd.
9         MR. McMULLEN: I would like to object to
10 the form of that question.
11    Q. (BY MR. ABELES) Okay. Let me cut to the chase.
12 Did your study exonerate Dr. Harris from abdicating his
13 duties?
14         MR. BYRD: Object to the form.
15         MR. McMULLEN: Same objection.
16    A. Nothing about what I have done could in any way
17 be characterized as trying to exonerate anyone.
18    Q. (BY MR. ABELES) So we shouldn't read into
19 paragraphs six and seven that you believe Symetra and
20 Newport committed wrongdoing and other defendants did
21 not? Is that fair?
22    A. Again, I'm not going to be offering the opinions
23 in six and seven. But if you ask me, I will reply that

Page 25

1 definitely Symetra should have stopped what happened,
2 and what happened never should have happened had
3 Symetra done their job.
4    Q. Well, so my question is different. So you have
5 not ruled out -- so this is -- set that last question
6 aside. You have not ruled out that if the church's
7 enterprise value was diminished, that Dr. Harris shares
8 responsibility; is that fair?
9         MR. BYRD: Object to the form.
10    A. I am working under the assumption of a finding
11 of liability, and I don't intend to offer this
12 affirmative opinion. But I firmly believe had Symetra
13 done their job, Dr. Harris would not have been able to
14 do anything that he did that resulted in the harm we
15 are dealing with and the harm to the reputation.
16    Q. (BY MR. ABELES) Have you ruled out that if the
17 church's enterprise value was diminished, that
18 Dr. Harris shares responsibility?
19    A. I think the answer I just gave you rules that
20 out.
21    Q. Meaning your study did exonerate Dr. Harris? Or
22 otherwise, I didn't understand your last answer.
23    A. Well, the answer is Dr. Harris would not have

7 (Pages 22 - 25)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 26

1  been able to do what he did had Symetra performed their
2  duties and their job. I'm not exonerating Dr. Harris.
3  I'm saying Symetra's failures, their failures, is why
4  Harris was able to do what he did. And had Symetra
5  done their job, Harris would not have been able to do
6  what he did.
7      Q. Would your -- are you familiar with the name Bob
8  Eaton or Robert Eaton?
9      A. I'm going to fail a memory test of what exact
10 role he had.
11     Q. He was kind of the agent who put Symetra and the
12 church together is my general understanding. I know
13 people argue about who he is working for, but does that
14 ring a bell?
15     A. I will assume that.
16     Q. That's okay. Did you understand Newport and
17 Symetra's duties to be identical here, vis-a-vis the
18 plan?
19     A. No.
20     Q. Okay. What did you understand as a general
21 matter Newport's duties to be?
22         MR. BYRD: Object to form.
23         MR. BLOCHO: Object to form.

Page 27

1      A. Again, I'm not here to offer opinions about the
2  duties of the custodian versus the duties of the plan
3  administrator. And again, the term custodian and
4  administrator are contract terms that are derived from
5  generally accepted accounting literature. So I'm using
6  those terms. And I'm not here to offer opinions.
7          But the answer to your question is the
8  custodian controls the assets. I'm going to shortcut
9  this. This is a high level answer. There is a lot of
10 detail to it. The custodian controls the assets,
11 protects the assets. The administrator makes sure all
12 the documentation is in place. And again, that was a
13 very high level answer.
14     Q. Yeah, no. I understand. Okay. Let's talk
15 about damages. Do you agree that valuation of an
16 entity is a point in time estimate of its worth?
17     A. A valuation -- we are talking about business
18 valuation, concepts?
19     Q. Yes.
20     A. I agree that a valuation is as of a specific
21 point in time.
22     Q. And a valuation on a given date reflects the
23 then current state of the entity's operations and

Page 28

1  opportunities. Is that a fair point?
2      A. I think you can find textbooks that say that.
3      Q. Do you agree with that?
4      A. I think it's more complex than that, but that's
5  a very oversimplified way of saying it.
6      Q. Do you agree that a valuation reflects then
7  prevailing market conditions and other economic
8  factors?
9      A. It can, yes.
10     Q. Do you agree that the valuation date is
11 important to an valuation analysis because markets and
12 market conditions may change and the estimated value
13 may be incorrect or inappropriate at another time?
14     A. That depends.
15     Q. What does it depend on?
16     A. Many things.
17     Q. For example?
18     A. The date of loss.
19     Q. Well, let me go back here. Do you agree that --
20 let's get away from churches and nonprofits for just a
21 minute and talk about something like a for profit
22 business. A valuation of, you know, a Home Depot store
23 across town given in 2020 is not one you would rely on

Page 29

1  in considering selling or purchasing that home, that
2  real estate today. Is that fair?
3      A. I mean, I don't know. It could be.
4      Q. It could be if the market conditions hadn't
5  changed? Is that why it could be?
6      A. I think it could be for a variety of reasons.
7      Q. Okay. Is one reason that economic conditions
8  today are different than they were in 2020, say?
9      A. It could be -- I mean, this is such a wild open
10 hypothetical. It could be anything. It could be
11 anything. I mean, it could be completely appropriate
12 or it could be completely inappropriate. I just don't
13 have enough information in your hypothetical to give
14 you a concrete answer.
15     Q. Okay. Do you agree that the valuation amount --
16 that a valuation of an entity today reflects the market
17 state and circumstances as of today, not any other
18 date?
19     A. That depends. It could.
20     Q. It depends on the market staying rigid or --
21     A. Again, that hypothetical is so broad, it depends
22 on a myriad of things that I can't possibly tell you
23 right now. I mean, you will have to give me a lot more

8 (Pages 26 - 29)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 30

1  information about the assumptions that are inherently
2  packed into that question.
3      Q.  Okay.
4      A.  For me to give you a better answer than that.
5      Q.  Let me ask you this:  Let's say you are looking
6  at an old valuation, something that's five years old.
7  In order to value that entity today, do you need to
8  look at and compare the market conditions at the time
9  of the five-year-old valuation and the market
10 conditions today as part of your inquiry?
11     A.  What should I assume the valuation methodology
12 is that I'm using?
13     Q.  Okay.  Let's say the market, the market
14 valuation.
15     A.  The market approach?
16     Q.  Market approach, thank you.
17     A.  What method?
18     Q.  Comparing to similar properties.
19     A.  That's not a --
20     Q.  What are some methods?  Help me out here.
21     A.  Capital -- Cap M.
22     Q.  Okay.  How about that one?  Would you have to
23 look -- would you have to compare market conditions

Page 31

1  prevailing at the time of the appraisal or the
2  valuation and versus today?
3      A.  Cap M relies on data that goes back many, many,
4  many years.  So based on that, I don't understand your
5  question.
6      Q.  Okay.  Prevailing market, in which valuation
7  method do prevailing market conditions matter?
8      A.  There is many elements of business valuation
9  that matter, and clearly, market conditions can have an
10 impact on value, whether it's a permanent impact or
11 temporary impact.  What is the actual valuation date?
12 Is it a current date?  Is the date of trial?  Is the
13 date of the wrongdoing?  All those things are relevant
14 to the answer to the question what is the market doing
15 to the value.  And so without more information, I can't
16 answer these types of questions.  They are way too
17 general with many, many assumptions implied and not
18 stated.
19     Q.  The valuation date for the opinion -- the
20 valuation you offered was January 31st, 2025; is that
21 right?
22     A.  The date of my report, that is correct.
23     Q.  And given the data that you had used, the AMEC

Page 32

1  data that you drew on, would the valuation you arrived
2  at be the same if you had conducted it as of January
3  31st, 2024?
4      A.  I don't know why I would have done that, and I
5  -- that would be relevant to the answer because, if I'm
6  trying to do something as a -- what I'm trying to do is
7  do valuation as of the date of trial.  I don't have the
8  date of trial.  All I have is the date of my report.
9  So my intention is to use the best available data that
10 applies to the facts in the case, but to have the value
11 be as of the date of trial.
12     Q.  Okay.
13     A.  So I wouldn't ever do it as of 2024 is the
14 point, and I haven't thought about what would happen if
15 I did it.
16     Q.  Let me ask it this way:  If the due date for
17 your report -- if this case had gone a lot faster and
18 the due date for your report had been January 31st,
19 2024, would you have arrived at the same valuation?
20     A.  Possibly, but I haven't really thought about
21 that.
22     Q.  The AMEC, the AMEC financial data that you did
23 use, was drawn from a financial report from the AMEC

Page 33

1  financial department for the fiscal year ending March
2  31st, 2022; is that right?
3      A.  Correct.
4      Q.  Okay.  And you used that data as you explained,
5  I think, in your supplement because you said it was the
6  last year before the reputational -- the last full
7  year, fiscal year, before the reputational harm would
8  have impacted AMEC.  Is that a fair summary of what you
9  said?
10     A.  Correct.
11     Q.  Okay.  If you had -- if your valuation had been
12 due a year earlier, you still would have used the FY
13 '22 data as the revenue piece in your model.  Is that
14 right?
15     A.  But I wouldn't do it earlier.  I would never do
16 that.  That's the reason I'm having trouble answering
17 that question.  So if I did something I would never do,
18 I would use the number that -- the revenue which was
19 the last year unimpacted by the allegations in this
20 case?
21     Q.  And --
22     A.  It would be inappropriate for me to use a year
23 that's more current because it's impacted by the

9 (Pages 30 - 33)

Julian Lester Alexander , III                          July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 34

1  allegations in this case, and I'm sure your expert
2  would love it if I used an impacted year.  Okay?  But
3  I'm going to do that.  I'm going to use the last year
4  that was unimpacted.
5      Q.  And that unimpacted year doesn't change,
6  depending on what day your report happens to be due.
7  Is that right?
8      A.  The unimpacted, the last unimpacted year is
9  2022.
10     Q.  Right.  So if your report had been due a year
11  earlier, your valuation would have ended up being the
12  same because you would have used the same FY 2022 AMEC
13  data as your -- for your revenue piece?
14     A.  Because my methodology is intending to come up
15  with the number as of the date of trial, it will be
16  whatever it is as of the date of trial.  The date of my
17  report is the best date I have at this time and the
18  only way I can issue an opinion as of the date of
19  trial.  So if my report had been due earlier but after
20  2022 --
21     Q.  Yes.
22     A.  -- it would have been the same number.
23     Q.  Okay.  And whenever trial comes, your number is

Page 35

1  still going to be the same because you are still going
2  to use that FY '22 data for the revenue input into your
3  model.  Isn't that right?
4      A.  With respect to the revenue number, that would
5  be the same.
6      Q.  Is there anything else that would change?
7      A.  As of today, no.  But there could be something
8  that would change, and I will do -- keep current
9  analysis.  But I don't know of anything that would
10  change at this point in time.  I don't expect these
11  changes.
12     Q.  Did you reach a conclusion that AMEC's
13  enterprise value was the same on January 31st, 2025,
14  and one year earlier on January 31st, 2024?
15     A.  I think you misstated my opinions.
16     Q.  How so?
17     A.  The way you phrased your question misstates my
18  opinions.
19     Q.  What part of my -- I'm not trying to misstate
20  your opinions.  So enlighten me.  How did I misstate
21  your opinion?
22     A.  What you said was not correct.
23     Q.  Okay.  Let me read it again just so we can -- is

Page 36

1  it your expert opinion that AMEC's enterprise value was
2  the same on January 31st, 2025, and one year earlier on
3  January 31st, 2024?  I understand you think I'm
4  misstating something, and my question is what?
5      A.  Because my methodology -- you are misstating my
6  methodology.  My methodology is to take the last
7  unimpacted year and determine what the value was in the
8  unimpacted year and then determine the effect on the
9  rate of return that one would expect that a stakeholder
10  would expect due to the uncertainty.  So I'm
11  calculating the diminution in value, okay?  I'm not
12  calculating the value as of the date.  I'm calculating
13  the diminution in the value.
14     Q.  You are calculating --
15     A.  And I'm dealing with the hand of cards that I
16  have been dealt by the facts and circumstances.  And
17  I'm following a generally accepted methodology in doing
18  so, and it's highly recognized.
19     Q.  Okay.  But you are calculating an unimpaired
20  value of AMEC as an enterprise and then you are
21  calculating an impaired value?  I got it right so far,
22  right?
23     A.  Well, not exactly.

Page 37

1      Q.  You calculate -- let's do it in pieces.  First,
2  you calculate an unimpaired value of AMEC as an
3  enterprise, true?
4      A.  As of the last date available to me when it was
5  unimpacted by the allegations in this case.
6      Q.  Got it.
7      A.  That is true.
8      Q.  Okay.  And then you calculate an impaired value
9  of AMEC as an enterprise, right?
10     A.  Again, as of using the last report I have of
11  unimpaired revenue, which is 2022, I then calculate the
12  impaired value of that revenue as my damage.
13     Q.  And then you calculate -- and then you subtract
14  one from the other, and that gives you the loss in
15  value, right?
16     A.  That is correct.
17     Q.  Okay.  I'm not sure what I said wrong, but I
18  think we agree generally on your framework.  Would the
19  fiscal year ending March 31st, 2022, financial
20  department revenue capture the market conditions
21  prevailing as of January 31st, 2025?
22     A.  I didn't understand.  You need to give me more
23  information.

10 (Pages 34 - 37)

Julian Lester Alexander , III                                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 38

1    MR. ABELES:  Let's take five minutes.
2         THE VIDEOGRAPHER:  This ends disc one.
3    Going off the record at 10:53.
4         (Recess taken.)
5         THE VIDEOGRAPHER:  This begins disc two.
6    Going back on the record at 11:01.
7         (Exhibit 778 was marked for identification.)
8    Q.  (BY MR. ABELES)  So, Mr. Alexander, I placed
9    before you Exhibit 778.  It's African Methodist
10   Episcopal Church, Inc., financial department, financial
11   statements and independent auditor's report, year
12   ending March 31st, 2022.  Do you see that?
13   A.  Yes.
14   Q.  And this is the fiscal year information revenue
15   -- this is the source of the fiscal year revenue
16   information that you used in your damages assessment,
17   correct?
18   A.  Correct.
19   Q.  This is the only financial data from AMEC that
20   you used in your model; is that correct?
21   A.  Correct.
22   Q.  And so AMEC's financial data from whenever it
23   was formed through March 31st, 2021, would not play a

Page 39

1    role in your assessment, correct?
2    A.  I didn't use it.
3    Q.  Okay.  And same for any of AMEC's financial
4    information from April 1st, 2022, through the present,
5    not used in your damages assessment, correct?
6    A.  Because it's impacted, yes, I didn't use it.
7    Q.  When did AMEC's value first become impacted by
8    the alleged wrongful acts that you reference in your
9    report?
10   A.  I don't have -- I don't have a recollection of
11   the precise date that the alleged wrongful acts became
12   public.  So I think it -- and you also asked me an
13   interesting economic question.  Again, when you are
14   talking about reputation, one economic view is it goes
15   back to, for example, when Symetra failed to do their
16   job as we were discussing earlier, which allowed Harris
17   to do what he did, which then later tarnished the
18   reputation of the church.  That would be one date.  The
19   other date under a less economically driven theory
20   would be when the investigations were done and it
21   became public.
22   Q.  And so your model presumes that the harm began
23   after the alleged wrongful acts were disclosed

Page 40

1    publicly.  Is that right?
2    A.  No, no.  I'm more from the economic camp that
3    believes that the harm flows from, for example,
4    Symetra's failures, which were way back.
5    Q.  But the harm that you identify flows from what
6    is referred to, I think, in Chalmers as stigma.  Isn't
7    that the threshold for causing the diminution in value
8    that you found?
9    A.  It's easier, I think, to understand this if you
10   think of the more common application of diminution of
11   value, which is you buy a new car.  It's wrecked right
12   after you buy it, and two years later, you sell it.
13   The act that diminished the value of the car was the
14   wreck two years ago.  The economic impact is realized
15   when you sell the car, and the buyer says, "I'm not
16   going to pay you as much as I would because this car
17   was wrecked two years ago."
18   Q.  Okay.  But your -- the harm that you found is
19   based on the market perceiving -- perceiving AMEC as
20   less valuable?  It's a market approach?  It's a market
21   approach, right?
22   A.  Just like the buyer of a car would perceive a
23   car that was wrecked five years ago is of less value

Page 41

1    than the same car with the same mileage, same
2    condition, except it hasn't been wrecked.  But the
3    wreck was five years ago, and in this case, the wreck
4    was many years ago.
5    Q.  You do your valuation -- is your valuation, your
6    unimpaired and your impaired, from the seller's
7    perspective or the buyer's?
8    A.  A valuation is from the perspective of a willing
9    buyer and a willing seller.
10   Q.  Okay.  And in order for the willing buyer -- say
11   that again.  You said willing buyer and willing seller?
12   A.  Yes, both possessing adequate knowledge.
13   Q.  And have you reviewed any of AMEC's financial
14   information from the after period, from after March
15   31st, 2022?
16   A.  I don't recall.
17   Q.  It wasn't of interest to you to see if, for
18   example, AMEC's capital costs had gone up in the after
19   period?
20   A.  I don't understand your question.
21   Q.  Did you study whether AMEC's cost of capital
22   rose during the after period?
23   A.  I mean, the analysis that I did is a study of

11 (Pages 38 - 41)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 42

1  their cost of capital.  That's the reason I don't
2  understand your question.
3     Q.  Did you look at any AMEC data to see if AMEC's
4  actual cost of capital have gone up?
5     A.  And you are presuming there would be data to
6  look at by that question?
7     Q.  Did you look at the terms of any loans that AMEC
8  may have?
9     A.  Based on the '22 and '21 financial statements,
10  there are no loans.
11     Q.  Okay.  So you did not conclude that AMEC's cost
12  of capital have gone up during the after period?  Is
13  that true, actual cost of capital have gone up during
14  the after period.  Is that true?
15     A.  I don't understand your question because that's
16  directly in conflict with my opinions.
17     Q.  Did you do an analysis of any loans that -- are
18  you aware of whether AMEC has taken on any debt during
19  the after period?
20     A.  Your question assumes that there would be a need
21  for AMEC to take on debt, and I'm not aware of a need
22  for them to take on debt.
23     Q.  The answer to my question --

Page 43

1     A.  And in looking at the history, they have not
2  used debt financing in the two years I'm looking at.
3     Q.  Okay.  And so from that, one can conclude that
4  AMEC's actual borrowing costs have not gone up during
5  the after period, true?
6     A.  So you are asking me about borrowing costs of an
7  entity that doesn't borrow money.  So if you don't
8  borrow money, there is no cost.  It can't go up, and it
9  can't go down.
10     Q.  Yeah.  Well, one thing that Chalmers and Jackson
11  suggest is that for contaminated properties, the cost
12  of capital can go up.  Right?
13     A.  It typically does go up, and it's because of the
14  reputational issues.
15     Q.  And you did not find that that happened here,
16  correct?
17     A.  No.  I did find that it has happened here.  In
18  my opinion, it has happened.  You are asking about cost
19  of capital that has two components.  You have an
20  equity, and you have a debt.  And then when you focus
21  on specifically on debt and you ask me questions about
22  debt, and there is no debt.
23     Q.  So that potential harm has not manifested here

Page 44

1  because AMEC has no debt.  Is that fair?
2     A.  No.  I mean, this whole issue of debt versus
3  equity is related to a conservative assumption that I
4  have made in calculating my cost of capital number,
5  despite the fact that my client does not utilize debt
6  capital, which has a lower cost, substantially lower
7  cost.  I have assumed that they would have -- would
8  incur an industry weighted amount of debt, which lowers
9  the rate of return and lowers dramatically the impact
10  of the equity yield adjustment that is required due to
11  the heightened risk because of the reputational harm.
12  As Chalmers' article makes very clear, in environmental
13  contamination, you lose the ability to obtain debt.  So
14  your rate of return from debt goes from whatever you
15  were paying -- your cost of capital, excuse me, goes
16  from whatever you were paying to zero because you can't
17  get any debt.  And your equity yield goes up.  And
18  instead of being 30 percent equity and 70 percent debt,
19  now you are 100 percent equity.  And it has a dramatic
20  impact, which is something that I could have taken into
21  account and I didn't, to be conservative.  Otherwise,
22  your questions don't make any sense to me.
23     Q.  Do you agree that substantial changes in a

Page 45

1  company's financial performance and prospects can take
2  place over a three-year period?
3     A.  Hypothetically can a company change over a
4  three-year period?  That is possible.
5     Q.  And is that especially true for fiscal years
6  ending March 31st, 2022, and March 31st, 2021, which
7  were impacted by the pandemic?
8     A.  Which had a conservative impact on my analysis,
9  yes.
10     Q.  Were you aware that AMEC received a PPE loan of
11  around $500,000 in April of 2021?
12     A.  I don't recall that.  In looking at the cash
13  flow statement and the audited financial statements, it
14  doesn't show that.  But I would need to refer to the
15  footnotes to see because it was likely forgiven and
16  treated as income.  No date, they have an unused line
17  of credit of 300,000.
18     Q.  If AMEC --
19     A.  Hold on.  Let me finish.  I'm looking for the
20  PPE loan.
21     Q.  Go ahead.
22     A.  Yeah.  It was forgiven, note 14.
23     Q.  So is it reflected in the revenue number that

12 (Pages 42 - 45)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 46

1  you utilized or not?  Can you tell?
2    A.  Let's see.  April 2nd.  I can't tell.
3    Q.  Okay.
4    A.  It -- based on the disclosure, it looks like it
5  probably offset organizational costs, but I'm having to
6  infer that from language in note 14.
7    Q.  Should one-off payments be included in a
8  forward-looking evaluation?
9    A.  Should one-off payments be included in a
10  forward-looking valuation?  Because of the methodology
11  that I'm using, which is comparing the effect on
12  revenue before and after an increase in the rate of
13  return that would be demanded because of the
14  reputational problems, that issue would have very
15  little, if any, impact.
16    Q.  But should one-off payments normally be included
17  in a forward-looking valuation as a general matter?
18    A.  If it has very little impact, it doesn't matter.
19    Q.  So fiscal year ending March 31st, 2022, which
20  I'm going to call fiscal year 2022, operates as your
21  baseline year for unimpaired value; is that right?
22    A.  And impaired.  That's what you are forgetting.
23    Q.  And impaired, right.  For both, right?

Page 47

1    A.  Correct.
2    Q.  When you are choosing --
3    A.  Just like if it was a car that was wrecked.
4    Q.  When you are choosing a baseline year, is it
5  important to test whether that year for other reasons
6  is an outlier relative to other years?
7    A.  And that presumes there are outliers that would
8  impact a before and after diminution in value analysis.
9  And based on my analysis, there are no outliers that
10  would have a material impact on a before and after
11  diminution in value analysis.
12    Q.  But it is important to check whether you are
13  measuring your baseline year is an outlier for reasons
14  unrelated to the issues, right?
15    A.  Yeah.  That's why you would not ever pick an
16  impacted year, okay?  And that's also why I wanted to
17  use a year that was audited that gave me footnote
18  disclosures so I could read them and see what was there
19  as to whether there is an outlier.  And in this case,
20  there is not.
21    Q.  In a hypothetical in which a very generous AMEC
22  parishioner had made a ten million dollar donation
23  which was captured in the revenue figures in fiscal

Page 48

1  year 2022, that would render that year an outlier,
2  right?  And you would have to control for that
3  donation, correct?
4    A.  Well, it depends.  And I would need more
5  information to answer that.
6    Q.  The largest donation before this million dollar
7  donation was a thousand dollars in my hypothetical.
8  You would need to -- you couldn't just use that year
9  willy-nilly, right, and say, "Oh, look at all these
10  revenues" without taking account of what looks like a
11  one-time donation, right?
12    A.  Well, the problem with your hypothetical is I'm
13  a CPA and I can't assume things, but the data I have
14  tells me it's not true.  So your hypothetical is not
15  true based on the audited financial statements so I
16  can't really make that assumption.  There is no ten
17  million dollar contribution.
18    Q.  I know that.  Sorry to interrupt you.  But we
19  both know that, okay?  I'm asking you about the concept
20  of outliers, whether it's important to test for them.
21  If 2022 was an outlier for some reason, including my
22  hypothetical which did not happen, about a ten million
23  dollar donation, you would need to control for that,

Page 49

1  deal with that in your analysis, right?
2    A.  And I'm telling you from examining the 2022 and
3  2021 audited financial statements, there is no outlier.
4  But had there been one, I would have needed to control
5  for it.
6    Q.  Thank you.  And these -- this Exhibit 778, these
7  financials are limited to the AMEC Financial
8  Department.  Is that true?
9    A.  Of course.
10    Q.  Yeah.  And if you could flip with me to page
11  seven, and it will be on -- I'm asking you about note
12  one here.  And the second sentence of note one, page
13  seven here, Exhibit 778, says, "AME consists of 13
14  districts in the United States and seven missionary
15  districts abroad.  Twenty-four operating funds were
16  established to address the various causes and services
17  that embody AME's mission."  First, you did not look at
18  any financials for these 13 districts; is that right?
19    A.  That is correct.
20    Q.  Or for these seven missionary districts abroad?
21    A.  True.
22    Q.  Okay.  And the next paragraph starts out, "AME
23  approves a budget at the Quadrennial General

13 (Pages 46 - 49)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 50

1  Conference.  The General Conference allocates budget
2  assessments to each of 20 districts based on their
3  economic conditions."  Did you evaluate their budget
4  assessments in your analysis?
5    A.  I didn't understand your question.
6    Q.  Did you look at any of these budget assessments
7  that each of the 20 districts get, receives?
8    A.  I looked at the budget.
9    Q.  Did you evaluate whether these budget
10  assessments have gone up or down relative to the before
11  period, the March period ending March 31st, 2022?
12    A.  I don't understand your question.
13    Q.  Okay.
14    A.  It may be because you paused a few times.  I was
15  having trouble following it.
16    Q.  Got it.  Did you evaluate -- so AME approves a
17  budget at the Quadrennial General Conference, and the
18  General Conference allocates budget assessments to each
19  of the 20 districts based on their economic conditions.
20  Did you evaluate whether these budget assessments got
21  higher or lower in the before period, in the after
22  period versus the before period?
23    A.  That would be outside of the scope of my

Page 51

1  methodologies.
2    Q.  Okay.  Got it.
3    A.  Again, I'm looking at 2022, the last unimpacted
4  year.
5    Q.  Right.
6    A.  And holding the revenue number constant.
7    Q.  Got it.
8    A.  It's also important to note if I were to include
9  other revenues, it would just make the damage number go
10  up.
11      MR. ABELES:  I'm just going to object as
12  nonresponsive and move to strike.
13    Q.  I just asked you, if you would, whether you
14  reviewed budget assessments.
15      MR. McMULLEN:  I'm going to object.  He has
16  a right to explain the position.  You are asking him
17  about other years to include in the budget assessments
18  so he has a right to explain.
19      MR. ABELES:  We have made our objections.
20    Q.  Did you conclude that the impaired valuation
21  that you calculated was caused by reduced tithing at
22  the district church level?
23    A.  The methodology I'm using is based on the

Page 52

1  perceptions associated with risks, and risks are
2  typically not -- have not materialized.  That's why I'm
3  using the same revenue number for unimpaired versus
4  impaired.  If I were to take those factors into
5  account, it would make my damage number higher.
6    Q.  So did you conclude that the impaired valuation
7  you calculated was caused by reduced tithing at the
8  district church level, district church level?
9    A.  Again, my analysis is based on increased -- the
10  perception of increased risk.  And had I also looked at
11  tithing and had it changed negatively, it would be an
12  add-in to this number.  It would not change this
13  number.  I have not looked at that as a measure of
14  conservatism.  I have not tried to make the number
15  bigger.  I'm only here to talk about the diminution in
16  value due to reputational harm.
17    Q.  And you did not look at tithing data at the
18  district church level; is that correct?
19    A.  To the extent it's reflected through the audited
20  financial statements of the Financial Department, that
21  would be incorrect.  To the extent it's not reflected
22  in the audited financial statements, you are correct.
23    Q.  Do you know which it is, whether it's reflected

Page 53

1  or not reflected in the audited financial statements?
2    A.  Well, explain to me what you mean by tithing.
3    Q.  I'm using it pretty generic, donations from the
4  congregation.
5    A.  That's what I assumed you were using.
6    Q.  Good.  Thanks for asking.
7    A.  But tithing is not actually the act of donating.
8  It's the act of promising to donate in the future.
9    Q.  Okay.  So let's use donating then.  Did you look
10  at any donation data at the district church level?
11    A.  To the extent it flows through the Finance
12  Department, yes.
13    Q.  Does it flow through to the Finance Department
14  is my next question?
15    A.  Let me look at the line items to answer.  Yes.
16    Q.  And what are you looking at to give you that
17  answer?
18    A.  The income statement.
19    Q.  What page are you on?
20    A.  Four.
21    Q.  And you were looking at the first number, budget
22  assessments; is that right?
23    A.  Correct.

14 (Pages 50 - 53)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 54

1  Q. And did you --
2  A. And let me make sure I'm clear. Principally --
3  and it's based on my experience with religious
4  organizations. Principally that would come from
5  donations. It could come from other fundraising
6  activities at the member church level that would not be
7  characterized as donations.
8  Q. And did you consider in your analysis whether
9  budget assessments have gone -- the trend in budget
10  assessments from, say, 2020 through 2025?
11  A. You would not do that in calculating the
12  diminution in value. So, no. I didn't do something I
13  would not do.
14  Q. Okay. Just not of interest to see whether those
15  assessments have actually gone up or down since the
16  alleged wrongful acts here?
17  A. Again, back to the car example to help explain
18  this. If you had a wreck five years ago and your car
19  is worth less because you had a wreck and you repaired
20  it, that's the diminution of value. Whether the car
21  goes up in value after that or goes down in value after
22  that, it doesn't change the diminution in value or
23  whether it went up more than what you thought it was

Page 55

1  going to go up after that. You still -- the value has
2  been diminished because it was wrecked. Here, the
3  value has been diminished because of the reputational
4  damage.
5  Q. You would agree that the kind of physical harm
6  that you are talking about with your car example, the
7  car has been wrecked, is a different kind of harm than
8  harm based on the perception of others. Is that fair?
9  A. No. I can't agree with that at all. I mean, so
10  your car is -- you have had a fender-bender. It's been
11  repaired, and it's as good as new. It still has a
12  factory warranty. It has everything you had before
13  the wreck. Everything you had before the wreck looks
14  just like it did. You can't even tell. But because
15  it's been wrecked, the value is diminished.
16  Q. If the public, the car buying public, knows
17  there has been a wreck, right?
18  A. Do you want me to assume that a seller of a
19  wrecked car does not disclose that the car has been
20  wrecked?
21  Q. Well, the information needs to get out into the
22  market, right?
23  A. Again, we are talking about a wrecked car and

Page 56

1  the seller not disclosing -- I don't follow your
2  question.
3  Q. In order for this kind of harm to manifest,
4  yeah, other people need to know that the harm happened,
5  right?
6  A. That is -- that is correct.
7  Q. Did you reach a conclusion to a reasonable
8  degree of certainty that the revenues of AMEC's
9  Financial Department are representative of the overall
10  financial performance of the AMEC organization,
11  including all 24 funds?
12  A. From a conservative point of view, yes.
13  Q. Why would you call it -- why would taking
14  revenue numbers from one of 24 funds be conservative?
15  A. Well, first, it's the Financial Department. So
16  it's the appropriate department to use to measure the
17  impact on the finances of the church. Second, it's
18  simple math. If you make the revenue number bigger and
19  then you apply the reduced multiple, it makes the
20  damage number go up. It's just math.
21  Q. When you look at page three here, this reflects
22  the assets of the AMEC organization?
23  A. We are still on the financials? Sorry. I

Page 57

1  didn't know which document.
2  Q. Yeah, of the financials, the FY 2022 financials.
3  I'm on page three on the asset, list of assets here.
4  A. And liabilities.
5  Q. And liabilities. Exactly. Under the noncurrent
6  assets, it says property and equipment that is valued
7  at 1. -- $1,411,817. Do you see that?
8  A. I do.
9  Q. And do you understand that to include the real
10  property that AMEC owns? It should, right?
11  A. I understand that to be the real property
12  related to the Financial Department.
13  Q. That the Financial Department owns, thank you.
14  And the total assets below that are at 14 -- are stated
15  as $14,432,597. Do you see that?
16  A. I do.
17  Q. And so the property is about -- makes up about
18  ten percent of the assets that the AMEC Financial
19  Department owns, true?
20  A. Correct.
21  Q. And as of 2021, if you look right next to it,
22  the property was valued at 1.68, 1.69 million rounding
23  up. And the total assets were about 22.17 million

15 (Pages 54 - 57)

Julian Lester Alexander , III                                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 58

1  dollars.  Do you see where I'm at?
2     A.  Correct.
3     Q.  And that's even a smaller percentage.  I
4  calculated it as 7.6 percent.  I don't know if you can
5  do it in your head.
6     A.  I can't do it in my head.
7     Q.  Okay.  You could add it up or -- 7.6 is smaller
8  than ten percent, right?  And so it's real property.
9  The Financial Department's real property makes up a
10 relatively small percentage of its overall assets,
11 correct?
12    A.  Yeah, which makes perfect sense.
13    Q.  Okay.  Could you flip to the next page.  We were
14 there before.
15    A.  Page four?
16    Q.  Page four.
17    A.  Okay.
18    Q.  We were talking about budget assessments a
19 minute ago.  I want to talk about the entry below that,
20 General Conference delegates and alternates.  Do you
21 see that?
22    A.  I do.
23    Q.  And there was over 2.9 million dollars in

Page 59

1  revenue associated with the General Conference, right?
2     A.  Appears that way, yes.
3     Q.  And that's for 2022.  In 2021, there was just
4  $26,618, right?
5     A.  Correct.
6     Q.  And do you understand that the General
7  Conference takes place every four years?
8     A.  I understand it's not every year, but I don't
9  remember it being four.
10    Q.  My understanding is it's every four years,
11 generally on the presidential election year, but this
12 was pushed because of COVID.  And you can just take
13 that as a representation.
14    A.  Okay.
15    Q.  And so that is a large amount of revenues, over
16 2.9 million, that is not expected to repeat every year
17 because it's associated with this every four-year
18 conference.  Is that -- do you agree?
19    A.  Assuming it's associated with the every four-
20 year conference and that it's properly -- and it is
21 properly recognized in 2022, I would agree.
22    Q.  Okay.  And if you look at the investment income
23 number, which is just below that, in 2022, it was

Page 60

1  $358,000 plus.  But in 2021, it was over 2.3 million
2  dollars.  Do you see that?
3     A.  I do.
4     Q.  Did you explore whether -- whether 2022 was an
5  outlier or 2021 being much higher was an outlier in
6  terms of investment income received by the Financial
7  Department?
8     A.  You asked me about two different years.  I can't
9  answer that.  It was a compound question.
10    Q.  Okay.  Did you explore -- well, fair enough.
11 Did you explore whether 2022 was an outlier in terms of
12 the Financial Department's receipt of investment
13 income?
14    A.  2021?
15    Q.  2022.
16    A.  I explored whether 2022 had material outliers
17 that would have a significant impact on my
18 determination and determined the answer is no.
19    Q.  Did you determine that investment income of,
20 say, under 500,000 is a more likely amount of
21 investment income that AMEC could expect to receive
22 going forward than over two million dollars in
23 investment income?

Page 61

1     A.  Bearing in mind, I did not utilize 2021 and
2  would not utilize 2021 because I intend to use the most
3  recent year that was not impacted, which would be 2022.
4  And I did consider the fact that the investment income
5  in 2022 is substantially lower than the investment
6  income in 2021.
7     Q.  You did consider it, and you deemed it
8  immaterial?  Is that correct?
9     A.  I don't know that immaterial is the correct
10 word.  I determined that it does not have a material
11 impact on -- adverse impact on my use of 2022.
12    Q.  Do you have any knowledge of the average amount
13 of investment income that the Financial Department
14 receives in a typical year?
15    A.  That presumes that there would be an average --
16 there would be a typical year.  And based on my own
17 knowledge of the investment markets, I'm not sure you
18 could say leading up to the years of 2021 and 2022 that
19 there were any typical years due to the pandemic.
20    Q.  So you don't know whether there is a typical
21 amount of investment income that AMEC has received over
22 the years?
23    A.  No.  That's not what I'm saying.

16 (Pages 58 - 61)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 62

1    Q.  That's not what you are saying?  Do you know the
2    answer to that question?
3    A.  Other than the answer I gave a minute ago, I'm
4    not sure there is another answer to it.  You are not
5    going to be able to draw a conclusion regarding
6    typicality by studying the pandemic years.  Those were
7    atypical years.  You are just not going to be able to
8    do that.
9    Q.  But in your report, you disclose that you did at
10    least look at fiscal year information for at least 2018
11    through 2021.  I'm hesitating because I don't remember
12    if it was 2017.  But set that aside, you did look at
13    information from 2018 forward, through at least 2022,
14    correct?
15    A.  I don't remember the exact start date.  I did
16    look at historical track record though.
17    Q.  And in doing so, did you evaluate how much
18    investment income the Financial Department receives in
19    a given year, in a typical year, I should say?
20    A.  Again, because that period of time includes the
21    pandemic, it's not possible to draw conclusions
22    regarding typicality.
23    Q.  How about from the prepandemic financials, so

Page 63

1    '18, '19 -- '18 and '19, let's say?
2    A.  Let me answer that question and the next one you
3    are going to ask me, okay?  '18 and '19 is not enough
4    to draw a conclusion regarding typicality.  The years
5    before that are too old and affected by other market
6    conditions that aren't present in this time frame.  So
7    the answer is it's the best available data for me to
8    use is what I used, which is 2022.  And to the extent
9    there are variances between that and 2021 and the other
10    years I analyzed, the 2022 data is the last unimpacted
11    year, and that is the methodology I would use.  And as
12    I have said over and over again, the impact of outliers
13    is not material on my determination.
14    Q.  Well, I want to come back to this General
15    Conference point.  If you had chosen 2021 -- I know why
16    you didn't.  But if you had chosen 2021, there would be
17    about 2.9 million dollars less in revenues as your
18    baseline, correct?
19    A.  Yeah.  I haven't done the math, but it's
20    approximately two million.
21    Q.  And the fact that this General Conference takes
22    place every four years, doesn't that inherently make
23    this year atypical relative to the other four years in

Page 64

1    any four-year period?
2    A.  Again, because it's a before and after analysis
3    where you keep the revenue the same, the types of
4    questions you are asking me about at the levels of
5    dollars we are talking about do not materially impact
6    the determination:  And it's better to use 2022 that
7    has the 2.9 million dollar number in it than it is to
8    use an older number that has 2.3 million number in it.
9    Both years have numbers that don't reoccur.  The
10    methodology is to use annual revenue because the yield
11    adjustment is based on a revenue multiple?  Okay.
12        So the methodology I'm using says use
13    revenue.  Because it's a before and after method, the
14    revenue number doesn't change.  So it's just the impact
15    of changing the rate of return on that revenue number.
16    So if you add a revenue into it, it's going to have --
17    you would have to start adding a lot of money into the
18    number for it to have an impact on the difference in
19    the before and after calculation.
20    Q.  Yeah.  But you are not saying that three million
21    dollars wouldn't have an impact on your calculations?
22    A.  Not a material impact, no, especially in light
23    of the fact there was 2.3 million in the year before.

Page 65

1    Because you are asking me, it's not about taking a
2    number out.  It's what year should you use.  Okay?  I
3    think closer to the event is better.  I think there are
4    differences at the line item level between both the
5    2021 year and the 2022 year.  And when you consider
6    both of them together, the better year to use is 2022.
7    And the variance between 2.9 million in one year versus
8    2.3 million in the other year does not have a material
9    impact on the determination.
10    Q.  You would agree though that the line item for
11    General -- there is a distinction between the line item
12    for General Conference revenue and for the investment
13    income in that the General Conference revenue will
14    skyrocket like clockwork every four years; whereas, the
15    investment income will generally be more -- will not
16    skyrocket like clockwork every four years?  That's one
17    difference, right?
18        MR. McMULLEN:  I'm going to object to the
19    form of that question.  It had a lot going on.
20    Q.  (BY MR. ABELES)  Yeah.  Did you understand my
21    question?
22    A.  In light of what the data shows, no.  Because
23    the data in 2021 shows 2.3 million investment income

17 (Pages 62 - 65)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 66

1 and only $358,000 in 2022.
2    Q. But as we sit here today, you don't know which
3 one is more typical of a given year, right, 358,000 or
4 2.3 million?  You just don't know?
5    A. I don't think that's -- I don't think that's
6 true.  I don't have 2020 and '19 and '18 and '17 or
7 whatever the years I analyzed in front of me.  So I'm
8 not able to answer specifically those questions, but I
9 think I have already addressed it generally that you
10 are not going to be able to draw conclusions about
11 typicality because of the pandemic and how it affected
12 religious organizations during that time frame.
13    Q. One thing that we do know is that every four
14 years or so, allowing for a pandemic to push things
15 forward, the revenue of the Financial Department, one
16 of its line items will go up a lot, right?  This line
17 item, General Conference delegates and alternates.
18    A. And that is one of the line items that would be
19 most impacted on a direct dollar basis due to
20 reputational loss, which again, my analysis is not
21 computing the direct loss.  My analysis is computing
22 keeping the number the same, what is the impact on the
23 risks that are associated with the reputation loss.

Page 67

1    Q. Could you read back?
2    A. And -- I'm not done yet.  And as I have said
3 over and over and over again, it does not have a
4 material impact on my determination.
5          MR. ABELES:  Could you read back my
6 question, please?
7          (Record read.)
8    Q. (BY MR. ABELES)  Can you answer that question?
9    A. No.
10    Q. Is your answer no, one line item won't go up a
11 lot, or no, you can't answer my question?
12    A. The way you phrased it, I can't answer the
13 question.
14    Q. There is a general --
15    A. I can't answer any other way than I have
16 answered it over and over and over again.
17    Q. There is a General Conference every four years,
18 right?
19    A. I'm assuming that.  You have told me that.
20    Q. Fair enough.  If there is a General Conference
21 every four years, then the Financial Department's
22 revenues for that conference will be much higher than
23 in off years, right?

Page 68

1    A. If you were to normalize 2022 for the fact that
2 the General Conference is nonrecurring or recurs
3 periodically, not annually, is not annual, okay?  The
4 impact on my determination is not material.  That's
5 what I keep saying over and over again.
6    Q. So I'm not asking you whether it's material.
7 I'm just asking you whether it happens, that revenues
8 -- that one of these line items every four years will
9 be much, much higher than it is in the other three
10 years, and that is this line item, the General
11 Conference line item?
12    A. The problem with your question and why I'm
13 having trouble answering it is you keep using terms
14 like much, much higher.  And that requires me to define
15 much, much higher, which I'm doing over and over again
16 by saying it doesn't have a material impact even using
17 your characterization of much, much higher.  And I
18 disagree with that.  If it doesn't have material impact
19 on my determinations, I disagree with your use of the
20 word much, much higher.
21    Q. Well, would you agree that three million --
22 roughly three million dollars out of 16.8, that's a
23 significant part of their revenues in 2022, right?

Page 69

1    A. And I would agree with that, and I would agree
2 that 2.3 million, almost 2.4 million, is a significant
3 part of the revenue in 2021.  The methodology uses
4 annual revenue.  It doesn't cherrypick out parts of
5 annual revenue that you don't want to use because you
6 want the number to be lower, and I'm not including
7 other revenue sources that I could include that would
8 make the number higher.  I'm using an audited number
9 from the last impacted year.
10          There is always compromises in any damage
11 calculation, but I'm trying to use the most reliable
12 number.  And if you sensitivity check it using 2022
13 versus 2021, it does not have a material impact on the
14 determination.
15    Q. Did you do a sensitivity assessment of 2023
16 versus 2022?
17    A. I would never use 2023.
18    Q. It's not -- I understand you say it's impacted,
19 but it's not even of interest just to see if you can
20 discern the impact from the actual numbers?
21    A. I'm not calculating the actual impact.  That
22 would be an additional damage.  I'm only calculating
23 the reputational loss.

18 (Pages 66 - 69)

Julian Lester Alexander , III                July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 70

1    Q. Tell me about the difference between the actual
2    damages and the reputational loss that you just
3    referred to. I'm not sure of the difference.
4        A. The reputational loss is based on perceptions
5    and increased risk. The actual damage is the actual
6    loss. They are two different things, and there doesn't
7    -- back to the car. The car may have appreciated.
8    Cars don't appreciate, but let's assume it did.
9        Q. Sometimes they do.
10       A. This car appreciated. But this other car also
11   appreciated, but it was wrecked. It's worth less than
12   the car that appreciated because it was wrecked. Both
13   cars appreciated, but the one that was wrecked is worth
14   less. This methodology is calculating the amount --
15   the difference in the value because it was wrecked.
16       Q. And that's not what you consider actual damages?
17   I don't want to mischaracterize you. I'm just
18   interested in your use of these terms, and I just want
19   to understand.
20       A. It's an actual damage. There is no question
21   about that. It's a true economic damage, and it would
22   be additive to the extent there were contributions
23   lost, that would be additional damage.

Page 71

1    Q. Right. Okay. So in your loss of value, you are
2    not taking into account reduced contributions, right?
3    That's what you say would be additive?
4        A. Correct. I'm taking into account the risk
5    associated with bad reputations.
6        Q. Got it.
7        A. Using evaluation methodology that was developed
8    and is tested and proven and court accepted to capture
9    the value of that harm.
10       Q. Can you go to page 11 of the same document here,
11   the financials? This is a note to what we were looking
12   at. This is note six, and we had been looking at the
13   property and equipment before, which refers you to note
14   six. And this shows how they got that calculation
15   there. Did you -- did you look at what property the
16   Financial Department actually owns, their real
17   property?
18       A. No. I wouldn't do that.
19       Q. Okay. You can put that aside.
20       MR. ABELES: Mark the next one, please, as
21   779.
22       (Exhibit 779 was marked for identification.)
23       MR. ABELES: This is actually a good place

Page 72

1    to stop.
2        MR. McMULLEN: Before we go off the record,
3    some of the appearances didn't make it. Kenny Byrd is
4    appearing on behalf of the plaintiffs. Put that on the
5    record. He came in a little late after we made
6    announcements. Anybody else that did not get a chance
7    to make an announcement on the record?
8        MR. BLUE: Dhamian Blue for the plaintiffs.
9    Thank you.
10       MR. ABELES: Going off the record.
11       THE VIDEOGRAPHER: This ends disc two.
12   Going off the report at 11:57.
13       (Recess taken.)
14       THE VIDEOGRAPHER: This begins disc three.
15   Going back on the record at 12:51.
16       Q. (BY MR. ABELES) Hi, Mr. Alexander. I have
17   placed before you Exhibit 779, which is entitled
18   "Adapting Old Theories For New Applications and New
19   Approach to Church Valuation" by John T. Schmick, which
20   I'm going to refer to as the Schmick paper, okay?
21       A. All right.
22       Q. And this is a paper that's referenced in your
23   report from which you drew your unimpaired

Page 73

1    capitalization rate from, correct?
2        A. Correct.
3        Q. And in this paper, the Schmick paper,
4    Mr. Schmick proposes a new methodology for estimating
5    value of religious properties, right?
6        A. Correct.
7        Q. And you have to flip to the end to see this, but
8    it's dated November 10th, 1999, right?
9        A. Correct.
10       Q. And it provides in the paper a capitalization
11   rate for real estate controlled by religious
12   institutions, correct?
13       A. Correct.
14       Q. And that rate that is provided is 59.47 percent,
15   correct? That's on the sixth page if you want to take
16   a look at it. I'm trying to get to it as well. It's
17   in a table on the top of the sixth page.
18       A. Bear with me. Yes.
19       Q. Okay. And the finance capitalization rate is
20   indicative of risk?
21       A. It's -- yes.
22       Q. And the higher the capitalization rate, the
23   riskier the investment according to the market; is that

19 (Pages 70 - 73)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 74

1  right?
2    A.  Yes.
3    Q.  Okay.  And in your unimpaired analysis, the cap
4  rate taken from the Schmick paper is the only variable
5  reflecting risk?
6    A.  I didn't understand that question.
7    Q.  In your unimpaired analysis, the only variable
8  that you used that reflects risk is this one, the one
9  borrowed from the Schmick paper; is that right?
10    A.  I think.  I'm not sure I'm understanding your
11  question.
12    Q.  Your unimpaired analysis consists of multiplying
13  the FY '22 revenues times this capitalization rate,
14  59.47?  You took an inverse of it, but that's correct,
15  right?
16    A.  I took an inverse of it, that's correct.
17    Q.  And the inverse is 1.68?
18    A.  Yeah.  It's a revenue multiple, correct.
19    Q.  Would you agree that the more inaccurate the
20  Schmick cap rate is -- I'm not saying it's inaccurate,
21  but the more inaccurate that cap rate is, the more
22  inaccurate your unimpaired estimate of fair market
23  value is, correct?

Page 75

1    A.  So you are saying -- you are not saying that the
2  capitalization rate I used is inaccurate.  You are just
3  saying if it were inaccurate, the more that it was
4  hypothetically inaccurate, that that inaccuracy would
5  flow through to my opinions; is that fair?
6    Q.  Yes, yes.
7    A.  That's correct.
8    Q.  Okay.  In your experience, do professionals in
9  the field -- let me withdraw that.  Are you aware of
10  professionals in the field who use Mr. Schmick's 59.47
11  revenue capitalization rate in valuing properties?
12    A.  I think the problem that you run into in valuing
13  religious properties is there is very few transactions.
14  And the purpose of this paper, which is over 25 years
15  old, was to develop a reliable methodology to
16  supplement the fact that it's just difficult to find
17  comparable transactions.  Am I specifically aware of
18  anyone utilizing this paper besides the fact that it's
19  been around for over 25 years?  No.  And it's using
20  generally accepted methodologies to determine the
21  revenue capitalization rates.
22    Q.  Yeah.  I understand about the methodology.  I
23  wanted to draw a distinction between the methodology,

Page 76

1  which is one thing, and the actual rate.  Are you aware
2  of this rate being used in the field, used in the field
3  in business, to value religious properties?
4    A.  Am I aware -- when you say the rate, are you
5  talking specifically about 59.47 percent?
6    Q.  Yes, I am.
7    A.  I'm aware that the study has existed for 25
8  years.  I am aware that it is still out there and being
9  used, but I cannot cite an example at this time.
10    Q.  I'm going to talk in terms of the 59 percent
11  rather than the 1.6.  So the 59.47 cap rate was derived
12  from four sales of church real estate properties in the
13  Minneapolis/St. Paul metropolitan market?
14    A.  I don't recall.
15    Q.  Okay.  If you look at the 59.47 in the second to
16  the last row in the table, do you see that?  And that
17  says "average seller revenue capitalization rate."  Do
18  you see that?
19    A.  Uh-huh (yes).
20    Q.  And it says S2 to S5.  Do you see that?
21    A.  Uh-huh (yes).
22    Q.  So you see that this rate is derived from these
23  four sales, S2 through S5, correct?

Page 77

1    A.  I see that.
2    Q.  Okay.  And I think you alluded to it.  These
3  properties were sold almost 30 years ago, correct?
4    A.  Correct.
5    Q.  Okay.  In forming your conclusions here, you
6  didn't conduct a survey of more recent sales of
7  religious properties; is that fair?
8    A.  No, I did not.
9    Q.  Okay.  And you did not evaluate sales of
10  religious properties in communities in which the
11  connectional church owns properties.  Is that true?
12    A.  I utilized these sales, and they are in
13  Minneapolis.
14    Q.  Not in the -- not in the locations where the
15  connectional church owns property, correct?
16    A.  It doesn't -- when you say connectional church,
17  are you talking about the big church?
18    Q.  Yeah, yeah.
19    A.  With the audited financial statements?  Those
20  are completely disconnected and don't have anything to
21  do with this.  The church, the big church's property,
22  has nothing to do with this methodology.
23    Q.  Okay.  Did you evaluate sales in communities in

20 (Pages 74 - 77)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 78

1  which the churches -- district churches owned property?
2      A. I did not even look to see to make that
3  determination. So the answer is I'm not sure.
4      Q. Well, I think the answer is no, you didn't
5  evaluate sales in locations in which district churches
6  owned property?
7      A. I don't think I can say that. I don't think I
8  have enough information to know the answer to that
9  question.
10     Q. Are you aware of where AMEC's district churches
11  own property?
12     A. I am not.
13     Q. Did you test in any way whether a capitalization
14  rate metric for sale real estate may be accurately
15  applied to an entity's operations?
16     A. In this situation, I think it very definitely
17  applies.
18     Q. I think that's a conclusion you reached, but did
19  you -- let me -- I will withdraw that part. You didn't
20  test whether a cap rate derived in '19 -- excuse me.
21  You did not test whether a capitalization rate metric
22  specific for real estate may be accurately applied to
23  operations. Is that correct?

Page 79

1      A. The implications and the wording that you are
2  using are flawed.
3      Q. Okay.
4      A. So I really can't answer the question that you
5  are asking me because it's very obvious from the facts
6  that real estate and the value of the real estate and
7  donations that fund the big church's budget are
8  directly related. And the article makes that point.
9  That's the reason this methodology was developed,
10  because of the lack of actual transactions and the need
11  to be able to value church property because there is a
12  direct relationship between the value of the church
13  property and the income that the church generates. And
14  the income that the church generates is what funds the
15  big church's budget. So with respect to testing it,
16  that's the test. It's obvious. They are directly
17  connected to one another.
18     Q. But you would agree that Mr. Schmick limits his
19  analysis to the valuation of church properties, not the
20  valuation of churches, correct?
21     A. He is using a business valuation approach. It's
22  based on the revenue that is generated at a location
23  that is a house of worship. That's the same revenue

Page 80

1  that funds the big church's budget. They are directly
2  related to one another.
3      Q. But he is using real estate metrics for purposes
4  of valuing real estate. You agree with that, right?
5      A. That makes no sense to me.
6      Q. Well, you would agree his focus is on real
7  estate, not enterprises, right?
8      A. The reason it makes no sense to me is because if
9  you own a steel mill, which is a piece of real estate,
10  the value of that steel mill is based on the income it
11  generates. If you own income-producing property, the
12  value of that income-producing property is based on the
13  income that it generates. This methodology proves that
14  the value of a church is based on the income that it
15  generates. The income that it generates is what funds
16  the church's budget. That's why this methodology is
17  the proper methodology to determine the impact of
18  diminution value on the big church.
19     Q. Your task here was to value the connectional
20  church -- part of your task. Part of your task here
21  was to value the connectional church as an
22  organization, not just its property. Is that correct?
23     A. My charge was to determine the diminution in

Page 81

1  value of the larger church.
2      Q. And part of that task, as we discussed, was to
3  calculate an unimpaired and an impaired value of the
4  connectional church as an organization, not just its
5  property. Fair?
6      A. To calculate the value of the church based on
7  the revenue multiples that are demonstrated by revenue
8  capitalization rates at the little C church level.
9      Q. But you didn't look at actual financial data at
10  the little C church level, true?
11     A. I'm not sure -- I think I know what you are
12  talking about, but the paper that I utilized is --
13  reflects the revenue being generated at the little C
14  level, and the implied multiple that transfers to the
15  principal operating asset of religious organization.
16  The church in which it fits people who come to church,
17  and when they come, they make donations that turns into
18  cash flow. And part of that cash flow goes to the big
19  church. So the value of that cash flow is the value of
20  that cash flow. And how you split it up, that value
21  goes with it.
22          So if the value is a multiple of 1.68 of
23  revenue unimpaired, that value translates to the value

21 (Pages 78 - 81)

Julian Lester Alexander , III                                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 82

1  to the big church.  And then if the value of the
2  multiple is only .45 because it's now been impaired
3  because its reputation has been damaged, then that
4  lowers the value to both the little church and the big
5  church because the funding of both organizations is the
6  same source.
7      Q.  Yeah.
8      A.  Wait a minute.  It's the same source, the people
9  who come to church and make donations.
10     Q.  But you did not examine whether that has
11 actually happened, whether tithing has been reduced at
12 the little C church level and, therefore, revenues at
13 the big church level have decreased, correct?
14     A.  That is not -- I will never have done that in
15 calculating a diminution in value damage because that's
16 not part of a diminution in value calculation.
17 Diminution in value is about the added risk for the
18 unknown, the things that might happen in the future and
19 how that affects value.  So that was a trick question.
20     Q.  Well, aren't you proposing that -- or aren't you
21 indicating that the diminution in value here comes from
22 -- or part of it comes from reduced -- well, let me
23 step back.  Isn't what this method is saying is that

Page 83

1  the diminution in tithing at the little church level
2  ripples through at the connectional church level,
3  impacts its revenues?
4      A.  The risk -- the reputational risk impacts the
5  value of the little C donations that then ripples
6  through to the big C donations.  There is added risk
7  because of uncertainties that cause the damage.
8      Q.  I guess -- go ahead.
9      A.  Because increased risks lowers value, and that's
10 a real damage.
11     Q.  But couldn't you have checked the '23 and '24
12 financials to see if that has actually manifested?
13     A.  Like the car example, it doesn't matter
14 subsequent values what they do, they are going to do
15 it.  But the diminution because the car was wrecked and
16 fixed, has been incurred.  And it's -- it's there.
17 This car looks just like the car that has never been
18 wrecked, but it's going to be worth less.  It doesn't
19 matter what the car then appreciated to or depreciated
20 to, but for the diminution.  The diminution is an extra
21 damage.
22     Q.  I'm trying to connect with you on this.  Let's
23 say there is a wreck.  There is a prediction by a

Page 84

1  valuation person that that wreck has diminished the
2  value by 50 percent.  Are you saying looking at the
3  actual sales figure to see how good that prediction
4  was, it is not a worthwhile exercise?
5      A.  No, I'm not saying that.  I'm saying that while
6  you could oversimplify it in the car example and get
7  that -- you can't draw that kind of situation out of
8  the facts we are dealing with here.
9      Q.  So is the car example too simplistic to work
10 here?  I mentioned it because you have been talking
11 about it all day.  Is it too simplistic as an analogy
12 or is it a good analogy?
13     A.  No.  It's a good analogy.  But the thing that is
14 difficult to say is the car's value goes up, but it's
15 been wrecked.  Let me do it this way.  You go to the
16 Black Book, and the car has got 20,000 miles on it.
17 It's two years old.  It's got all these options on it.
18 And if you go to used Black Book -- there is the Blue
19 Book too, but the Black Book actually is what the used
20 car dealers use.  Okay?  And they will say this is what
21 the average wholesale value is, all right?  And then
22 you tell the used car appraiser, "But it's been
23 wrecked," and they are going to knock some money off of

Page 85

1  that.
2      Q.  Sure.
3      A.  All right?  So the issue that you are now trying
4  to translate to is what is the inherent value of the
5  church, okay?  And my methodology is holding the
6  inherent value the same, and I'm calculating
7  diminution.  Well, what if the value was reduced even
8  more because of a physical loss that flows from the
9  very same thing that is also creating this added risk
10 because the risk component of the damage has not yet
11 materialized but it's still a legitimate risk.  Then
12 you would have two damage numbers at that point.  You
13 would have the diminution in value plus the actual loss
14 that materialized.
15     Q.  When you use the term "inherent value," is that
16 different from fair market value?
17     A.  It's an accounting term.  So, no.  In this case
18 it's not any different.
19     Q.  Because you also used in your report, sometimes
20 you said fair market value and sometimes you say
21 intrinsic value.  Are they all the same or is there a
22 difference between those?
23     A.  Intrinsic value is the true fundamental value.

22 (Pages 82 - 85)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 86

1 And many times it and fair market value are the same,
2 but they can be different.
3    Q. Is that the case in religious properties, that
4 there is a divergence?
5    A. (Witness nods head back and forth.)
6    Q. We have intrinsic, inherent and fair market
7 value. Are inherent and intrinsic the same or --
8    A. The way I was using inherent, I meant it to be
9 the same as fair value, as fair market value, and as
10 intrinsic value.
11    Q. Did you consider that a capitalization rate
12 calculated in 1999 may not reliably be used to value
13 organizations -- let me walk that back. Did you
14 consider whether a cap rate derived in 1999 is still
15 accurate for valuing property in 2025?
16    A. Yes.
17    Q. And what went into that consideration?
18    A. The fact that the components of many valuation
19 methodologies contain historical data that's much older
20 than that. Therefore, historical data and historical
21 track values are clearly relevant to today's values.
22    Q. Did you look at property sales from more recent
23 times to determine whether the cap rate there is

Page 87

1 similar to the cap rate that Mr. Schmick calculated in
2 1999?
3    A. There is really no reason for me to do it. I
4 haven't done it, but there is no reason to do that.
5 Rates of return typically do not change because of the
6 passage of time. They are typically based on risk
7 assessments that changes the rate of return, and
8 empirical studies and valuation have proven that over
9 and over and over again. So the whole line of
10 questioning about it's old is really uninformed with
11 how valuation works and how those who invest assess
12 risk and wish to be compensated for accepting that
13 risk.
14    Q. Are there any empirical studies of which you are
15 aware that might be similar to what Mr. Schmick did in
16 1999 but were conducted more recently, with regard to
17 religious properties?
18    A. Not -- there were many, many studies, most of
19 them that I can think of are much older than Mr.
20 Schmick's study. They don't relate to religious
21 properties. They are routinely utilized in valuation
22 science by experts to do valuation in nonlitigation.
23 They are used by market analysts in doing stock market

Page 88

1 valuations, and they contain data that goes back many,
2 many, many years.
3    Q. There does come a point where it's too long ago,
4 right? Like Colonial era sales of churches, whatever
5 rate those were being sold at, you wouldn't want to use
6 something like that now, correct?
7    A. I really don't have enough information to answer
8 that. What I do have is the information that says that
9 the -- what I will call scientific study of the factors
10 that affect valuation goes back to right after the
11 depression, and that's a long time.
12    Q. On the next page, which is the seventh page of
13 the Schmick paper here, there is a heading that says
14 relationship to other approaches in the first sentence
15 there. Says -- are you with me, sir?
16    A. I'm catching up. I'm not there yet.
17    Q. Let me wait for you.
18    A. Okay.
19    Q. It's the page after the table, right under
20 "relationship to other approaches." It says, "As with
21 any appraisal assignment, the revenue capitalization
22 approach for church property is not intended to be the
23 sole determinant of value." And here you estimate the

Page 89

1 unimpaired value of AMEC as an organization by
2 multiplying its fiscal year 2022 revenues times the
3 59.47 percent cap rate, right?
4    A. Correct.
5    Q. And that is the method by which you calculated
6 the unimpaired value of the AMEC connectional church,
7 right?
8    A. For comparative purposes, yes.
9    Q. Mr. Schmick states that his approach -- his new
10 approach, then new approach, should be used in
11 conjunction with the cost approach and the sales
12 comparison approach to value as a third approach or
13 methodology for estimating market value. And did you,
14 Mr. Alexander, do an analysis using the cost approach?
15    A. You are conflating assignments.
16    Q. I am? I'm just reading this sentence and just
17 asking you if you did this approach.
18    A. This is a damages assignment. This is not an
19 appraisal assignment, and I'm calculating the
20 diminution in value using a generally accepted
21 methodology. I'm not appraising church property.
22    Q. Yes, but you are appraising the value of the
23 church? You don't like that word appraised? Is that

23 (Pages 86 - 89)

Julian Lester Alexander , III                          July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 90

1  the wrong word?  You are valuing the connectional
2  church; is that right?
3      A.  No.
4      Q.  As part of your analysis?
5      A.  I'm determining what the value of a revenue
6  string coming through the Financial Department is based
7  on a multiple that is connected directly to the
8  donation generating ability of smaller churches that
9  contribute to the budget and then adjusting the risk
10  using the Chalmers' risk factors, the midpoint of the
11  Chalmers' risk studies, and then recomputing that same
12  value to arrive at a diminution of value damage number.
13  This is a damages calculation.
14      Q.  Yeah.  But in order to get that number, you did
15  an evaluation of the connectional church, an unimpaired
16  valuation, didn't you?
17      A.  I did an unimpaired revenue multiple
18  calculation, which is how you do the diminution in
19  value damages calculation.
20      Q.  You did calculate an unimpaired value of the
21  connectional church?
22      A.  Yeah, fair value, which is a litigation term.  I
23  calculated a fair value for the purposes of determining

Page 91

1  damages.  You are not going to find the market
2  approach.  There is no sales of the big AME church,
3  comparable sales.  You will never find that.  I'm not
4  doing an evaluation.  There is no reason for me to -- a
5  business valuation of the big church.  I am calculating
6  the value of a revenue stream under the premise of no
7  harm, and then I'm adjusting the rate of return for the
8  additional perceived risk because of the reputational
9  harm that's incurred, and the difference in those two
10  fair values is the economic loss sustained by the
11  church, big C church, which is a generally accepted
12  damage methodology.
13      Q.  So this -- in other words, this advice of
14  Mr. Schmick's that you should use other methods
15  alongside his method, doesn't apply in damages
16  calculations?  That's basically the point?
17      A.  No.  The point is you are not going to find a
18  comparable sale of the big C AME church because there
19  is only one of them.
20      Q.  With nonprofits, they are supposed -- their
21  revenues and costs are supposed to even out for the --
22  if they make too much profit, they can lose their
23  nonprofit status.  Do you know that?

Page 92

1      A.  What's your basis for that?
2      Q.  The law of nonprofit, I guess.  The IRS rules.
3  So is it your contention that a nonprofit can for years
4  on end make profits without risking its nonprofit
5  status?
6      A.  Depends on what the mission of the nonprofit is.
7  I mean, I've -- I've worked for, audited, been engaged
8  by many incredibly profitable nonprofits.  For example,
9  your alma mater.
10      Q.  Georgetown?
11      A.  Yeah.  An incredibly profitable nonprofit.
12      Q.  But doesn't it have to pump those profits back
13  into -- back out in order to maintain its nonprofit
14  status, if you know?
15      A.  Probably this is beyond the scope of my
16  engagement, other than to say I have seen many, many
17  very profitable nonprofit enterprises.
18      Q.  So you can put that aside.  Well, if these
19  little C churches that we have referred to, the
20  district churches, listed a piece of property for sale
21  and asked for your advice on the value, would you point
22  them to the Schmick paper?
23      A.  I can't agree with the premises of your

Page 93

1  question.
2      Q.  Well, let's say a church has outgrown -- it's
3  doing well, one of these district churches, and needs a
4  bigger church.  So it wants to list its current church
5  for sale and asks for your advice on a sale price.  You
6  wouldn't just point them to the Schmick paper, right,
7  and say multiply this by your revenues and list it at
8  that?
9      A.  Yeah.  I still, I can't -- I can't agree with
10  the premise of your question.
11      Q.  What's wrong with it?
12      A.  I'm a CPA.  That would never happen.
13      Q.  Someone wouldn't come to you for advice as to
14  what to list their price at -- their property at.  Is
15  that the point you are making?
16      A.  Likely not.  And if they did, I might be
17  restricted to advise them on the sale of real estate
18  under state law in most states.  I'm a business
19  valuation person.
20      Q.  Now your impaired valuation begins with your
21  unimpaired valuation as an input, correct?
22      A.  Yes.
23      Q.  And if your unimpaired valuation is unreliable,

24 (Pages 90 - 93)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 94

1  then your impaired valuation is unreliable because your
2  unimpaired is an input to your impaired, correct?
3      A. If the unimpaired value is unreliable, it would
4  depend on the degree to which it was unreliable. But
5  if it was sufficiently unreliable, it would render my
6  opinion unreliable.
7      Q. And even if your unimpaired valuation is
8  reliable, your impaired valuation may be unreliable if
9  you selected an unreliable cap rate in order to
10 calculate the impaired value, correct?
11     A. So the hypotheticals you are asking me, I don't
12 agree with.
13     Q. Right. I know that.
14     A. I'm just making sure my answer has that in it.
15     Q. You got it.
16     A. I don't agree with, but purely hypothetically
17 speaking, if something is unreliable, materially
18 unreliable, then it's materially unreliable.
19     Q. And you used the Chalmers and Jackson paper in
20 deriving your impaired capitalization rate, correct?
21     A. Actually, I used my own professional experience,
22 and that paper is a product of it.
23     Q. Can you explain what you mean by that answer?

Page 95

1      A. So I worked with Jim's team from the inception
2  of that paper until I left PWC. I continued working
3  with Jim off and on. I was directly involved in the
4  development of the data that went into the empirical
5  study that was the basis for that paper as well as
6  updates to that paper. I conducted the interviews of
7  the private equity funds that purchased the properties
8  and the businesses contained contamination, and I asked
9  them why and what.
10     Q. Okay. Let me give you a copy of that.
11     (Exhibit 780 was marked for identification.)
12     Q. (BY MR. ABELES) And this is the Chalmers and
13 Jackson paper that's referenced in your report, right?
14     A. Correct, yeah. It's the first one.
15     Q. Is this the one that you were just referring to
16 in terms of you worked on the data that went into this
17 paper here?
18     A. I worked on this one and others --
19     Q. Okay.
20     A. -- that follow this.
21     Q. Okay. This is the only one that you cited in
22 your report, right?
23     A. It's the only one that's publicly available,

Page 96

1  that I'm aware of that's publicly available.
2      Q. Got it. Now when Chalmers and Jackson -- and so
3  this one is called "Risk Factors in the Appraisal of
4  Contaminated Property." I'm going to refer to it as
5  Chalmers and Jackson or Chalmers -- Chalmers from here
6  on out. When Chalmers -- Chalmers uses the term --
7      A. Just call him Jim. I know who you are talking
8  about.
9      Q. Right. When Jim and his partner used the term
10 "contamination," you understood them to mean
11 environmental contamination, correct?
12     A. That is correct.
13     Q. And that sort of contamination that has
14 physically manifested in some point, requiring clean up
15 or remediation?
16     A. Not always.
17     Q. Not always, but physical contamination we are
18 talking about?
19     A. Many times, it's the risk of contamination, not
20 actual contamination. An example would be neighboring
21 property has ground water contamination, and there is
22 concern that the ground water will migrate to your
23 property.

Page 97

1      Q. Right.
2      A. Despite the fact that you don't drink out of a
3  well or even use the ground water.
4      Q. And that's a risk of physical contamination,
5  right, something you can touch?
6      A. Well, no. I mean, what I just described, you
7  can't touch it because nothing has happened.
8      Q. Right. But the danger is that that ground --
9  that contaminated ground water might get into your
10 pipes and your children and family, right?
11     A. Well, no. Let me give you the scenario.
12     Q. Go ahead.
13     A. It's a business that operates on land, okay? It
14 doesn't use the ground water, okay? Next door is
15 another business that's contaminated the ground water.
16     Q. Uh-huh (yes).
17     A. There is concerns that that ground water
18 contamination next door could migrate, hasn't migrated,
19 but it could. The value of your property has been
20 damaged --
21     Q. Sure.
22     A. -- by your neighbor contaminating the ground
23 water that could go under your property, and the proof

25 (Pages 94 - 97)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 98

1  of that are surveys of investors that would invest in
2  that business, not buying the land, that invest in that
3  business. And the additional yield requirement, equity
4  yield, they would demand to accept the risk that is
5  possible -- it hasn't happened. It's possible that
6  ground water could migrate.
7    Q. Got it.
8    A. And even though it won't affect the business at
9  all, the fact that the business sits on land that is
10  contaminated with ground water contamination that could
11  continue contaminating other people as it migrates
12  through the ground water diminishes the value of the
13  business.
14    Q. Okay. Now the AMEC connectional church has not
15  suffered environmental contamination or the risk of
16  environmental contamination, correct?
17    A. The value factors used to -- that I'm relying on
18  used to appraise contaminated property -- and my work
19  was in contaminated businesses, okay -- are based on
20  risk. The risk that my business value could be harmed
21  by something I cannot control, that has no real impact
22  on my business but it's still a risk because the
23  perception of a buyer will be harmed by it, is

Page 99

1  analogous in my opinion, completely directly analogous
2  to that of reputational harm.
3    Q. Would you agree with my point that the risk that
4  the AMEC enterprise has been subjected to is not
5  environmental contamination, correct?
6    A. It is not environmental contamination. Like
7  many of the companies I surveyed who have not been
8  subjected to environmental contamination, they were
9  subjected to the risk that some day in the future,
10  their property would be subjected to environmental
11  contamination.
12    Q. Okay. And that latter situation is also not
13  something that AMEC has suffered, that future risk of
14  environmental contamination, right?
15    A. Well, obviously the bad thing is not
16  environmental contamination.
17    Q. Fair enough.
18    A. But the risk is associated with the bad thing,
19  and investors' response to the risk of a big thing
20  happening is two things. If it's so bad or so
21  uncertain, then they don't invest. But that's
22  typically not true. What I have found in doing
23  surveys, typically an investor will invest. They just

Page 100

1  want a much higher rate of return to accept the risk
2  that some day a bad thing may happen. And the less you
3  know about it, the higher the rate of return. In other
4  words, the higher the risk, the more uncertainty, the
5  more unknown, they are still investors. They are just
6  going to want an even higher rate of return. I picked
7  the midpoint.
8    Q. We'll get there. We'll get there. Would you --
9  would you consider environmental contamination as -- do
10  you use it as an analogy for the harm that AMEC claims
11  that it's suffered? Because they are different, right?
12  And that's what I'm trying to get at.
13    A. I understand you are trying to get at that, but
14  I don't agree with you that it's different. The risk
15  of unknown bad things and the risk of how bad things
16  might affect the future being unknown is very
17  analogous. It's the same.
18    Q. But let's take the case in which environmental
19  contamination has happened, okay? So not your future
20  one, but it's happened. Okay? If a church is
21  contaminated, physically contaminated, the problem --
22  nobody can go there, right, if it's contaminated
23  enough, okay? You agree with that?

Page 101

1    A. I'm having a hard time understanding that.
2    Q. Okay. Well, let's say yesterday, the EPA
3  announced that a church that you go to is contaminated.
4    A. How?
5    Q. The air is unbreathable?
6    A. Why?
7    Q. Because it's filled with carbon dioxide. I
8  don't know.
9    A. Can it be remediated?
10    Q. Potentially, but let me finish my question.
11  Okay?
12    A. Okay.
13    Q. Okay. Let's do it this way. Yesterday one
14  church announced that it was suffering from a financial
15  scandal and another church announced that it's
16  suffering from environmental contamination. They are
17  going to be different reactions, right, on
18  parishioners' behavior based on those two different
19  kinds of harms?
20    A. I would need more information. I mean, the
21  specifics of what the uncertainties are and the level
22  of risk is important to the valuation of what a stake-
23  holder would perceive the appropriate rate of return to

26 (Pages 98 - 101)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 102

1  attach to that.  So you have to have more information.
2  I mean, here we have really good documentation of the
3  reputational harm that's been caused here.  In
4  environmental contamination, you would have similar
5  documentation, which varies.
6          Another area which is also analogous is
7  leverage, high risk, private equity, speculative
8  investing in startup enterprises.  That's another
9  example.  All of those three examples, the rate of
10  return is enhanced because of the risk of an
11  unfavorable outcome that is uncertain and cannot be
12  reasonably predicted of how it's going to work out.
13      Q.  You would agree that the magnitude of the risk
14  varies with different kinds of harm, right?
15      A.  The magnitude of the risk varies, depending upon
16  the level of uncertainty.
17      Q.  And not the type of harm?  Is that -- you don't
18  agree with that?
19      A.  Well, I think uncertainty captures more than
20  just this narrow type of harm question that you are
21  asking me.
22      Q.  As part of your answer before, you indicated
23  that we have lots of documentation of the reputational

Page 103

1  harm that AMEC has suffered.  What is that
2  documentation that you are referring to?
3      A.  I will fail a memory test.  I don't have my
4  binder with me.
5      Q.  As we sit here today, are you able to point to
6  any documents that reflect the reputational harm AMEC
7  has suffered?
8      A.  Without my binder, I can't do that.
9      Q.  Now in your report, I don't think you cited any
10  authorities indicating a method developed for
11  estimating value of physical contaminated property can
12  be used for estimating value of other kinds of impaired
13  property.  Correct?
14      A.  Would you mind either reading that back or
15  rephrasing?
16      Q.  Yeah.  I will give it to you again.  Your report
17  doesn't cite any authorities, any other papers,
18  anything, indicating that a method developed for
19  estimating value of physically contaminated property
20  can be used for estimating value of other kinds of
21  impaired property?
22      A.  I'm not aware of a paper that does that.
23      Q.  Okay.  And did you test, analyze, evaluate

Page 104

1  whether a risk premium applicable to physically
2  contaminated property may reliably be applied to other
3  kinds of impaired property?
4      A.  Based on my actual experience, it is evident,
5  first of all, these are not properties.  My experience
6  were not properties.  My experience were businesses.
7      Q.  Okay.
8      A.  Okay?  And where the uncertainty associated with
9  the contamination was the driving force that lowered
10  the value of the business.  And based on that, I
11  believe it is appropriate to use this analogy to value
12  risk because it is a methodology to use to determine
13  what is the value of increased risk.  And again, it's
14  not about the nature of the contamination.  It's about
15  the unknowns associated with the contamination.
16      Q.  Well, one unknown with physically contaminated
17  property might be that the property simply cannot be
18  used by people, right?
19      A.  Yeah, but -- I understand that in the extreme
20  case, but that's not what I have been involved in.  My
21  experience has been involved with active businesses,
22  operating either near or close to or across the street
23  from or whatever, you know.  And my analysis on both

Page 105

1  the plaintiff and the defense side is evaluating the
2  degree to which that business has been harmed simply
3  because of the presence of something that they can't
4  remediate.  They can't deal with.  It's an added risk
5  that increases the risk, the operating risk, of the
6  enterprise.
7      Q.  Would you agree --
8      A.  And that's why I use this methodology, multiple
9  cases, and it's been admitted.
10      Q.  Would you agree from a lender's perspective,
11  there is a difference between mortgaging a physically
12  contaminated property versus other kinds of impaired
13  property?
14      A.  I would agree that from a lender's perspective,
15  they are typically not going to lend to a contaminated
16  property.
17      Q.  Meaning a physically contaminated property?
18      A.  If the collateral is land, they are not going to
19  lend.  And it's because of the way the federal laws
20  work with the cleanup responsibility.  The financial
21  institution can be held responsible 100 percent for the
22  cleanup of the property.  So that's why they won't
23  lend.

27 (Pages 102 - 105)

Julian Lester Alexander , III                          July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 106

1    Q. Setting aside the lender, from a human being's
2  perspective, there is a difference between visiting a
3  physically contaminated property and other kinds of
4  impaired property?
5    A. I don't understand your question.
6    Q. Well --
7    A. I don't understand the comparison, the
8  difference between visiting and other. I don't
9  understand what other is.
10   Q. Versus visiting other kinds of -- thank you.
11 From a human being's perspective, there is a difference
12 between visiting a physically contaminated property
13 versus visiting other kinds of impaired property?
14   A. I'm still not sure I understand your question.
15 Other kinds of -- give me an example of another kind of
16 impaired property.
17   Q. Property that's been impaired because of a
18 reputational injury, its value has been impaired
19 because of a reputational injury.
20   A. I don't really see any difference between
21 someone who doesn't want to go to church because the
22 church has contaminated ground water and someone who
23 doesn't want to go to church because they don't like

Page 107

1  the church's reputation. The financial impact is the
2  same.
3    Q. By the way, when I'm looking at this, I'm
4  looking at the time, not my messages. In the Chalmers
5  and Jackson paper, which is Exhibit 780, on the very
6  first page still, there is a sentence that's on the
7  left-hand side, so in the beginning, that starts "this
8  framework focuses." Do you see that?
9    A. Not yet.
10   Q. Okay. It's about the third sentence, I would
11 say.
12   A. Okay.
13   Q. Okay. So the authors write, "This framework
14 focuses attention on the cash flow consequences or
15 direct cost of contamination and on the way in which
16 the risk implications of contamination affect the cost
17 of capital available to the contaminated property." Do
18 you see that?
19   A. I do.
20   Q. And you didn't offer an opinion based on a
21 review of AMEC's Financial Department's -- you didn't
22 analyze AMEC Financial Department's cash flow over
23 time. Is that true?

Page 108

1    A. I'm only offering opinion on the second part of
2  that sentence. So there would be no need for me to do
3  that.
4    Q. Okay. So you are offering an opinion on the way
5  in which the risk implications of contamination affect
6  the cost of capital available to the property -- well,
7  to the organization here, I guess? Is that right?
8    A. The risk implications affect the cost of
9  capital, not of contamination.
10   Q. And so you have no opinion as to whether the
11 increased risk that you say -- well, let me ask a
12 better question. You are not offering an opinion that
13 AMEC's cash flow has been negatively impacted by the
14 injury you say that it has suffered?
15   A. I do not have -- I'm not offered as an expert on
16 that component of damage.
17   Q. Okay. Did you review the AMEC Financial
18 Department's direct costs over time? Did you review
19 AMEC Financial Department's direct costs over time?
20   A. I don't have an opinion about the cash flow
21 consequences or direct costs of the reputational
22 issues. So I didn't do that work because I'm not
23 offering an opinion about that.

Page 109

1    Q. And so you did not find that as a result of the
2  alleged wrongful acts in this case, AMEC's direct costs
3  have risen; is that fair?
4    A. I have no opinion either way.
5    Q. Okay.
6    A. Because if I don't look at something, I don't
7  know the answer.
8    Q. Sure. That makes sense.
9    A. Again, I'm only here talking about the risk
10 implications on cost of capital of the church.
11   Q. You understand I need to -- one thing I need to
12 go back to the office with is what are this guy's
13 opinions. So that's why I'm being so particular here.
14 If I don't have that, this has been a big waste of
15 time. So thank you for bearing with me.
16      MR. ABELES: I think we have been going for
17 about an hour now so why don't we take a little break?
18      THE VIDEOGRAPHER: This ends disc three.
19 Going off the record at 1:50.
20      (Recess taken.)
21      THE VIDEOGRAPHER: This begins disc four.
22 Going back on the record at 2:02.
23   Q. (BY MR. ABELES) Still talking about Jim's paper

28 (Pages 106 - 109)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 110

1  here.  I'm on page 45.  This is a section on the
2  right-hand column on 45 on Exhibit 780 that says,
3  "Conceptual Framework," and I'm going to refer you to
4  the third paragraph down, beginning with the findings.
5  Do you see that?
6      A.  Yeah.
7      Q.  Okay.  I'm going to ask you about the second
8  sentence, but I wanted to read the first sentence for
9  the context.  It says, "The findings from the
10  investigative phase provide the basis for determining
11  the direct costs associated with the property as well
12  as for developing the fact pattern from which to
13  evaluate the risk perceptions of market participants
14  relative to the affected property."  Now the next
15  sentence says, "The fact pattern becomes the foundation
16  for assessing whether the market perceives additional
17  risk associated with the property (i.e. stigma)."  The
18  way that Chalmers and Jackson are using this term
19  stigma, there is a stigma associated with the property
20  if the market perceives additional risk in acquiring
21  it?  Is that how you understand them to be using this
22  term?
23      A.  Or operating on it.

Page 111

1      Q.  If the market perceives additional risk in
2  acquiring the property or the market operates on that
3  risk.  Is that the clarification that you made there?
4      A.  The risk of operating on that property --
5      Q.  Got it.
6      A.  -- is perceived by the market as being higher
7  than it otherwise would be.
8      Q.  I see.  Okay.  So there we go.  Thanks.  So I
9  asked -- so there is a stigma associated with the
10  property if the market perceives additional risk in
11  acquiring it.  We'll get to operating in a second, but
12  I think you agree with that first point, my question,
13  right?
14      A.  I agree with what it says, yes.
15      Q.  And there is stigma associated with the property
16  if the market perceives additional risk in operating on
17  the property, right?
18      A.  Well, I was clarifying that it's not just about
19  buying property.  It's about the impact on the business
20  that it's actually being operated or conducted on that
21  property.
22      Q.  And at least as Chalmers and Jackson use the
23  term, if there is no stigma as they defined it and we

Page 112

1  just discussed, that under their framework, there is no
2  impairment and the cap rate should remain unchanged,
3  correct?
4      A.  I agree with that.
5      Q.  And if the cap rate is unchanged, then assuming
6  -- then the valuation would be unchanged?
7      A.  In my methodology, the before and after value
8  numbers would be the same.
9      Q.  You would just add zero, right?
10      A.  It would be zero, right.  The multiple wouldn't
11  change.
12      Q.  So a finding of stigma so defined is a threshold
13  before applying a risk premium to derive impaired
14  value?
15      A.  I think I understand your question, and I think
16  it would be associated with a finding of liability.  It
17  wouldn't per se be stigma.  I mean, stigma includes
18  risks and uncertainties.  Using that context, then I
19  would agree with your statement.
20      Q.  Yeah.  And just -- and I am trying to describe
21  the paper accurately.  If there has been some
22  contamination on property but no stigma associated with
23  that contamination, then there is no need to add

Page 113

1  additional risk premium in valuing that property; is
2  that right?
3      A.  The risk premium is exclusively associated with
4  the additional risks.  They are associated with that
5  business.  So it's -- I'm saying what you are saying,
6  but I'm using the words that I would use.  I don't --
7  typically stigma gets confused a lot, and there is a
8  lot of cases that misapply the word stigma.  So I make
9  sure I define it.  So what I'm talking about is the
10  risks of uncertainties that cannot be properly
11  quantified, assessed, timetables are uncertain about
12  remediating that risk.  The fact of whether the risk
13  can be remediated might be uncertain.  All of those go
14  into the rate of return that someone would require to
15  accept those risks.  And if those risks are not
16  present, which is what I think your question was, then
17  there would not be any damage associated because there
18  is no risk.
19      Q.  Right.  Does your report say if there is a
20  stigma associated with this reputational harm that AMEC
21  has suffered, here is the damages, or does your report
22  say "I found that there was stigma associated with this
23  reputational harm and here is the damages"?

29 (Pages 110 - 113)

Julian Lester Alexander , III                           July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 114

1    A. So I think it's in between those two. Because
2  I'm a CPA, I have some obligations to address not
3  liability but the reasonableness of what I'm
4  calculating in light of the allegations being made in
5  the case. And I would say paragraphs six and seven was
6  me addressing that, and I don't plan to issue those
7  opinions. But that's me addressing the reasonableness
8  of if there were a finding of liability, is it
9  reasonable to compute this damage, but I think I am a
10  damages expert computing the damage under the
11  assumption of a finding of liability.
12    Q. Yeah. So I think I get what you are saying.
13  You are not going to just issue a report, I assume
14  liability and here is the damages if this liability
15  story is absurd, right? You need something to sink
16  your teeth in to make sure -- was that basically your
17  point?
18    A. Yeah. I think it's a little more formal than
19  that. It needs to be grounded into financial reality
20  that makes sense and is rational, financially rational,
21  which is again why I went through the exercise of
22  articulating what -- I will agree I characterize them
23  as opinions, but what I have agreed not to testify to

Page 115

1  at trial.
2    Q. So just to make sure we are on the same page,
3  you do not intend to offer an opinion that the alleged
4  wrongful acts created a stigma associated with the AMEC
5  connectional church; is that right?
6    A. I believe that's a fact witness issue.
7    Q. Okay.
8    A. Let me amend that answer a little bit. Really
9  append it, not amend it. But I have considered the
10  reasonableness of that, and I believe that's reasonable
11  that there is a cause and effect relationship that
12  exists. But I'm not here to testify about the
13  existence or nonexistence. That's a fact witness
14  issue.
15    Q. Okay. And so you didn't consider in your
16  analysis whether, for example, the little C district
17  churches have actually suffered a reduction in
18  membership; is that right?
19    A. Understanding that the little C's do not have to
20  actually suffer a reduction in membership, you are
21  correct, for this -- excuse me. Let me finish it. The
22  little C's do not have to suffer a reduction in
23  membership for this to be a valid damage determination,

Page 116

1  you are correct.
2    Q. Okay. Similar question, and I understand your
3  caveat about it nonetheless being valid. But let me
4  just for the record, you did not consider whether
5  AMEC's district churches suffered a reduction in
6  tithing after disclosure of the alleged wrongful acts?
7    A. Because it's about the uncertainties associated
8  with the future, the little C churches do not have to
9  actually incur a reduction, merely the presence of the
10  risk that in the future reduction could occur raises
11  the risk, which lowers the value, which causes the
12  damage.
13    Q. But the answer to my question is: You did not
14  evaluate reductions in tithing, subject to your
15  caveats, correct, at the little C level?
16    A. Because that's not part of the methodology for
17  determining the damage, one would not do that. That
18  would be a separate damage.
19    Q. Got it. And I think we have talked about this
20  earlier. I think what we talked about before was AMEC
21  doesn't have any debt so it hasn't -- of course, it
22  hasn't -- its borrowing costs have not gone up. We
23  have gone through -- let me just ask you. You have not

Page 117

1  identified any evidence in the records supporting a
2  finding that after disclosure of the alleged wrongful
3  acts, AMEC actually suffered an increase in their cost
4  of capital attributable to disclosure?
5    A. If you would add debt cost of capital, I could
6  answer that question.
7    Q. Okay. You have not identified any evidence in
8  the factual records supporting a finding that after
9  disclosure of the alleged wrongful acts, AMEC actually
10  suffered an increase in cost of debt capital
11  attributable to disclosure?
12    A. That is correct, based on my understanding.
13    Q. What is that difference, cost of capital versus
14  cost of debt capital?
15    A. Cost of capital includes equity and debt
16  together.
17    Q. Okay. Got it. And you have not studied whether
18  AMEC actually suffered a decrease in gross revenues
19  after disclosure of the alleged wrongful acts; is that
20  fair?
21    A. That's not a -- a decrease in revenues after is
22  not a component of the damage that I have calculated.
23    Q. Nor is it a decrease in net income; is that

30 (Pages 114 - 117)

Julian Lester Alexander , III                        July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 118

1  fair?
2     A. Nor is a decrease -- subsequent to 2022 a
3  decrease in net income is not a component of the
4  damages that I have calculated. It would be an
5  additional damage, if it occurred.
6     Q. Returning to this point about stigma, I asked
7  you if it was an opinion of yours, and we talked about
8  that. Is it an assumption or is it more than an
9  assumption based on your CPA view that you need to --
10  it needs to be reasonable to you?
11    A. What is it?
12    Q. That stigma, stigma occurred here.
13    A. It's clear to me that reputation impacts value.
14  I don't believe that's an opinion. I think that's
15  established.
16    Q. But did you offer a finding that the harm here
17  rose to the level of stigma and, therefore, impacted
18  value?
19    A. Since I don't -- it's a matter of professional
20  practice I don't use the word stigma. So, I mean, it
21  has multiple meanings. So I don't use it. I use the
22  words I have been using in my report and I'm testifying
23  about, which is the increased risk and uncertainty.

Page 119

1  And there is increased risk and uncertainty associated
2  with reputational harm. And I'm assuming there will be
3  a finding that there was reputational harm. I'm not
4  trying to resolve the ultimate issue of whether there
5  was or wasn't.
6     Q. Okay.
7     A. I think that answered your question.
8     Q. So generally speaking, when valuing a business,
9  an appraiser evaluates either the equity or the
10  enterprise? Do I have that right?
11    A. The equity? I'm sorry.
12    Q. The equity or the enterprise? Those are the two
13  basic kinds of valuations of a business?
14    A. Well, you can value the enterprise. And then to
15  the extent the enterprise is financed by equity, you
16  can value the equity instrument separately. If it's
17  100 percent equity financed, it would be the same
18  number.
19    Q. Right. Got it. So when you evaluate the
20  equity, that's the value of the company's shares, while
21  valuing the enterprise provides a value of the whole
22  business, including debt, correct?
23    A. Enterprise value is typically computed before

Page 120

1  deducting debt, but I have also seen it referred to as
2  the residual value after deducting debt.
3     Q. And so let me bring you to the chart in the
4  Chalmers' paper. One moment. Page 55. And you
5  understand these premiums to be risk premiums for
6  equity investors?
7     A. Correct.
8     Q. So that means that they are premiums demanded by
9  potential buyers of an entity's shares?
10    A. In this study, it does.
11    Q. Right. That's what I mean. They don't reflect
12  premiums demanded by potential buyers of the whole
13  enterprise, right?
14    A. If there was no access to debt capital, they do,
15  which happens when the -- in many cases involving the
16  risk associated with environmental contamination, it's
17  so high that the debt market is closed. And the only
18  way you could acquire the company is 100 percent equity
19  finance.
20    Q. So I understand that happens. Do you know if
21  that's happened here, if these sales that fed into this
22  analysis, the owners were closed off from debt markets?
23    A. Scenario four.

Page 121

1     Q. Scenario four, okay. But not the other
2  scenarios; is that right?
3     A. Correct. It's typically -- even though scenario
4  two and three show a decrease, as these studies
5  continued, it became more apparent that it's really an
6  all or nothing. You are either going to get -- if the
7  typical loan to value is 70 percent debt, 30 percent
8  equity, depending on the state of the contamination,
9  the degree -- depending on the known versus the unknown
10  about the contamination, you either have access to the
11  typical amount of debt with no extra interest charge or
12  you have no access to debt.
13    Q. Is that called cliff risk, you are either here
14  or bottom of the cliff?
15    A. Right. You are either 100 percent equity or
16  using these numbers here 70 percent debt and equity.
17  Loan to value 70. So 70 percent debt, 30 percent
18  equity.
19    Q. So given your experience about the way debt
20  markets really do work now, aren't these numbers stale?
21    A. No.
22    Q. Aren't they -- they are not consistent with your
23  own experience though as you just described?

31 (Pages 118 - 121)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 122

1    A. No, they are. Scenario four is consistent with
2 the worst of the situations where -- and it's not the
3 type of contamination. It's the uncertainties that go
4 with the contamination, okay? It doesn't matter
5 whether it's PCB's or leaking underground storage tank.
6 It's the degree of uncertainty. And if the degree of
7 uncertainty rises to the level where a financial
8 institution could be held financially responsible for
9 something and that something typically cannot be
10 quantified, you know, it's normally not. We have
11 quantified it, and it's just too high. We are not
12 going to do it. It's usually "I don't have any idea
13 what it is." The financial institution typically will
14 decline to lend. So you are left with if you want --
15 the rate of return for your capital is going to be the
16 equity rate of return because that's the only investor
17 that will invest. And because there is no bank and
18 they are going to have to go at 100 percent, they are
19 going to want even more of a rate of return. Because
20 the risk is so high, it's run off the affordable
21 capital source. And again, risk and uncertainty, you
22 can interchange those words.
23    Q. Okay. So you had indicated that you had done

Page 123

1 some work as it relates to this exhibit, the Chalmers'
2 paper. Do you know how many equity investors provided
3 sourcing for the risk premiums used here roughly?
4    A. No. If you would like, I'm happy to tell you
5 what I do remember.
6    Q. Go ahead.
7    A. So Jim Chalmers worked for the largest -- I
8 don't remember how many, but it was virtually all of
9 them -- private equity funds that specialized in the
10 acquisition of environmentally contaminated businesses
11 and/or property.
12    Q. Right.
13    A. Okay. His practice -- and that was before. He
14 was a professor at one of the Arizona colleges, lived
15 in Phoenix at that time, and now he has retired and
16 gone to Wyoming where he bird hunts all day. So
17 jealous. And he would advise those funds on these
18 risks.
19    Q. Uh-huh (yes).
20    A. Okay. He then joined Coopers and Lybrand then,
21 and about that same time, I was able to get Coopers and
22 Lybrand hired by Monsanto. Monsanto was the only
23 producer of PCB in the U. S. And so there was a 20-

Page 124

1 year history of -- I don't know how many lawsuits where
2 Jim and I worked together on all different types of
3 problems, Jim being the expert and me and my Birmingham
4 team being the ones who did what Jim told us to do.
5 And in that context, we would update every time --
6 there was multiple lawsuits. Every time he would issue
7 a report, we would have to call the investors and
8 resurvey them. And there was a survey report that
9 originally Jim did, and then finally one of them I did
10 it where I was the survey expert. I had done enough of
11 that where I could to a reasonable degree of certainty
12 testify about the survey results.
13    I can't remember how many, but it was
14 statistically valid and it was significant. And the
15 only change was this -- it might have to do with
16 financial crisis, this reduction from .7 or the loan to
17 value 70 percent. The 50 percent, that went away. It
18 went from 70 percent to zero.
19    Q. The cliff risk, right?
20    A. Yeah.
21    Q. So when you say that these figures are
22 statistically significant, is there a way I could check
23 that? Do they provide the information here that proves

Page 125

1 statistical significance?
2    A. Well, no. But I'm sure you are aware that The
3 Appraisal Journal peer reviews articles, and you can't
4 get published by The Appraisal Journal if you haven't
5 done it properly.
6    Q. And that distinguishes this paper from the
7 Schmick paper, right, which was not peer reviewed,
8 correct?
9    A. It does in that respect, yes.
10    Q. So I'm going to refer you to the description in
11 scenario two here on the right-hand column.
12    A. What page are we on?
13    Q. Fifty-five. So it says, "Scenario two
14 represents an intermediate risk level with a seven
15 percent equity yield premium and a reduced LTVR of 50
16 percent. And LTVR is loan to value?
17    A. Ratio.
18    Q. Ratio? Okay. And so when they say 50 percent,
19 that means the bank is only willing to lend you up to
20 50 percent of the value, right?
21    A. Correct.
22    Q. Okay.
23    A. That's the one that went away.

32 (Pages 122 - 125)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 126

1    Q. That's the one that went away?
2    A. Yeah.
3    Q. Now you selected nine percent as your risk
4  premium to use --
5    A. Correct.
6    Q. -- in your report, right?
7    A. Correct.
8    Q. And that is 200 basis points higher than this
9  seven percent one here?
10    A. It's the midpoint between fifteen percent and
11  three.
12    Q. Meaning nine is halfway in between three and
13  fifteen?
14    A. Correct, because that scenario that you were
15  just pointing to is no longer -- doesn't exist anymore,
16  and I will just go ahead and finish and then you can
17  ask me more questions. And it's my opinion that the
18  risk profile is very high, okay? And in order to be
19  conservative, I have elected to use the midpoint,
20  although I believe it would be completely appropriate
21  to use fifteen percent.
22    Q. You would. Fifteen percent, this entity that
23  can't borrow any money and is running at a fifteen

Page 127

1  percent risk premium in the market. You would compare
2  this situation to that?
3    A. I think you could. That's what I said. I think
4  you could. I don't think I have done that.
5    Q. Do you understand that AMEC still has access to
6  capital markets, right?
7    A. I understand they have a line of credit. I
8  don't think there is any evidence either way that they
9  have access to the bond market, and I'm not trying to
10  say they don't have access. That's the reason I'm
11  using the midpoint. I'm assuming they do have access
12  to debt capital.
13    Q. Okay. Well, I want to go back to scenario two
14  for a second. In scenario two, there is a seven
15  percent risk premium and that's associated with a
16  reduction in LTVR of 50 percent. You did not find that
17  AMEC's LTVR is reduced by 50 percent; is that right?
18    A. They don't have anywhere near that much debt.
19  So I don't think you can -- you won't find what their
20  true economic loan to value ratio is because there is
21  no debt on their balance sheet, okay? They have a line
22  of credit, and they haven't even drawn down on it. So
23  you can't -- it's all hypothetical. So what I'm doing

Page 128

1  is I don't believe it's the minimum risk. I don't
2  believe scenario two is applicable at all because it's
3  an all or nothing. So really you are left with
4  scenarios one. You are left to 70 percent loan to
5  value or zero. So you are looking at either fifteen or
6  three, and I don't believe it's three. I believe it's
7  higher, and I'm using the midpoint between the two.
8    Q. Did you look at any metrics, AMEC specific
9  financial metrics, when you selected nine percent?
10    A. I'm not sure I understand what you are asking.
11    Q. There are a variety of metrics here on the left
12  side that then match up with these various scenarios.
13  Did you look at any of AMEC's individual -- AMEC
14  specific metrics, its income, its property value,
15  whatever, in coming up with your nine percent premium?
16    A. To the extent there was information available to
17  me, I have looked at it, recognizing that the analysis
18  is valuing cash flow, not property. Okay? And so I
19  have audited financial statements that give me the cash
20  flow.
21    Q. Right.
22    A. And then I have this survey that tells me based
23  on my own professional experience, it's not scenario

Page 129

1  one and it's not scenario four, although as I have
2  testified, I could see an argument for it being
3  scenario four. So I have used the midpoint.
4    Q. And that selection of the risk premium is what
5  drives the loss in value that you found, right?
6    A. That is true.
7    Q. Okay.
8    A. And there is no information to support any
9  assumption regarding the loan to value ratio. So I
10  have assumed that it was unchanged. Let me amend that
11  answer. Other than market data that I used to adjust
12  the capitalization rates.
13    Q. Right.
14    A. To get to a multiple.
15    Q. Market data meaning the IBIS report? Is that
16  what you are referencing?
17    A. No. Well, yeah. But let me show you. I'm
18  really referencing a calculation in my report. It's
19  appendix two, the calculation in appendix two where I'm
20  taking a market-based multiple, extracting out the
21  equity portion using market-based data, then adjusting
22  the equity yield and then getting it back to a revenue
23  multiple.

33 (Pages 126 - 129)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 130

1    Q.  And that's from the IBIS report?
2    A.  Correct.
3    Q.  Yeah.  I just forgot to highlight the quote I'm
4  about to read to you, and I don't want you to get lost
5  so give me one second.  Okay.  Still on 55, or back on
6  55 as it may be, on the left-hand side, there is a
7  heading that says capitalization rates with effects of
8  contamination.  And I think the very last sentence of
9  that paragraph begins "The actual risk premium."  Do
10  you see that?
11    A.  Are we talking about the last sentence of the
12  first --
13    Q.  Yes.
14    A.  -- paragraph under "Capitalization Rates With
15  Effects of Contamination"?
16    Q.  Correct.
17    A.  "As the property moves through discovery," that
18  sentence?
19    Q.  Yeah.  That's what I'm going to ask you about.
20  So Chalmers says, "The actual risk premiums applied to
21  a particular property though should reflect the
22  characteristics of that property, and particularly its
23  stage in the remediation cycle."  Do you agree with

Page 131

1  Jackson and Chalmers on that?
2    A.  Assuming that the risk can be remediated, I
3  agree.  Many risks cannot be remediated.
4    Q.  Would you agree that you did not choose your
5  risk premium based on the characteristics of AMEC's
6  property?
7    A.  Of course not.
8    Q.  Or of AMEC -- go ahead.
9    A.  This risk has nothing to do with the
10  uncertainties associated with property.  It has to do
11  with the uncertainties associated with the business of
12  the church, which is consistent with how this
13  methodology is applied to a business or an income-
14  generating operation that is subjected to these
15  uncertainties that flow from contaminated property.
16  And many times, when it is a business, there is
17  actually no tangible impact other than the reputational
18  issues caused by the business being in the proximity of
19  or on top of environmental contamination.  Many times
20  that's the only thing.  That's why this is so analogous
21  and why this isn't an appropriate analysis --
22  methodology to apply here in determining the damage
23  that I have calculated.

Page 132

1    Q.  In your study, does it matter what stage of
2  remediation AMEC may be in?
3    A.  It -- what matters is the level -- the abilities
4  of the big C church versus the inability of the big C
5  church to remediate the problem.  So that's probably
6  the bigger driver because many times in the
7  reputational risk area, there is not much you can do
8  about it, you know.  It's something that has happened
9  here, the facts of this case.  It's created a
10  reputational problem that's created a risk of bad
11  things that may not have happened yet but certainly
12  could, which then translates to a loss of value.
13    Q.  Have you reached the conclusion that AMEC's
14  injury is permanent?
15    A.  I have not.
16    Q.  And you are unable to tell me what stage of the
17  remediation process AMEC was in as of January 31st,
18  2025?
19    A.  It's not that I'm unable to tell you what stage.
20  I don't -- at this time, I cannot recall specific
21  information about any type of remedial acts.
22    Q.  One of the interesting things that I found from
23  this paper is that the later the stage, that could be

Page 133

1  worse from the property owner's perspective or it could
2  be better because you have more knowledge.  You know
3  and you have a better idea as it gets later as to
4  whether this injury will be permanent.  So it strikes
5  me that the stage of remediation is important to the
6  valuation.  But I think you disagree; is that right?
7    A.  Well, the problem is is differentiating the
8  damage from the value that would have occurred had the
9  damage never been incurred in the first place.  It's
10  like -- an analogy is a fraud on the stock market,
11  okay?  The stock drops, but then the stock recovers.
12    Q.  Right.
13    A.  So there is no damage, right?
14    Q.  No, but --
15    A.  Right, no.  There is a damage.  So it's very
16  analogous to that situation.  There is a damage.  So
17  then the factfinder is typically the one who has to
18  decide whether that recovery was truly a remediation of
19  that damage or whether that recovery was the function
20  of natural economics that would have occurred anyway,
21  and had they never suffered this loss, they would be
22  better off by the amount of the loss.
23    Q.  But in that case, when an entity has recovered,

34 (Pages 130 - 133)

Julian Lester Alexander , III                                July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 134

1  fully recovered its reputation, let's say, its only
2  damages are what it spent to recover its reputation,
3  right?
4       A.  And any losses it suffered during the time frame
5  that its reputation was harmed.  However, it's very
6  difficult to establish -- in fact, I'm not even sure
7  how you remediate.  It's outside of my area of
8  expertise, but I'm just speaking now how one would
9  remediate loss of reputation.
10      Q.  In your study, you didn't look at any documents
11 -- well, let me wipe that away.  You didn't conduct a
12 survey of AMEC parishioners' views on its reputation,
13 right?
14      A.  I have not.
15      Q.  Okay.  And have you seen any even anecdotal sort
16 of studies or reports on the perceptions of AMEC
17 parishioners' views of AMEC?
18      A.  I have not.
19      Q.  And so the risk premium that was derived from,
20 drawn from -- I'm not trying to argue with you -- that
21 came out of the Chalmers and Jackson paper, that
22 represented a rate associated with required returns to
23 equity holders, which can only be applied to an equity-

Page 135

1  based return, right?
2       A.  It could be applied when you are calculating the
3  weighted average cost of capital.  It should be applied
4  to the industry component that would typically
5  represent equity.
6       Q.  I'm just trying to get to the stage where you
7  had to convert it.  There was a need to convert the
8  rate here from an equity-based return to an enterprise-
9  type return, right?  And that -- let me stop there.
10      A.  No, that's not correct.  There was a need to
11 address the fact that the market multiples that I'm
12 using have two cost of capital components.  They have a
13 debt component and an equity component.  However, my
14 yield adjustments only apply to the equity component.
15      Q.  Hence, the need to convert these numbers before
16 you apply them, right?
17      A.  Yeah.  Hence for the need for appendix two.
18      Q.  Got it.  And so in order to apply the nine
19 percent premium, you needed to convert the revenue cap
20 rate in the unimpaired value calculation into an
21 unimpaired net income cap rate; is that right?
22      A.  Yes.
23      Q.  Okay.  And the way you did that was to use a

Page 136

1  proxy figure of 5.5 percent, which is the average ten-
2  year net income margin reported for all religious
3  organizations by a November 2024 IBISWorld Industry
4  Research Report, correct?
5       A.  True.
6           (Exhibit 781 was marked for identification.)
7       Q.  (BY MR. ABELES)  I'm going to mark this IBIS
8  report as the next exhibit, 781.  I am going to direct
9  you to page 65 in this exhibit, the IBISWorld Exhibit
10 781 first.
11      A.  Okay.
12      Q.  And the number on the bottom right, 5.5, this is
13 the number that you used, correct?
14      A.  Correct.
15      Q.  Okay.  And this is the ten-year average net
16 income rate?
17      A.  Yes.
18      Q.  And this figure incorporates many varieties of
19 religious organizations?
20      A.  Correct.
21      Q.  And the many denominations that fall under the
22 banner of Christianity?
23      A.  Correct.

Page 137

1       Q.  And this figure represents a proxy for net
2  income as of November 2024, correct?
3       A.  Correct.
4       Q.  And as part of your model, you apply this net
5  income proxy for 2024 to revenue data for the fiscal
6  year ending March 31st, 2022, correct?
7       A.  Correct.
8       Q.  And you didn't use actual net income data for
9  AMEC's Financial Department to estimate the
10 department's net income, correct?
11      A.  That would be incorrect if you did that.  So I
12 didn't do it.
13      Q.  Why would it be incorrect?
14      A.  Because I'm calculating an industry number, and
15 one company does not represent the industry.  One
16 operation doesn't represent the industry.  That's the
17 reason you need to use industry data, and your expert
18 is just wrong.
19      Q.  Well, help me understand why using an entity's
20 own actual net income data is less appropriate than
21 using a proxy that incorporates Muslim, Hindu,
22 Christian, Jewish organizations, everything under the
23 sun.

35 (Pages 134 - 137)

Julian Lester Alexander , III                     July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 138

1    A. It's an industry metric that I'm trying to
2  determine, not an isolated metric.  That would change
3  the premise of value if you used the church's metrics,
4  and I don't want to change the premise of value.  I
5  want it to be fair value, not strategic value.
6    Q. What's the difference between fair value and
7  strategic value?
8    A. Well, strategic value is -- incorporates the
9  particular enterprise's uniqueness, their operating
10  history; whereas, fair value, which is the appropriate
11  standard to use for damage determination, incorporates
12  market data, what the industry achieves.  And that's
13  why your expert is wrong, saying that I should use the
14  church's.
15    Q. Well, if I'm interested in -- I know it's
16  farfetched.  If I'm interested in purchasing AMEC,
17  shouldn't I be more interested in AMEC's net income
18  than what the industry's net income is?
19    A. Well, you should be interested in -- and I think
20  the more practical is if you are looking at combining a
21  church's efforts with the AMEC church, a merger of two
22  churches, church doctrines even.  You should -- you
23  should be looking at what the marketplace, what rate of

Page 139

1  return one should expect in order to conduct your
2  mission and the value, the individual income of your
3  target based on the market rate of return.  You should
4  never determine in my opinion under fair value standard
5  the market rate of return using the target's rate of
6  return.  You should evaluate the target's rate of
7  return based on the market rate of return.
8    Q. What if the target vastly lags or outpaces the
9  market, then you don't capture that in an industry
10  benchmark, right?
11    A. Well, yeah, you do.
12    Q. Hmm.  Well, if AMEC's actual net income is
13  fifteen percent and you are using this five and a half
14  percent, you are going to be undervaluing AMEC, right?
15    A. I would need to go through and do the math to
16  see because, remember, it's a before and after
17  methodology.  And so if you are consistent on both
18  sides, right now I can't even imagine what would happen
19  if I did that other than I believe it would be wrong to
20  do that.
21    Q. And so you referenced our expert's name is Renee
22  McMahon.  And so where Ms. McMahon presented a table of
23  AMEC's historical net income dating back to fiscal year

Page 140

1  2017, it's your contention that that's just of no value
2  in valuing AMEC, that analysis?
3    A. Tell me again.
4    Q. Review of AMEC's actual net profits from 2017
5  forward, is it your contention that that review is of
6  no value in valuing AMEC?
7    A. If the industry can achieve a rate of return of
8  5.5 percent off of a dollar revenue, I think that's the
9  most valid point to look at.  Whether the target is
10  inefficient or more efficient doesn't change what the
11  industry says that revenue stream is worth.
12        So I'm trying to do a damage calculation
13  that's grounded in what the industry says.  I'm not
14  trying to calculate per se a strategic value and what
15  impact it had on the strategic value.  I have not done
16  that calculation.  And after this deposition, I'm going
17  to do that calculation because I don't know what will
18  happen because, again, I'm using the before and after
19  method.  And it's not always easy to predict what
20  that's going to do.  You know, because when you make
21  the change that Ms. McMahon is suggesting, you have to
22  change both numbers.  And then the difference is the
23  damage.  I don't know what will happen, but I will find

Page 141

1  out.
2    Q. Okay.  And so why ten year, by the way?
3    A. What's that?
4    Q. There is a three year, a five year and a ten
5  year.  Why did you select the ten year?
6    A. Because it was the longest period of time.
7    Q. Why do they bother giving a three and five year
8  here?  Who is that for?
9    A. You will have to ask IBISWorld.  Again,
10  valuation metrics are over long periods of time.  Every
11  component of every buildup method, of every cap in
12  method, is based on studies over long periods of time.
13  The longer the period of time, valuation science states
14  over and over again or demonstrates over and over again
15  that over longer periods of time is more reliable than
16  shorter periods of time.  And that's why.
17    Q. Is it generally the case that the longer the
18  horizon, the higher the projection, at least when it
19  comes to net income?
20    A. Is it generally the case?  No.  There is no way
21  to generalize in that way.
22    Q. I'm just wondering.  And so you say the exercise
23  of comparing this 5.5 rate to AMEC's historical net

36 (Pages 138 - 141)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 142

1    income rates is not useful?
2        A.  I didn't understand your question.
3        Q.  I think you used the word sensitivity earlier.
4    In deciding to use this 5.5 percent rate as part of
5    your conversion process, you don't find -- you didn't
6    find it useful to compare that rate to AMEC's actual
7    historical net income.  Is that fair?
8        A.  I don't believe it's appropriate if you are
9    trying to determine a market-based metric to use the
10   target's data to do that.  I believe that is patently
11   wrong.
12       Q.  Even as a sensitivity test?
13       A.  Yes.
14       Q.  Okay.
15       A.  Because the market is what we are trying to --
16   is the benchmark for the damage.  That's the market.
17   What is the effect on the fair value of this revenue
18   stream, that's where the damage comes from.  It's a
19   market-based damage.
20       Q.  Did you evaluate whether recruiting of new
21   clergy has been impacted by the alleged wrongful acts
22   at the connectional or district level?
23       A.  I gave consideration to it, but I don't -- I

Page 143

1    don't have any opinions about it.
2        Q.  Okay.  So I mentioned clergy in my last
3    question.  How about other employees?  Did you evaluate
4    AMEC's ability to attract employees at the connectional
5    level or district level following disclosure of the
6    alleged acts?
7        A.  Talking about the church support staff and --
8        Q.  Yeah.
9        A.  No, I did not.
10       Q.  Can we go back to your expert report, 777.  I
11   want to go to the last -- well, in the last sentence of
12   paragraph six, you say, "Moreover, the wrongful acts of
13   the plan asset custodian or plan administrator and the
14   harmful impact of such on the qualified AMEC's plan
15   beneficiaries harmed the ability of the AMEC to carry
16   out its mission, which has diminished the fair value of
17   the AMEC."  In what ways have the alleged wrongful acts
18   harmed the ability of the AMEC to carry out its
19   mission?
20       A.  I'm sorry.  I zoned out on you.  I apologize.
21       Q.  No problem.
22       A.  Where are we now?
23       Q.  So I'm in the last sentence of paragraph six in

Page 144

1    your report, first report, and you referred to harm to
2    the ability of the AMEC to carry out its mission.  And
3    my question is:  In what ways has the alleged wrongful
4    acts harmed the ability of the AMEC to carry out its
5    mission?
6        A.  That's another example of me reconciling my
7    damage methodology with the facts, but I don't intend
8    to offer that opinion.
9        Q.  Okay.  Fair enough.  Does the size of the loss
10   of the value of the plan, the retirement plan, play any
11   role in the size of the loss in the value of the AMEC
12   enterprise?
13       A.  Not directly.
14       Q.  Indirectly, so far as it impacts reputation?
15       A.  Correct.  I'm sorry, yes, correct.  I didn't
16   mean to interrupt you.  I apologize.
17       Q.  No worries.  But it doesn't matter whether that
18   loss was ten million or 100 million so long as there is
19   a significant enough impact on reputation to impact
20   value; is that right?
21       A.  Well, I mean, just as a financial person, I
22   think the amount of the loss can have an impact on the
23   magnitude of reputational damage.  But whether the

Page 145

1    number is ten million or 100 million, I don't have an
2    opinion about that.
3        Q.  I get that.  But whether it's ten million or 100
4    million doesn't affect the loss you calculated,
5    correct?
6        A.  Correct.  My loss is in addition to any loss
7    suffered by the plan.
8        Q.  What exhibit number is the IBIS thing again?
9        A.  781.
10       Q.  Let's go back to Exhibit 781.  And I'm going to
11   take you to page 20.  Actually, I think I have to take
12   you earlier.  One second.  Okay.  Page nine, please.
13   Under -- about halfway down, "Key takeaways:
14   Performance."  First bullet, "Declining religious
15   importance is affecting the industry drastically,
16   decreasing demand and revenue.  Adaptation to digital
17   platforms is now essential to sustain church
18   connectively and secure needed funding."  Forget the
19   second sentence.  I want to talk about the first.  Did
20   you take into consideration in your analysis this
21   decline in religious importance and decreasing demand
22   and revenue in your analysis?
23       A.  Yes.  That's what I referred to as the fragile

37 (Pages 142 - 145)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 146

1  state of the industry.
2      Q.  And -- well, did you make an adjustment, I
3  guess, to AMEC's FY 2020 -- well, let me step back.  If
4  AMEC is losing value as you have measured, one reason
5  it may be losing value is because all religious
6  institutions according to IBIS are suffering from this
7  dynamic in the marketplace of decreased demand for
8  religious institutions, right?
9      A.  The -- by keeping the revenue constant and only
10  adjusting for risk, that has calculated the component
11  of value loss due to the added risk.
12      Q.  Doesn't that depend on if and when this decrease
13  in revenue associated with reduced religiosity hits?
14      A.  I'm not sure I understand your question, but I
15  will answer what I think you are asking me --
16      Q.  Go ahead.
17      A.  -- this way.  I'm not assuming any decrease in
18  revenue.  That would be a separate calculation.  And if
19  I had made that calculation, I think your criticisms
20  are valid.  You know, how do you know that wasn't
21  revenue they were just going to lose anyway and
22  attribute it to reputation loss?  Here, I'm attributing
23  my damage to increased risk based on my authority and

Page 147

1  the portion of value that's associated with that
2  increased risk that goes along with reputational
3  problems that could manifest themselves in future
4  losses.
5      Q.  But isn't there -- isn't there also a risk
6  presented to potential investors of declining
7  participation in organized religion?  Isn't that also a
8  risk?
9      A.  It is a risk.
10      Q.  Right.
11      A.  It would manifest itself in a series of years of
12  decreasing revenue.
13      Q.  And -- well, okay.  Wouldn't you agree that if
14  I'm an investor and I believe IBIS, I have to price
15  this risk too, right, before I make an offer for a
16  religious institution?
17      A.  And it's hard to talk about it, and I understand
18  that.
19      Q.  Yeah.
20      A.  It's really the value of the church's ability to
21  conduct its mission and -- but what you would need to
22  look at is the difference in reputational risk and the
23  ability to remediate that risk versus the risk of

Page 148

1  membership loss, you know, due to dissatisfaction with
2  formalized religion and your ability to remediate that
3  risk.  So -- and evaluate which one is more
4  controllable than the other.
5          And based on my experience, the risk of
6  people being unhappy and leaving your church, which I
7  have been on the finance committee at my church for a
8  number of years.  And, you know, the general trends in
9  the population are all things -- well, first, the
10  specifics causing people to say, "I'm unhappy and I'm
11  going to leave" unrelated to reputation, okay?
12  Typically, my experience, being involved in the finance
13  committees of my churches, can be remedied, usually
14  requires personnel change.  And that can remediate
15  that.
16          The risk of declining membership is kind of
17  already baked into the valuation because that's nothing
18  new.  That's been going on for a while.  So it's baked
19  into the multiple already.  So it's in the 59 percent.
20      Q.  Well, doesn't your model assume the same level
21  of -- I'm going to use religiosity to capture this
22  dynamic.  The same level of religiosity in the before
23  period and the after period?

Page 149

1      A.  Yes.  And to be clear, the phenomena of
2  declining religious attendance has been in -- existed
3  for quite some time, for a long time, way before the
4  Schmick paper.  So this is not new, and like I said,
5  it's factored into the before number.
6      Q.  And using the Schmick paper, you would agree
7  that your model presupposes the same level of
8  religiosity to capture in this dynamic in 1999 and
9  today?
10      A.  Making it clear what you mean by religiosity,
11  which is a word -- I'm going to say it.  That the
12  general trends away from the church are at the same
13  level now as they were in 1999?  It does.
14      Q.  Okay.  And if you look at 13 under the executive
15  summary, the first sentence says "Peace out" for some
16  reason, but then it says, "Declining member numbers
17  have been hurting church donations and revenue," right?
18  So it's possible that a church that hasn't had any
19  financial problems at all could be losing value over
20  the course of -- I don't know how long.  The last ten
21  years, let's say?
22      A.  Well, the issue of declining membership dates
23  back to the '60's.  It's been going on ever since the

38 (Pages 146 - 149)

Julian Lester Alexander , III                                July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 150

1  social revolution began, the late, late '60's.  So it's
2  -- it's not a new phenomenon.  That's why I'm telling
3  you it's baked into the before numbers.  It's already
4  factored in.
5      Q.  They put it in their executive summary first in
6  bold, and it's the only bold sentence.  So they -- they
7  believe it's an important dynamic going on in the
8  marketplace?
9      A.  Oh, yeah.  Look, when you have a negative trend
10 that's been going on for that long, it's a serious
11 problem.  But it has been going on for quite some time.
12 I mean, church attendance in the '50's is quite
13 different than the church attendance in the '60's,
14 '70's, '80's, '90's through today.
15     Q.  And did you consider whether during the before
16 period, AMEC was -- its district churches were
17 suffering from dwindling attendance?
18     A.  I'm sorry?
19     Q.  So I want to stay out of the after period
20 because that's impacted by the conduct.  Did you look
21 at AMEC's trend in service attendance during the before
22 period?
23     A.  I considered it, but I didn't specifically study

Page 151

1  it.
2          MR. ABELES:  So I'm not quite done, but I
3  want to take a break so that I can just organize the
4  end here and just make sure I haven't missed anything.
5  So why don't we go off the record.  We will not come
6  back and say we are done, but I don't have that much
7  left.
8          THE VIDEOGRAPHER:  This is disc four.
9  Going off the record at 3:13.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  This begins disc five.
12 Going back on the record at 3:30.
13     (Exhibit 782 was marked for identification.)
14     Q.  (BY MR. ABELES)  Mr. Alexander, I placed before
15 you Exhibit 782, I believe, which is the supplemental
16 Rule 26 report that you provided to us.  It's dated May
17 23rd, 2025.  That's what this is, correct?
18     A.  That is correct.
19     Q.  Okay.  I want to take you to number nine, which
20 is on page two of your supplement here.  It states that
21 individual church real estate values are economically
22 dependent upon the levels of church -- you said
23 donotations.  I think you meant donations, right?  I

Page 152

1  looked up denotations.  You couldn't have possible
2  meant that.  Is that it?
3      A.  You are correct.  That's a typographical error.
4      Q.  That's your one correction.
5      A.  And I hadn't even noticed it until just now.
6      Q.  Yeah.  Anyway, okay.  So let me restate that.
7  So you say here, "Individual church real estate values
8  are economically dependent upon the levels of church
9  donations."  And I wanted to ask you:  There is a
10 church property for sale, and I like the property but I
11 want to put a bank on it.  I don't care about their
12 level of donations, right?
13     A.  Yeah.  The unstated premise is if the highest
14 and best use is a religious organization.  You are
15 correct, if it's not the highest and best use, it could
16 have another value.
17     Q.  But in terms of religious organization, if I am
18 a different denomination than the one that is -- let's
19 use -- let's make it a real example.  I'm a person who
20 wants to establish a Catholic church, and on this
21 property is a Protestant church.  I don't really care
22 what their level of donations are, right, because I'm
23 going to have a different group of parishioners,

Page 153

1  correct?
2      A.  That's correct, but you care about the size of
3  the church.  Because if it can only hold 100 people,
4  that's a constraint because the church attendance
5  drives donations.  Not everybody who donates attends
6  church regularly or attends it at all in some cases,
7  but there is a direct correlation between the number of
8  people who attend.  So if you intentionally restrict
9  the size, it's not going to be worth as much.
10         Also based on my experience again with
11 church finance committees, as you evaluate building a
12 new sanctuary versus acquiring another sanctuary, you
13 always evaluate the revenue that you are going to
14 receive from the bigger sanctuary.
15         And then the third thing that supports this
16 statement is churches regularly issue bonds, and the
17 investment marketplace regularly buys church bonds.
18 And the only way those bonds are paid is by donations
19 and the offering memorandums typically have projections
20 of the increases in donations that they expect to get
21 because they are going to build a bigger church.  So
22 all that points to the fact that church values are
23 economically dependent on the levels of church

39 (Pages 150 - 153)

Julian Lester Alexander , III                          July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 154

1  donations, which is also tied to the size of the church
2  structure.
3      Q.  So long as the highest and best use is for a
4  religious organization?
5      A.  True.  And I didn't feel it was necessary to
6  state that because I'm not renewing an opinion about an
7  individual little C church.  I'm rendering an opinion
8  about the denomination of the big C church.
9      Q.  But I think this one -- this one -- this one is
10 referencing a little -- a church on a property, right?
11     A.  Which is where the donations that ultimately
12 flow up to the big C come from.
13     Q.  Okay.  I'm not sure about -- and maybe you
14 answered it.  I'm not sure about the answer to my
15 Catholic/Protestant question.  I understand the size of
16 the building matters.  But the value I, the Catholic
17 person, place on this property is not dependent on the
18 levels of that church's historical donations, right?
19 Because I have a different group of folks who are going
20 to come visit me.
21     A.  I don't say historical, and let me explain my
22 answer.  If you are on the committee evaluating whether
23 to acquire a church or build a new church, you are

Page 155

1  doing that because your church is full.
2      Q.  Uh-huh (yes).
3      A.  So you have got the members.  You just don't
4  have the structure that you need.  So that's what I
5  mean, the value is still dependent on donations.  I
6  just can't receive any more donations, and I have
7  members who want to come but they can't find room and
8  they are complaining and I'm afraid I'm going to lose
9  members.  So we either have to build a new sanctuary
10 that's bigger, or in my experience contemporary church
11 is going gangbusters but it's in too small of a
12 gymnasium.  So we need to build this massive
13 contemporary worship center and, oh, by the way, the
14 traditional service is having great difficulties, you
15 know.  But the contemporary is going gangbusters so we
16 need to build a contemporary center because otherwise
17 people are leaving and going to another church.  So you
18 are correct.  If you are a Catholic church, it would be
19 your membership, but it's because you have outgrown
20 your church and you need a bigger church.
21     Q.  That's what I'm really interested in.
22     A.  That's why I used buyers and not sellers to
23 determine my multiple because the buyers drive the

Page 156

1  market.  The buyers need a new church.
2      Q.  Right.
3      A.  And typically they need a bigger church to
4  support higher levels of donations.  So there is a
5  direct correlation.
6      Q.  I wanted to ask you about your footnote six,
7  okay?
8      A.  Let me find it.
9      Q.  Your footnote six says, "The market yield on U.
10 S. treasury securities at 30-year constant maturity
11 from 2020 to 2025 is comparable to or lower than the
12 market yield on U. S. treasury securities at 30-year
13 constant maturity from 1995 through 1998."  So I
14 printed that.  I think I got it right, that chart that
15 you sort of spelled out.  And I'm going to mark this as
16 783.
17         (Exhibit 783 was marked for identification.)
18     Q.  (BY MR. ABELES)  So, first, at the top, so this
19 is Fred.  This is the same website you pointed me to,
20 and you get the 30-year constant.
21         MR. BYRD:  Sorry, guys, Mr. Byrd.  Is this
22 something that you put this on exhibit share?  Do we
23 have this?

Page 157

1          MR. ABELES:  I emailed this and a bunch
2  of --
3          MR. BYRD:  Is this one of the emails?
4  Okay.  As long as it's on there.  Thank you.  If not, I
5  wanted to make sure.
6          MR. ABELES:  I think it's called Fred is
7  the name of the title, I believe.
8      Q.  So it's just a chart.  And so I set this up
9  correctly, right, to capture what you were saying,
10 Mr. Alexander, 30-year constant maturity?
11     A.  I'm assuming you start with the 1990 --
12     Q.  Five?
13     A.  '95 because I reference '95 to '98, but that's
14 not showing it on there.
15     Q.  Oh, yes.  So I will represent to you that, yes,
16 the numbers I did was 1995 through 2025.  Those are my
17 parameters.
18     A.  Okay.
19     Q.  So I guess I didn't understand your point, that
20 it's comparable to or lower than the market yield.  Can
21 you explain that with reference to this chart?
22     A.  Today, I really don't recall the criticism I was
23 responding to, and so I -- unfortunately I cannot

40 (Pages 154 - 157)

Julian Lester Alexander , III                                 July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 158

1  explain that any more than what the report says.
2    Q.  Okay.  What if we looked back up at No. 13 here,
3  which this is a footnote.
4    A.  I'm looking at 13 when I say that.
5    Q.  Okay.  Got it.  Okay.  But I think they are
6  pretty darn different, right, from 1995 through 2020
7  through 2025?
8    A.  I think it's factually accurate.  What I'm
9  saying, it's either comparable or lower, okay?  But the
10  context of why I said that and what I was responding
11  to, I don't recall.
12    Q.  I think it was about prevailing market
13  conditions, going back to the '90's when the gentleman
14  who wrote those papers wrote those papers.  But anyway,
15  it doesn't matter.  Okay.  Let's mark the next exhibit
16  as 784, and this is going to be a press release dated
17  May 25th, 2022, from the AMEC church.
18    (Exhibit 784 was marked for identification.)
19    Q.  (BY MR. ABELES)  I will ask you to look that
20  over, Mr. Alexander, and let me know when you are
21  satisfied.
22    A.  I believe I have seen this before.  Do you want
23  me to read it?

Page 159

1    Q.  No.  Let me know if you need to.  I don't think
2  you are going to need to look at it.
3    A.  I will, if you ask me a question, I will tell
4  you.
5    Q.  So that was going to be my first question:  Have
6  you read this before, and your answer is yes?
7    A.  I'm pretty sure I have seen this before.
8    Q.  Now as far as I know, this is when AMEC
9  announced to the public that these problems had
10  happened.  Do you know any differently?
11    A.  I don't have a recollection.
12    MR. BYRD:  Sorry, object to the form and
13  the characterization of that.  Go ahead.
14    A.  I don't have the timeline of events in my mind.
15    Q.  (BY MR. ABELES)  Fair enough.
16    A.  So I'm unable to answer that question.
17    Q.  The tenor of this press release is that AMEC was
18  a victim of the problems regarding its plan.  Do you
19  agree with that?
20    MR. McMULLEN:  I'm going to object to the
21  form.  It says what it says.
22    A.  Yeah.  I mean, I don't have an opinion as to the
23  characterization of this document other than it reports

Page 160

1  some previous distressful things and uses some pretty
2  inflammatory words like "embezzlement."
3    Q.  (BY MR. ABELES)  Yeah.  It isn't as though AMEC
4  says we did something wrong and here is what we are
5  going to do about it, right?
6    MR. McMULLEN:  Object to the form of the
7  question.
8    A.  I don't have an opinion about that.  That's a
9  characterization.
10    Q.  (BY MR. ABELES)  Okay.  But this is the
11  mechanism, right, this kind of thing, announcements to
12  the public, that would cause a diminution in value,
13  correct?
14    A.  This clearly is the type of information that
15  harms a reputation.  Yes.
16    Q.  Even if the release is sympathetic towards the
17  organization?
18    A.  I'm not sure I know what you mean by
19  sympathetic.
20    Q.  Can there be reputation -- so I guess my
21  question is:  Doesn't the mechanism of harm here
22  require AMEC's parishioners to blame the victim, at
23  least as they are portraying themselves?

Page 161

1    MR. McMULLEN:  I'm going to object to the
2  form of the question.
3    A.  I can only speak from my experience of dealing
4  as both an auditor and a due diligence performer and
5  later in my career an expert witness.  Bad news is
6  never good news, and it doesn't really matter, you
7  know, who is pointing fingers at who.  It has a
8  negative impact on the value.  If bed news happens at a
9  publicly traded company, the stock goes down, okay?  It
10  doesn't matter whose fault it is.  It's the auditor's
11  fault.  It's the CEO's fault, and they fire the CEO.
12  It's the Board's fault.  They terminated the Board.  It
13  doesn't matter.  The stock goes down.  So that's been
14  my experience, and this is of the type and character of
15  information that I, as a CPA, call bad news.
16    Q.  (BY MR. ABELES)  Yeah.  But bad news can lead
17  to increased financial support, right?  Like if a
18  friend has cancer and needs money, that's bad news that
19  can lead to increased financial support from that
20  person's family and friends, right?
21    A.  I'm not sure it's fair to use the cancer
22  analogy.  But if the church has cancer, if there is a
23  cancer in the church, that is sure to affect the

41 (Pages 158 - 161)

Julian Lester Alexander , III                July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 162

1  reputation and the value of the church.
2     Q.  Isn't it just as --
3     A.  Because it's tough to cure cancer.
4     Q.  Isn't it just as likely that the church would be
5  able to increase its donations because as it claims
6  it's been victimized?
7     A.  I don't see any evidence.  I mean, I'm
8  testifying as an expert, and you are asking me to
9  assume that the presence of bad news will have the
10  cause and effect, the causal relationship to create
11  good things.
12     Q.  I'm saying we don't know.  We don't know.
13     A.  And I'm saying that in and of itself has an
14  impact on the value because we do not know.  It's bad
15  news, and we do not know what impact it's going to
16  have.  That can be quantified.  There are generally
17  accepted methodologies for doing it, and that is what I
18  have done.
19     Q.  I think one of our themes has been that the
20  church is not a business.  It's different, right?
21        MR. McMULLEN:  Object to the form.
22     A.  I'm sorry.  You will have to ask that question
23  again.

Page 163

1     Q.  (BY MR. ABELES)  Well --
2     A.  I didn't know what you were asking me.
3     Q.  No, I understand.  I get that.  Let me try and
4  do better.  The type of financial support that a church
5  receives is not the same as the type of financial
6  support a public company receives in issuing stock,
7  right?
8     A.  Yeah.  I really can't agree with you there.  A
9  bond is a security, and they are sold in the
10  marketplace.  And churches issue bonds all time, and
11  investors buy those bonds.  Pension funds buy those
12  bonds, expecting to be repaid and expecting to earn a
13  return on their investment.  Technically, you could say
14  a church is not a business, but they operate to
15  generate income to cover their expenses.  And they
16  typically produce a profit.
17     Q.  But the church's members are not expecting a
18  financial return from their donations, a direct one,
19  correct?
20     A.  They are expecting a return in the form of the
21  church performing its mission.  That's the return on
22  their contributions and donations, which is the revenue
23  source, okay?  The revenue source, one, churches are

Page 164

1  not capitalized by per se people giving money in the
2  form of legal instrument that allows them to return
3  that money; such as, a stock certificate.  That's now
4  how they are capitalized.  They are capitalized through
5  donations and earnings on endowments and those type of
6  things so that the church can perform its mission.  But
7  it still fundamentally operates on a we have to make
8  money in order to conduct and cover the expenses of our
9  mission, to pay debt to the extent there was debt
10  issued, and if the debt was sold as a form of bond,
11  provide a return on the investment to an investor who
12  is in the marketplace and who is comparing that
13  investment to stocks and bonds of publicly traded
14  companies.
15     Q.  Does AMEC issue bonds?
16     A.  No.
17     Q.  Do you know whether -- so you have not concluded
18  that their ability to issue bonds has been impacted by
19  the acts at issue in this case, right?
20     A.  I haven't been asked to look at that.
21     Q.  Okay.  And you have not quantified the loss of
22  support from membership, if any, caused by the acts at
23  issue in this case, correct?

Page 165

1     A.  I'm only quantifying the impact of reputational
2  harm, which is about uncertainties regarding the
3  future, not about actual current losses that have been
4  sustained.
5        MR. ABELES:  I will pass the witness.
6        MR. McMULLEN:  Anybody else on the phone
7  has any questions for this witness?
8        MR. BLOCHO:  Hi.  This is Larry Blocho.  I
9  don't have any questions, but I just need to make a
10  quick record, if that's okay.
11        MR. ABELES:  Go ahead.
12        MR. McMULLEN:  You are from Newport, right?
13        MR. BLOCHO:  Correct.
14        MR. McMULLEN:  Go ahead.
15        MR. BLOCHO:  I just want to make this
16  record, but just for the record, Newport has agreed
17  with plaintiffs and church but because the litigation
18  is stayed as between us, Newport is precluded from
19  questioning the witness.  But if final approval of the
20  settlement is denied and the stay is lifted, Newport
21  reserves the right to call the witness back to question
22  any and all things.
23        MR. McMULLEN:  That's the agreement.

42 (Pages 162 - 165)

Julian Lester Alexander , III                          July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 166

1  That's my understanding.  Thank you.
2        MR. ABELES:  Anyone else?
3        MR. McCULLOUGH:  Scott McCullough.  No
4  questions for Day and Knight.
5        MR. McMULLEN:  Mr. Byrd?
6        MR. BYRD:  On behalf of the plaintiffs, we
7  have no further questions.
8        MR. McMULLEN:  Okay.  And I think that was
9  it, everything, because Mr. Blue is there on behalf of
10 the plaintiffs, right?  Yeah.  Okay.  I don't have any
11 questions.
12       THE VIDEOGRAPHER:  This concludes the
13 deposition.  Going off the record at 3:54.
14
15       (Deposition concluded at 3:54 p.m.)
16
17
18
19
20
21
22
23

Page 167

1        C E R T I F I C A T E
2
3  STATE OF ALABAMA)
4  JEFFERSON COUNTY)
5
6       I hereby certify that the above and foregoing
7  proceeding was taken down by me by stenographic means,
8  and that the questions and answers therein were
9  produced in transcript form by computer aid under my
10 supervision, and that the foregoing represents, to the
11 best of my ability, a true and correct transcript of
12 the proceedings occurring on said date at said time.
13      I further certify that I am neither of counsel
14 nor of kin to the parties to the action; nor am I in
15 anywise interested in the result of said case.
16      Signed the 15th day of July, 2025.
17
18
19           Anne E. Miller
20           ACCR #486
21           Expires 9/30/25
22      My commission expires 11/19/27
23

Page 168

1  <Contact Name of Person Handling Read & Sign>
2  1901 6th Avenue North, Suite 1620, Birmingham, AL, 35203
3           July 17, 2025
4  RE: AME Church Employee Retirement Fund Litigation - Complex v.
5  7/7/2025, Julian Lester Alexander , III (#7403849)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-carolinas@veritext.com.
16 Return completed errata within 30 days from
17 receipt of testimony.
18    If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions

Page 169

1  AME Church Employee Retirement Fund Litigation - Complex v.
2  Julian Lester Alexander , III (#7403849)
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22 _____  _____
   Julian Lester Alexander , III          Date
23

43 (Pages 166 - 169)

Julian Lester Alexander , III                    July 7, 2025
AME Church Employee Retirement Fund Litigation

Page 170

1   AME Church Employee Retirement Fund Litigation - Complex v.

2   Julian Lester Alexander , III (#7403849)

3        ACKNOWLEDGEMENT OF DEPONENT

4     I, Julian Lester Alexander , III, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11   _____   _____

12   Julian Lester Alexander , III           Date

13   *If notary is required

14        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15        _____ DAY OF _____, 20___.

16

17

18        _____

19        NOTARY PUBLIC

20

21

22

23

44 (Page 170)